# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Exide Technologies, *et al.* | ) | Bankr. Case No. 02-11125 (KJC) |
| | ) | |
| EnerSys Delaware, Inc., | ) | |
|             Appellant, | ) | Civil Action No. 06-302 (SLR) |
| | ) | |
|     v. | ) | |
| | ) | |
| Exide Technologies, | ) | **Related to Docket No. 12** |
|             Appellee. | ) | |
| | ) | |

## OPENING BRIEF OF APPELLANT
### ENERSYS DELAWARE, INC. f/k/a ENERSYS, INC.

STEVENS & LEE, P.C.
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Telephone: (302) 425-3304
Facsimile: (302) 654-5181
E-Mail: tgw@stevenslee.com

STEVENS & LEE, P.C.
Robert Lapowsky, Esquire
Neil C. Schur, Esquire
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 575-0100
Telecopier: (215) 851-0214
E-mail: rl@stevenslee.com
       ncsc@stevenslee.com

Dated: September 5, 2006

*ATTORNEYS FOR ENERSYS DELAWARE,*
*INC. f/k/a ENERSYS, INC.*

## TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION ..................................................1

II.   STATEMENT OF ISSUES PRESENTED AND APPLICABLE STANDARD OF
      APPELLATE REVIEW ...............................................................................................................1

      A.   Statement of Issues Presented. ........................................................................................1

      B.   Applicable Standard of Appellate Review. ......................................................................3

III.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ......................................4

IV.   SUMMARY OF ARGUMENT .....................................................................................................5

V.    FACTS .......................................................................................................................................8

VI.   ARGUMENT AND AUTHORITIES ............................................................................................10

      A.   The Bankruptcy Court Erred in Holding That Rejection Terminates EnerSys' Rights
           Under the Agreement ....................................................................................................10

      B.   The Bankruptcy Court Erred in Concluding That the Agreements Are Executory .....................22

           1.   The Agreements Are Not Executory Because Substantial Performance Has
                Occurred .............................................................................................................22

           2.   Even if the Agreements Have Not Been Substantially Performed, the Agreements
                Are Not Executory Because the Exclusive Remedies Provisions Preclude the
                Possibility That Any Remaining Obligations Are Material. ..................................26

           3.   Even if the Agreement Has Not Been Substantially Performed and the Exclusive
                Remedy Provisions Do Not Preclude the Existence of Any Remaining Material
                Obligations By Either Party, None of the Remaining "Obligations" Identified By
                the Bankruptcy Court Is Material ..........................................................................33

      D.   Even if the Agreement Would Otherwise Be Executory, Rejection Must Be Denied
           Because Exide Failed to Seek Rejection of All of the Contracts Which Were Integrated
           Into the Agreement. .......................................................................................................42

      E.   Even if the Agreement Would Otherwise Be Executory, Rejection Must Be Denied
           Because Exide Sold Its Rights to Use the "Exide" Mark On Industrial Batteries to
           EnerSys ..........................................................................................................................45

      F.   The Bankruptcy Court Erred When It Concluded That Debtors Satisfied The Business
           Judgment Test ...............................................................................................................48

      G.   If the Rejection Order is Reversed, the Transition Plan Order Must Also Be Reversed. ............58

VII.  CONCLUSION .........................................................................................................................59

(i)

## TABLE OF AUTHORITIES

CASES

*A. Bourjois Co. v. Katzel,*
    260 U.S. 689 (1923) ........................................................................................................ 46

*American File Co. v. Garrett,*
    110 U.S. 288 (1884) ....................................................................................................... 11

*American Flint Glass Workers Union v. Anchor Resolution,*
    197 F.3d 76 (3d Cir. 1999) ......................................................................................... 3, 49

*In re Annabel,*
    263 B.R. 19 (Bankr. N.D.N.Y. 2001) ............................................................................. 14

*In re Austin Dev. Co.,*
    19 F.3d 1077 (5th Cir. 1994) .......................................................................................... 14

*Beissel v. Pittsburgh & Lake Erie R.R. Co.,*
    801 F. 2d 143 (3d Cir. 1986) .......................................................................................... 30

*In re Bergt,*
    241 B.R. 17 (Bankr. D. Alaska 1999) ............................................................................. 14

*Butner v. United States,*
    440 U.S. 48 (1979) ......................................................................................................... 12

*Canada Dry Corp. v. Nehi Beverage Co.,*
    723 F. 2d 512 (7th Cir. 1983) ......................................................................................... 33

*Central Trust Co. v. Chicago Auditorium Ass'n.,*
    240 U.S. 581 (1916) ................................................................................................... 11-12

*In re Centura Software Corp.,*
    281 B.R. 660 (Bankr. N.D. Cal. 2002) .......................................................................15-17

*In re Chateaugay Corp.,*
    102 B.R. 335 (Bankr. S.D.N.Y. 1989) ............................................................................ 36

*In re Chestnut Ridge Plaza Assocs.,* 156 B.R. 477, 480 (Bankr. W.D. Pa. 1993) ..................... 55

*In re Columbia Gas Sys., Inc.,*
    50 F. 3d 233 (3d Cir. 1995) ..................................................14, 17, 22-23, 27, 36-37, 38

*Conde Nast Publications, Inc. v. United States,*
    575 F.2d 400 (2d Cir. 1978) .......................................................................................46-48

*Connecticut National Bank v. Germain,*
    503 U.S. 249 (1992) ....................................................................................................... 18

SL1 660512v2/008444.00325

*Copeland v. Stephans,*
   106 Eng. Rep. 218 (K.B. 1818) ............................................................................ 11

*In re Drexel Burnham Lambert Group, Inc.,*
   138 B.R. 687 (Bankr. S.D.N.Y. 1992) ................................................................ 14

*Ebenhoech v. Koppers Indus.,*
   239 F. Supp. 2d 455 (D.N.J. 2002) ..................................................................... 50

*F & K Supply Inc. v. Willowbrook Dev. Co.,*
   288 A.D.2d 713 (App. Div. 3d Dep't 2001) ...................................................... 43

*Green v. O'Neill,*
   308 B.R. 677 (D. Del. 2004) ................................................................................ 3

*In re Gucci,*
   126 F.3d 380 (2d Cir. 1997) ............................................................................... 14

*Hadden v. Consolidated Edison Co.,*
   34 N.Y. 2d 88, 312 N.E. 2d 445 (1974) ........................................................ 23-26

*In re Hale Desk Co.,*
   97 F.2d 372 (2d Cir. 1938) ............................................................................ 26, 27

*In re Hamilton Roe Int'l, Inc.*
   162 B.R. 590 (Bankr. M.D. Fla. 1993) ............................................................... 22

*Heller v. Pope,*
   250 N.Y. 132, 164 N.E. 881 (N.Y. 1928) ......................................................... 46

*In re HQ Global Holdings, Inc.,*
   290 B.R. 507 (Bankr. D. Del. 203) ............................................................... 15, 17

*In re Integrated Health Services, Inc.,*
   2000 Bankr. LEXIS 1310 (Bankr. D. Del. 2000) ............................................... 43

*Kenyon v. Automatic Instrument Co.,*
   160 F.2d 878 (6th Cir. 1947) .............................................................................. 48

*In re Kilpatrick,*
   160 B.R. 560 (Bankr. E.D. Mich. 1993) ........................................................ 14, 15

*Kronner v. United States,*
   110 F. Supp. 730 (Ct. Cl. 1953) .................................................................... 39, 48

*In re Lan Associates XI, L.P.,*
   192 F. 3d 109 (3d Cir. 1999) .............................................................................. 58

*In re Lavigne,*
   114 F. 3d 379 (2d Cir. 1997) ......................................................................... 14, 33

*In re Lionel Corporation,* 722 F.2d 1063, 1071 (2d Cir. 1983) ............................ 57

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*,
   756 F.2d 1043 (4th Cir. 1985) ........................................................................ 16-17

*In re Mitchell*,
   249 B.R. 55 (Bankr. S.D.N.Y. 2000) .................................................................. 14

*In re Orion Pictures Corp.*,
   4 F.3d 1095 (2d Cir. 1993), *cert. denied*, 511 U.S. 1026 (1994)...................... 57

*Palazzetti Import/Export, Inc. v. Morson*,
   2001 U.S. Dist. LEXIS 20243 (S.D.N.Y. 2001)................................................ 26

*Palmer v. Hoffman*,
   318 U.S. 109 (1943), *reh'g denied*, 318 U.S. 800 (1943) ................................ 50

*In re Phillips Services, Inc.*,
   284 B.R. 541 (Bankr. D. Del. 2002) .............................................................. 36, 42

*Powhatan Mining Co. v. Ickes*, 118 F.2d 105, 107-109 (6th Cir. 1941)...................... 55

*Prima Tek II, L.L.C. v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) ........................................................................ 47

*Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*,
   872 F. 2d 36 (3d Cir. 1989)......................................................................... 23, 49

*Sir Speedy, Inc. v. Morse*,
   256 B.R. 657 (D. Mass. 2000) .......................................................................... 14

*In re South Motor Company of Dade County*,
   161 B.R. 532 (Bankr. S.D. Fla. 1993)............................................................... 14

*Staples, Inc. v. Montgomery Ward, LLC*,
   307 B.R. 782 (D. Del. 2004) ......................................................................... 3, 48

*In re Streets & Beard Farm Partnership*,
   822 F. 2d 233 (7th Cir. 1989).......................................................................... 23

*In re Sudburry, Inc.*,
   153, B.R. 776 (Bankr. N.D. Ohio 1993)........................................................ 36, 37

*In re Teleglobe Communications Corp.*,
   304 B.R. 79 (D. Del. 2004) ...................................................................... 13-14, 19

*In re THC Financial Corp.*,
   686 F.2d 799 (9th Cir 1982)........................................................................... 36

*Thompson v. Fairbanks*,
   196 U.S. 516 (1905) ........................................................................................ 12

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
   103 F. Supp. 2d 711 (S.D.N.Y. 2000), *aff'd*, 294 F.3d 383 (2d Cir. 2002)........... 33

*United States v. Casoni,*
  950 F.2d 893 (3d Cir. 1991) ................................................................................. 50

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,*
  944 F.2d 870 (Fed. Cir 1991), *reh'g denied,* 1991 U.S. App. LEXIS 28620 (Fed. Cir.
  Dec. 3, 1991) ....................................................................................................... 46

*In re Vencor,* 2003 Bankr. LEXIS 659 (Bankr. D. Del. 2003) ................................. 49

*Waldorf v. Shuta,*
  142 F.3d 601 (3d Cir. 1998) ................................................................................... 1

*In re Walnut Associates,*
  145 B.R. 489 (Bankr. E.D. Pa. 1992) .................................................................... 14

*Waterman v. Mackenzie,* 138 U.S. 252, 256 (1891) ............................................... 46

*In re Weinstock,*
  1999 U.S. Dist. LEXIS 18480 (E.D. Pa. 1999) ..................................................... 14

*William C. Atwater & Co., Inc. v. Panama R.R. Co.,*
  246 N.Y. 519, 159 N.E. 418 (N.Y. 1927) ............................................................. 46

## STATUTES, RULES & REGULATIONS

11 U.S.C. § 365 ..................................................................................................... 11

11 U.S.C. § 365(g) ................................................................................................ 12

11 U.S.C. § 365(g)(1) ............................................................................................ 13

11 U.S.C. §365(h) .................................................................................................. 19

11 U.S.C. §365(n) ...................................................................................... 15-16, 18-21

11 U.S.C. § 365(n)(1)(A) ................................................................................... 18-19

11 U.S.C. § 541 ..................................................................................................... 12

11 U.S.C. § 544, 545, 547, 548 and 549 ................................................................. 12

11 U.S.C. § 546(a)(1) ............................................................................................ 13

28 U.S.C. § 158(a)(1) .............................................................................................. 1

Fed. R. Bankr. P. 8013 ............................................................................................ 3

Fed. R. Evid. 401 ................................................................................................... 51

Fed. R. Evid. 402 ................................................................................................... 51

Fed. R. Evid. 701 ................................................................................................... 52

Fed. R. Evid. 801(c) ............................................................................................................... 49

Fed. R. Evid. 802 .................................................................................................................. 49

Fed. R. Evid. 803(6) .......................................................................................................... 49, 52

**OTHER AUTHORITIES**

17A Am Jur 2d Contracts § 748 (2004) ................................................................................. 26

2 McCarthy on Trademarks § 18.5 ....................................................................................... 46

22 NY Jur. 2nd CONTRACTS § 269 (2002) ........................................................................... 44

22 NY Jur. CONTRACTS § 370 (2002) .................................................................................. 40

Alfred Q. Ricotta, *Comment: Community Associations and Bankruptcy: Why Post Petition Assessments Should Not Be Dischargeable*, 15 Bank. Dev. J. 187, 208 (1999) ..................... 15

Collier on Bankruptcy, *Effect of Rejection of an Executory Contract or Unexpired Lease,* ¶ 365.09[3] (15th Ed. Rev 1999) .......................................................................................... 15

H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977) ............................................................. 23

Hon. Ronald Barliant, *Effect of Rejection on Rights Other than Rights to Payment*, The Bankruptcy Strategist Volume XX, Number 1 (November 2002) ........................................ 15

Hon. William L. Stocks, *Representing Employees and Employers in Bankruptcy,* Southeastern Bankruptcy Workshop (August 2002) ............................................................ 15

Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227 (1989) [Westbrook] ................................................................................................ 10, 11

Jay Lawrence Westbrook, *The Commission's Recommendations Concerning the Treatment of Bankruptcy Contracts*, 5 Am. Bankr. Inst. L. Rev. 463, 471 (1997) .............................. 15

Michael T. Andrew, *Executory Contract in Bankruptcy: Understanding Rejection*, 59 U. Colo. L. Rev. 845, 929 (1988) .......................................................................................... 10, 21

Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. Colo. L. Rev. 1 (1991) [Andrew II] ................................................................................. 11

Restatement of Law, 2d, *Contracts* § 230 ............................................................................ 38

Restatement Second, *Contracts,* § 241 ................................................................................ 33

Restatement Second, *Contracts,* § 241(c) (1981) ................................................................. 33

Richard Lieb, *The Interrelationship Of Trademark Law And Bankruptcy Law*, 64 Am. Bankr. L.J. 1, 36-37 (1989) .................................................................................................. 15

## INTRODUCTION

Appellant EnerSys Delaware, Inc. f/k/a EnerSys, Inc. ("**EnerSys**") respectfully submits this brief in support of its appeal from the final orders of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), entered on April 3, 2006 and July 3, 2006, respectively.

## I.    STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

On April 3, 2006, the Bankruptcy Court entered the *Order Granting Debtors' Motion to Reject* (the "**Rejection Order**") (EnerSys' Designated Appeal Record ("**ENAR**") 342) and the corresponding supporting opinion (the "**Opinion**") (ENAR 341) authorizing the Appellee, Exide Technologies (the "**Appellee**" or "**Exide**"), to, *inter alia*, reject an Asset Purchase Agreement dated June 10, 1991, a Trademark and Tradename License Agreement dated June 10, 1991, an Administrative Services Agreement dated June 10, 1991 and a letter agreement dated December 27, 1994 (collectively, the "**Agreements**") between it and EnerSys.  On July 3, 2006, the Bankruptcy Court entered the *Order Approving Transition Plan and Denying Stay Motion without Prejudice* (the "**Transition Plan Order**") (collectively, the Rejection Order and Transition Plan Order shall be referred to as the "**Bankruptcy Court Orders**").  (EnerSys' Supplemental Designated Appeal Record ("**ENSAR**") 7).  The Bankruptcy Court Orders are final orders, and this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).  *See Waldorf v. Shuta*, 142 F.3d 601, 613 (3d Cir. 1998).

## II.    STATEMENT OF ISSUES PRESENTED AND APPLICABLE STANDARD OF APPELLATE REVIEW

### A.    Statement of Issues Presented.

1. Did the Bankruptcy Court err in concluding that rejection of the Agreements effects a termination of the Agreements, including the Trademark Agreement, and divests EnerSys of any rights under the Agreements, including the Trademark Agreement?

Suggested Answer: Yes.

2. Did the Bankruptcy Court err in concluding that the Agreements have not been substantially performed by either EnerSys or Exide and remain executory notwithstanding evidence that, pursuant to the Agreements, in 1991, Exide transferred an entire industrial battery business and EnerSys paid Exide over $130.0 million, representing the full consideration for the business?

Suggested Answer: Yes.

3. Did the Bankruptcy Court err in concluding that the exclusive remedy provisions of Section 13.6 of the Asset Purchase Agreement and Section 8 of the Trademark Agreement do not preclude both EnerSys and Exide from terminating all of their remaining performance under the Agreements in the event of breach by the other and, so, do not preclude a finding that the Agreements are executory?

Suggested Answer: Yes.

4. Did the Bankruptcy Court err in concluding that both EnerSys and Exide have remaining material obligations under the Agreements notwithstanding that none of the remaining obligations can fairly be said to go to the root or essence of the Agreements and notwithstanding that neither Exide nor EnerSys would be deprived of the substantial benefit of its bargain if the other failed to perform any of its remaining obligations?

Suggested Answer: Yes.

5. Did the Bankruptcy Court err in concluding that Exide's failure to seek rejection of all of the agreements executed in 1991 did not preclude rejection of the Agreements?

Suggested Answer: Yes.

6. Did the Bankruptcy Court err in concluding that the Agreements, including the Trademark Agreement, did not evidence a closed sale of the right to use the "Exide" trademark in the industrial battery business?

Suggested Answer: Yes.

2

7. Did the Bankruptcy Court err in concluding that Exide's decision to reject the Agreement satisfied the business judgment test applicable to a bankrupt estate given that it was based upon inadmissible and incomprehensible sales forecasts and speculative and unsupported trial testimony of certain Exide employees and lacked any analysis of the amount of the likely rejection damage claim?

Suggested Answer: Yes.

8. Assuming the Rejection Order is reversed, must the Transition Plan Order also be reversed?

Suggested Answer: Yes.

**B. Applicable Standard of Appellate Review.**

On appeal, the district court may affirm, modify or reverse a bankruptcy judge's judgment, order or decree, or remand the case for further proceedings. *See* Federal Rule of Bankruptcy Procedure 8013. In cases originating in the bankruptcy court, the role of the district court on appeal is to determine whether findings of fact were "clearly erroneous," and to review questions of law *de novo. Staples, Inc. v. Montgomery Ward, LLC*, 307 B.R. 782, 784-85 (D. Del. 2004).[1] "When reviewing mixed questions of law and fact, the court must accept the bankruptcy court's finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Id.* at 785 (*citing American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999)).

---

[1]    The District Court also refers to the standard of review for conclusions of law as "plenary," but it is *de novo* as applied. *See, e.g., Green v. O'Neill*, 308 B.R. 677, 679 (D. Del. 2004) (referring to the standard of review as plenary); *American Flint Glass Workers Union v. Anchor Resolution*, 197 F.3d 76, 80 (3d Cir. 1999) (referring to the standard of review as plenary, but applying a *de novo* review to an appeal of summary judgment because it is purely a legal question).

3

III.    **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

Exide and its debtor affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court on April 15, 2002 (the "**Petition Date**").

On March 14, 2003, Exide filed several Notices of Rejection (the "**Notices to Reject**") seeking to reject the Agreements. (ENAR 1-6). On April 14, 2003, EnerSys timely filed its objection to the Notices to Reject. (ENAR 12).

The Bankruptcy Court held a seven-day trial beginning on March 3, 2004 and concluding on March 31, 2004.

On April 3, 2006, the Bankruptcy Court entered the Rejection Order authorizing Exide to reject the Agreements and implementing a two-year period for the parties to transition use of the "Exide" trademark back to Exide. (ENAR 342). On April 3, 2006, the Bankruptcy Court also issued its Opinion in support of the Rejection Order. (ENAR 341).

On April 11, 2006, EnerSys timely filed its Notice of Appeal from the Rejection Order. (District Court Docket No. 1). On April 11, 2006, EnerSys also filed its *Emergency Motion of EnerSys Delaware, Inc. f/k/a EnerSys, Inc. for Stay Pending Appeal of the Order Granting Debtors' Motion to Reject* (the "**Stay Motion**") and its *Motion of EnerSys Delaware, Inc. f/k/a EnerSys, Inc. for an Order Expediting Time for the Hearing to Consider Its Motion for a Stay Pending Appeal of the Order Granting Debtors' Motion to Reject*. (ENAR 344-345). On April 20, 2006, Exide timely filed its objection to the Stay Pending Appeal Motion. (ENAR 348).

On April 21, 2006, EnerSys timely filed its Designation of Items for Record on Appeal and Statement of Issues on Appeal. (District Court Docket Nos. 2-6).

On April 27, 2006, the Bankruptcy Court held a hearing to discuss, *inter alia*, certain jurisdictional issues related to the implementation of a transition plan and the implementation of a transition plan itself. (ENSAR 4).

4

On May 1, 2006 and May 31, 2006, Exide filed its Designations of Items on Appeal and Amended Designations of Items on Appeal, respectively. (District Court Docket No. 9).

The Bankruptcy Court held a further hearing on June 29, 2006 regarding the transition plan and Stay Motion. (ENSAR 8). The Bankruptcy Court entered the Transition Plan Order on July 3, 2006. (ENSAR 7).

On July 11, 2006, EnerSys filed its *Amended Notice of Appeal of EnerSys Delaware, Inc. f/k/a EnerSys, Inc. of Order Granting Debtors' Motion to Reject and of Order Granting Transition Plan.* (District Court Docket No. 8).

On August 28, 2006, EnerSys filed *EnerSys Delaware, Inc. f/k/a EnerSys, Inc.'s Supplemental Designation of Items For Record on Appeal and Supplemental Statement of Issues on Appeal.* (District Court Docket No. 15).

## IV.    SUMMARY OF ARGUMENT

Before addressing the issues presented by this appeal, it is useful to place them in context. In 1991, Exide transferred its industrial battery business to EnerSys. An important element of the transaction was Exide's agreement to transfer to EnerSys all of Exide's rights to use the "Exide" trademark in the industrial battery business. The agreement to transfer rights in the trademark along with the business was important because "Exide" was, and is, one of the most recognizable and valuable trademarks in the industrial battery business. In fact, absent a perpetual right to use the trademark in the industrial battery business, EnerSys would not have purchased the business.

The transfer of Exide's rights in the trademark was accomplished by the execution of a perpetual, worldwide, exclusive, royalty free license. The license was perpetual and royalty free because Exide was fully paid (over $130.0 million) for the transfer of its industrial battery business, including the important rights in the trademark, at closing in 1991. In reliance on the fact that it had fully paid for perpetual control of the trademark, after the closing

5

in 1991, EnerSys used the "Exide" name on its premium batteries and spent millions of dollars promoting the "Exide" mark in the industrial battery business.

Through the power of rejection, Exide now seeks to reach back over time, rewrite the 1991 deal and obtain a pure windfall by reclaiming the "Exide" trademark. This case is really that simple and that outrageously inequitable.

If Exide is successful in reclaiming the "Exide" trademark for use in the industrial battery business, it will have stretched the concept of rejection of contracts beyond all recognizable limits. While cases do exist in which trademark licenses have been rejected, none involved perpetual, exclusive royalty free licenses purchased in connection with the sale of an entire business. In fact, no cases exist on facts remotely resembling those in this case.

If this case were permitted to be decided on the equities, EnerSys has no doubt that it would not be a close call. In fact, it is highly unlikely Exide would even have sought to reject if equitable considerations controlled. Unfortunately, equitable considerations do not control. Fortunately for EnerSys, this is a case in which the law works to prevent an inequitable result.

First, both Exide and the Bankruptcy Court misapprehend the impact of rejection. As this Court has recently ruled, rejection does not terminate contracts. Rather, rejection simply permits a debtor to breach and relegates any resulting monetary claim for damages to pre-petition, unsecured status. And, just as would be the case outside of bankruptcy, a party that breaches a contract (in this case, Exide, by rejecting the contract) cannot strip the non-breaching party of vested rights. As a result, even if rejection is granted, it will not strip EnerSys of its exclusive rights to use the "Exide" trademark in the industrial battery business.

Second, even if rejection does strip non-debtor counterparties of fully paid and vested rights, in order to be subject to rejection, a contract must be executory. In order for a contract to be executory, material obligations must remain due on both sides which, if not performed, would give the other party the right to terminate all of its remaining performance. In

6

order for an obligation to be material, it must go to the root and essence of the contract and, if not performed, deprive the other party of the substantial benefit of its bargain. If a contract has been substantially performed by a breaching party, the non-breaching party is not permitted to terminate its remaining performance, even if material obligations remain outstanding.

The Agreements in this case are not executory. Perhaps the most apparent reason is that, while some obligations do remain outstanding, those remaining obligations pale in comparison to the obligations of each party that were performed at closing in 1991. As a result, the Agreements have long since been substantially performed. Further, even if it were determined that the Agreements have not yet been substantially performed, the exclusive remedy provisions of the Agreements preclude either party from terminating all remaining performance in the event of a breach by the other. Finally, none of the individual obligations which remain outstanding go to the root or essence of the Agreements nor would the failure of either Exide or EnerSys to perform any of those obligations deprive the other of the substantial benefit of its bargain. The root and essence of the Agreements was that Exide would transfer its industrial battery business (including battery manufacturing plants, inventory, employees etc.) to EnerSys and EnerSys would pay Exide for that business. Exide transferred the business and EnerSys paid the purchase price in 1991. Failure of either party to perform the obligations which remain outstanding, while possibly entitling the other to damages or injunctive relief, would not deprive the other of the substantial benefit of its bargain.

Third, assuming the Agreements remain executory, Exide failed at trial to meet its burden of proving that rejection is in the best interest of the estate. To the contrary, the trial record establishes that (a) Exide really has no idea what qualitative benefit it will obtain by rejecting the Agreements, and (b) rejection will impose a substantial (EnerSys estimates over $67.0 million) rejection damage claim on the estate.

For the reasons set forth herein, the Rejection Order and the Transition Plan Order must be reversed.

7

## V.    FACTS

On March 26, 1991, Yuasa Battery Co. Ltd.[2] ("**Yuasa Ltd.**") and Exide Corporation, a predecessor in interest to Exide Technologies Inc., entered into a letter of intent (the "**LOI**"), pursuant to which each expressed its interest in a transaction by which Exide would sell and Yuasa Ltd., or one of its subsidiaries, would purchase all of the assets, including intellectual property and goodwill, associated with Exide's industrial battery business.  (ENAR 285).  On June 10, 1991, Yuasa, a subsidiary of Yuasa Ltd. and a predecessor-in-interest to EnerSys, and Exide Corporation entered into the APA which effected the transaction originally described in the LOI and pursuant to which Yuasa (now EnerSys) paid Exide in excess of $135 million (including payments for a covenant not to compete and the value of assumed liabilities) for the assets of Exide's industrial battery business, including trademarks, tradenames, patented technology and related goodwill.  (ENAR 212 §§ 2.1, 2.4).  The Trademark Agreement is Exhibit "T" to the APA.  (ENAR 210).  All of the consideration for the industrial battery business, including the trademarks, was paid to Exide at the closing in 1991.

The Trademark Agreement granted EnerSys a perpetual, exclusive, worldwide, royalty-free license to use certain trademarks, including "Exide," (the "**Marks**") on products sold within the industrial battery business.  (ENAR 210).

---

[2]    After the closing in 1991, Yuasa, Inc. changed its name to Yuasa-Exide, Inc.  In 1998, Yuasa-Exide, Inc. merged with Yuasa, Inc. with Yuasa, Inc. surviving the merger.  In 2000, Yuasa, Inc. changed its name to EnerSys, Inc.  In 2006, EnerSys, Inc. changed its name to EnerSys Delaware, Inc.  Also, sometime after 1991, Exide Corporation merger with GNB Technologies, Inc. and changed its name to Exide Technologies, Inc.  For ease of reference, Yuasa, Inc., Yuasa-Exide, Inc. and EnerSys will all be referred to as "EnerSys" and Exide Corporation and Exide Technologies, Inc. will be referred to as "Exide."

8

Although the document used to effect the transfer of the Marks is titled a license, P. Michael Ehlerman, Exide's former Vice President and Chief Financial Officer and the only witness presented at trial by either party who participated in the negotiation of the Agreements, testified that EnerSys' ability to use the Exide trademark in the industrial battery business on a perpetual, worldwide, exclusive basis was an indispensable component of the 1991 Transaction. (ENAR 194 pp. 128-30, 148). He further testified that Exide's counsel's written statement that Exide's intent in entering into the Asset Purchase Agreement was "to sell substantially all of the assets comprising the industrial division to Yuasa for cash" was a "fair description." (ENAR 194 p. 148).[3] Mr. Ehlerman testified that the transaction relating to the Marks was styled as a license only because Exide required the ability to continue to use the Marks in its non-industrial battery business and counsel advised that division of the Marks could only be effected by means of a license. (ENAR 194 p. 131).

EnerSys further established at trial that the parties' actions since 1991 were wholly consistent with Exide's counsel's description of their original intent. For over a decade, EnerSys has been using the Marks without interference, guidance, monitoring or any involvement whatsoever by Exide. (ENAR 193 pp. 148-56; ENAR 194 pp. 6-17, 31-45, 156-58; ENAR 195 pp. 293-326). Further, since 1991, Exide has consistently treated EnerSys' interest in the Marks as the equivalent of ownership. In fact, a number of Exide's senior managers, including a prior Chief Executive Officer, had attempted to "buy back" the Marks. (ENAR 193 pp. 99-100; ENAR 195 pp. 90-91; ENAR 201 pp. 106-09).

At trial, EnerSys established that it had spent millions of dollars since 1991 promoting the Marks in the industrial battery business. (ENAR 201 pp. 75-76). Indeed, EnerSys now has leading market shares in that business all over the world. (ENAR 201 p. 217). EnerSys

---

[3]     Mr. Ehlerman was one of four people at Exide primarily responsible for the negotiation of the Agreements including the Trademark Agreement. (ENAR 194 pp. 122-23). After the closing, Mr. Ehlerman became the Assistant Chairman, President and CEO of Yuasa Battery (America), Inc. (ENAR 194 pp. 121-22).

9

presented expert testimony that, if the Debtors were permitted to reject the Agreements, and if rejection was interpreted to strip EnerSys of its rights under the Agreements, including its exclusive and fully paid for right to use the Marks in the industrial battery business, EnerSys would lose the benefit of its substantial investment, both in 1991 and since, in the Marks and will suffer damages with a present value of at least $67.0 million. (ENAR 202 pp. 58-108; ENAR 216). EnerSys also established at trial that Exide does not even have a plan for use of any rights, including rights in the "Exide" Mark, which Exide may gain if rejection is granted. (ENAR 193 pp. 167-68; ENAR 195 pp. 45, 117, 134, 151).

## VI.    ARGUMENT AND AUTHORITIES

### A.    The Bankruptcy Court Erred in Holding That Rejection Terminates EnerSys' Rights Under the Agreement

In the Opinion, the Bankruptcy Court concluded that rejection of the Agreements effects termination of EnerSys' rights under the Agreements. According to the Bankruptcy Court, among the rights EnerSys would lose upon rejection of the Agreements is EnerSys' exclusive right to use the "Exide" trademark on industrial batteries. In other words, the Bankruptcy Court viewed rejection as an avoidance power by which Exide can recapture rights that were transferred, and fully paid for, pre-petition. The Bankruptcy Court's holding regarding the impact of rejection is a legal conclusion and, as such, is subject to *de novo* review. The Bankruptcy Court's holding is incorrect and must be reversed.

The Bankruptcy Court's view of rejection as an avoidance power is one which was once widely held by practitioners and courts. However, beginning in 1988 and concluding in 1991, Professors Andrew and Westbrook published a series of three groundbreaking law review articles addressing the impact of rejection and explaining why rejection is not an avoidance power and does not terminate a non-debtor's vested rights under a contract. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L. Rev. 845 (1988) [Andrew I]; Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.

L. Rev. 227 (1989) [Westbrook]; Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. Colo. L. Rev. 1 (1991) [Andrew II].

The Andrew/Westbrook articles are compelling and are required reading for anyone seeking an in-depth understanding of the interplay between the law of contracts and the law of bankruptcy. Each article traces the history of the treatment of contracts in bankruptcy proceedings to early 19th century England.

The initial problem which English courts had to address was how to treat the non-debtor counterparty to a contract as to which performance by the debtor was not yet due at the time of the bankruptcy filing. On the one hand, it would be unfair to other creditors to bind the bankruptcy estate as if the estate itself had entered into the contract simply because performance first came due post-petition. On the other hand, it would be unfair to the non-debtor to deny him a claim in the bankruptcy simply because nothing was due under the contract on the filing date.

The first problem (making sure the bankruptcy estate was not automatically burdened by all of the debtor's outstanding contracts) was resolved in *Copeland v. Stephans*, 106 Eng. Rep. 218 (K.B. 1818), in which it was made clear that a contract does not pass to a bankruptcy estate absent an affirmative election by the estate representative. The *Copeland* approach was subsequently adopted in the United States, *see, e.g.*, *American File Co. v. Garrett*, 110 U.S. 288 (1884) (It has long been a recognized principle of the bankrupt laws that the assignees were not bound to accept property of an onerous or unprofitable character) and, eventually, codified in Section 70(b) of the Bankruptcy Act, and, later, in Section 365 of the Bankruptcy Code. 11 U.S.C. § 365.

The second problem (proper characterization of the claims of non-debtor counterparties to contracts not assumed by the bankruptcy estate) was ultimately resolved in *Central Trust Co. v. Chicago Auditorium Ass'n.*, 240 U.S. 581 (1916), in which the United States Supreme Court held that rejection constitutes a breach entitling the non-debtor to a claim, even if

11

no claim existed on the bankruptcy filing date. The *Chicago Auditorium* approach was codified in the Bankruptcy Act and, later, in Section 365(g) of the Bankruptcy Code. 11 U.S.C. § 365(g).

The point of all this is that the historical underpinnings of rejection had nothing to do with expanding the debtor's rights as they existed when the bankruptcy was filed. Rather, the concept arose simply to ensure that the claims of non-debtor counterparties to contracts were not unfairly promoted (by affording them automatic administrative status based upon the fortuity of the debtor's performance coming due post filing) or demoted (by disallowance of the claim for breach of an unassumed contract  based upon the fortuity of the debtor's breach occurring post filing).

Professors Andrew and Westbrook also devote substantial attention to the concept of property of the estate and the traditional avoidance powers granted to a trustee. Pursuant to Section 541 of the Bankruptcy Code, the bankruptcy estate consists of all of the debtor's legal or equitable interest in property as of the filing date. 11 U.S.C. § 541.  Those interests are governed by state law, *see Butner v. United States*, 440 U.S. 48 (1979), and are limited to the same extent to which the debtor's rights were limited prior to the bankruptcy filing. *See Thompson v. Fairbanks*, 196 U.S. 516, 526 (1905). Under the Bankruptcy Code, the only method by which a debtor can expand its filing date rights is by exercise of the statutory avoidance powers granted under Chapter 5. *See* 11 U.S.C. §§ 544, 545, 547, 548 and 549.

Both Professors Andrew and Westbrook point out the conceptual difficulties inherent in treating rejection as an avoidance power. First, traditional avoidance powers (*i.e.*, preference, fraudulent transfer, etc.) are all rooted in a discernible policy which seeks to undo transactions based upon some perceived unfair advantage obtained by a non-debtor at the expense of creditors. However, the mere fact that a contract is executory is not any indication that the non-debtor counterparty gained any unfair advantage at the expense of creditors. As a result, there is no rational policy which would justify allowing a debtor to reclaim rights granted to a non-debtor simply because such rights were granted under an executory contract. Second, if rejection

12

is treated as an avoidance power, it actually is much more potent than the strong arm, preference or fraudulent transfer avoidance powers. Such is the case because rejection avoidance: (a) has an unlimited reach-back period, and (b) does not require any proof of insolvency.

An example tellingly demonstrates the logical difficulty in treating rejection as a super-avoidance power. Assume that, in 1991, instead of entering into the Agreements, including the Trademark Agreement, and receiving over $130.0 million in return, Exide had simply given EnerSys the Exide trademark for nothing. That hypothetical transaction, obviously much worse for Exide and its creditors than the actual 1991 Transaction, would not be avoidable under any of the statutory avoidance powers (i.e. preference, fraudulent transfer) because too much time has passed. *See* 11 U.S.C. § 546(a)(1). On the other hand, if one accepts rejection as avoidance, the actual 1991 Transaction, for which Exide received fair market value, would be avoidable. The difference in the two results cannot be justified based on any articulable bankruptcy policy or goal.

Finally, Professors Andrew and Westbrook both point out that nothing in the Bankruptcy Code says that rejection equates to termination of a contract. To the contrary, Section 365(g)(1) of the Bankruptcy Code simply says that rejection constitutes a breach by the debtor. 11 U.S.C. § 365(g)(1). Clearly, under non-bankruptcy law, a party who is not in breach of a contract (like EnerSys) does not lose any rights because the other party (in this case, Exide) breaches. The result is no different under the Bankruptcy Code.

Professors Westbrook and Andrew both conclude that rejection is not an avoidance power. The contract survives. The only impact of rejection is that which was historically intended, the non-debtor's monetary damages are not treated as an administrative claim.

Since the publication of the Andrew/Westbrook series of articles, there has been a steady stream of cases adopting the Andrew/Westbrook view of the impact of rejection. Included among them are this Court's recent decision in *In re Teleglobe Communications Corp.*,

304 B.R. 79 (D. Del. 2004) (rejection constitutes a breach of a lease, not a termination), as well as at least three decisions from Courts of Appeal (including one from the Third Circuit Court of Appeals). *See, e.g., In re Gucci,* 126 F.3d 380 (2d Cir. 1997) (*dicta* rejection of licensing agreement does not eliminate underlying property right); *In re Austin Dev. Co.,* 19 F.3d 1077 (5th Cir. 1994) (rejection of lease did not constitute forfeiture), *cert. denied,* 513 U.S. 874 (1994); *In re Lavigne,* 114 F. 3d 379, 386-87 (2d Cir. 1997) (rights not extinguished by rejection); *In re Columbia Gas Sys., Inc.,* 50 F. 3d  233, 239 (3d Cir. 1995) ("Rejection, which is appropriate when a contract is a liability to the bankrupt, is equivalent to a non-bankruptcy breach"); *In re Annabel,* 263 B.R. 19, 26 (Bankr. N.D.N.Y. 2001) (rejection does not terminate contract); *Sir Speedy, Inc. v. Morse,* 256 B.R. 657, 659 (D. Mass. 2000) ("Rejection does not cause a contract magically to vanish.  The post-rejection rights and obligations of the debtor and the non-debtor are exactly the same as they would have been had the debtor first breached the contract and then filed for bankruptcy."); *In re Mitchell,* 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000) ("Although there is some contrary authority, it now appears to be well-settled that rejection does not terminate an executory contract . . . or necessarily avoid the rights of the non-debtor party under the contract."); *In re Walnut Associates,* 145 B.R. 489 (Bankr. E.D. Pa. 1992) (rejection does not void underlying contract); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 700-711 (Bankr. S.D.N.Y. 1992) (same); *In re Weinstock,* 1999 U.S. Dist. LEXIS 18480, At *17-18 (E.D. Pa. November 12, 1999) (rejection does not terminate contract); *see also In re Bergt,* 241 B.R. 17, 21 (Bankr. D. Alaska 1999) (holding that a right of first refusal is not repudiated by rejection; "trend of the law is, however, that rights created by state law in a specific asset are not avoidable by rejection"); *In re South Motor Company of Dade County,* 161 B.R. 532, 545-46 (Bankr. S.D. Fla. 1993) (rejection does not terminate lease); *In re Kilpatrick,* 160 B.R. 560, 563 (Bankr. E.D. Mich. 1993)("As has been persuasively argued by others, the theory that rejection somehow 'vaporizes' the subject agreement serves no recognized policy, has no statutory or historical

14

support and inappropriately transforms the 'power' to reject (*i.e.*, decline to assume) a contract into some kind of avoiding power.").

It is also important to recognize that, since publication of the Andrew/Westbrook articles, there has been virtually no academic debate. In other words, in the last decade plus, no law professor or practitioner has presented any reasoned basis on which to dispute the Andrew/Westbrook conclusions.[4]

In the Opinion, the Bankruptcy Court notes the existence of authority supporting EnerSys' proposition that rejection does not terminate an executory contract, including *Columbia Gas*. The Bankruptcy Court then distinguishes those cases on the basis that none involved a trademark license. (ENAR 341 p. 38).

The obvious flaw in the Bankruptcy Court's approach is that none of the cases which follow the Andrews/Westbrook view of the impact of rejection suggest that its reasoning should only be applied to certain types of contracts. Further, the Bankruptcy Court fails to offer any reasoning (other than faulty reasoning related to a negative inference to be drawn from 11 U.S.C. §365(n) of the Bankruptcy Code, discussed below), supporting such distinction.

The Bankruptcy Court did find support for its conclusion in two bankruptcy court decisions dealing with rejection of trademark licenses. *In re HQ Global Holdings, Inc.*, 290 B.R. 507 (Bankr. D. Del. 2003) and *In re Centura Software Corp.*, 281 B.R. 660 (Bankr. N.D. Cal.

---

[4]    There have, on the other hand, been numerous articles which have expressed agreement with the Andrew/Westbrook conclusion. *See, e.g.*, Hon. Ronald Barliant, *Effect of Rejection on Rights Other than Rights to Payment*, The Bankruptcy Strategist Volume XX, Number 1 (November 2002); Hon. William L. Stocks, *Representing Employees and Employers in Bankruptcy*, Southeastern Bankruptcy Workshop (August 2002); Jay Lawrence Westbrook, *The Commission's Recommendations Concerning the Treatment of Bankruptcy Contracts*, 5 Am. Bankr. Inst. L. Rev. 463, 471 (1997); Alfred Q. Ricotta, *Comment: Community Associations and Bankruptcy: Why Post Petition Assessments Should Not Be Dischargeable*, 15 Bank. Dev. J. 187, 208 (1999); Richard Lieb, *The Interrelationship Of Trademark Law And Bankruptcy Law*, 64 Am. Bankr. L.J. 1, 36-37 (1989); Collier on Bankruptcy, *Effect of Rejection of an Executory Contract or Unexpired Lease*, ¶ 365.09[3]  (15th Ed. Rev 1999).

15

2002). However, neither opinion reflects more than a cursory analysis of the issue and both contain obvious analytical errors.

In *Centura,* the trademark licensee stipulated to the rejection of the license agreements and pursuant to that stipulation reserved its rights under Section 365(n) of the Bankruptcy Code. In an adversary proceeding, the trademark licensee then sought a declaratory judgment concerning its ongoing rights under Section 365(n) of the Bankruptcy Code. The debtor filed a counterclaim seeking a determination that the licensee had no continuing rights to use the trademark, and then filed a motion for partial summary judgment requesting that the court determine that Section 365(n) of the Bankruptcy Code does not protect trademark rights. 281 B.R. at 663-64.

The *Centura* Court granted summary judgment and rejected the trademark licensee's argument that it had rights under Section 365(n) of the Bankruptcy Code. The *Centura* Court's decision was correct, but irrelevant. On its face, Section 365(n) of the Bankruptcy Code does not apply to trademark licenses since trademark licenses do not fall within the definition of intellectual property. 11 U.S.C. § 101(35)(a). However, that only matters in this case if, due to the application of a negative inference, Section 365(n) of the Bankruptcy Code stands for the proposition that rejection terminates trademark licenses. For reasons discussed below, no such negative inference can be drawn.

Unfortunately for the licensee in *Centura,* it first asserted the correct argument (*i.e.*, that rejection would not deprive it of its rights in the trademark for reasons having nothing to do with Section 365(n) of the Bankruptcy Code) at the hearing on the debtor's motion for partial summary judgment. The *Centura* court rejected the licensee's belated argument stating "In fact, both pre- and post-amendment cases, as well as scholarly writing suggest that, upon the rejection of a trademark license, Lubrizol's harsh holding controls, and the licensee is left only with the claim for breach." *Id.* at 673. The *Centura* opinion does not take note of, let alone attempt to reconcile, the many cases cited above for the proposition that rejection does not equate to

16

avoidance or termination of a contract. Further, the "scholarly writings" relied upon by the *Centura* court contain no real analysis of the impact of rejection but, rather, simply recite the *Lubrizol* holding.[5] *See id.* at n.24. Finally, and most incredibly, the *Centura* court cites Professor Andrew's 1988 article as support for the rejection as avoidance power approach. In fact, as noted above, Professor Andrew's article is the seminal authority for the diametrically opposed proposition.

It is respectfully submitted that the *HQ Global* decision is similarly flawed. First, the *HQ Global* court does not even acknowledge the existence of the Third Circuit's discussion of the impact of rejection in *Columbia Gas*. Second, after acknowledging the existence of other cases holding that rejection does not equate to avoidance and termination of a contract, the *HQ Global* court relies upon the California bankruptcy court's *Centura* decision, which, for reasons stated above, lends no reasoned support to the rejection as avoidance approach. Third, in dismissing the non-debtor licensee's argument that, notwithstanding rejection, it would retain the right to use the licensed marks, the *HQ Global* court states:

> This argument misses the mark entirely. The essence of the Agreements was the Debtors' affirmative grant to the Franchisees of the right to use their proprietary marks. As a result of the rejection, that affirmative obligation of the Debtors to allow the Franchisees to use the marks is excused.

> *Id.* at 513.

What the *HQ Global* court fails to explain is how the Debtor could be "excused" from the contractual obligation to allow the franchisees to use the mark unless the contract was, in fact, terminated upon rejection. The failure to go that next step and reconcile the decision with the cases cited for the proposition that rejection does not equal termination undercuts any authority which might otherwise attach to the *HQ Global* decision.

---

[5]     *See Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985) (holding that rejection terminates a patent license).

The Bankruptcy Court also found support for its conclusion that rejection terminates trademark licenses by drawing a negative inference from Section 365(n) of the Bankruptcy Code. As noted above, Section 365(n) of the Bankruptcy Code does, in fact, provide post-rejection protections to non-debtor intellectual property licensees, defined not to include trademark licensees. Exide argued that, by negative inference, then, non-debtor trademark licensees must have no rights post-rejection. The Bankruptcy Court accepted Exide's argument. However, in so doing, the Bankruptcy Court failed to address any of the arguments against application of a negative inference raised by EnerSys in its Post-Trial Brief. Rather, it appears that the Bankruptcy Court concluded it should draw a negative inference based solely on the fact that trademarks could have been, but were not, included within the protections of Section 365(n) of the Bankruptcy Code. EnerSys does not dispute that such is the case. However, the fact that something could have been, but was not, included in a particular piece of legislation is just the start, not the end, of a negative inference inquiry.

The question is whether Congress, by enacting Section 365(n) of the Bankruptcy Code, intended to require that any contract not covered by Section 365(n) of the Bankruptcy Code (or the similar provisions of Sections 365(h) and (i) of the Bankruptcy Code) is to be treated as terminated by rejection, with all vested rights (even if fully paid for) avoided. For the reasons stated below, no such negative inference can be justified.

In preparing to address the negative inference issue, it is first important to understand how negative inference is used in statutory construction. In *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992), the Supreme Court rejected a negative inference argument in a bankruptcy case stating: "In any event, canons of construction are no more than rules of thumb that help courts determine the meaning of legislation."

Next, it must be noted that the specific language of Section 365(n) of the Bankruptcy Code itself argues against any negative inference. Section 365(n)(1)(A) of the Bankruptcy Code gives a counterparty to an intellectual property license the right:

18

> to treat such contract as terminated by such rejection *if* such
> rejection by the trustee amounts to such a breach as would entitle
> the licensee to treat such contract as terminated by its own terms,
> applicable nonbankruptcy law, or agreement made by the
> licensee with another entity... (emphasis supplied)

11 U.S.C. § 365(n)(1)(A).  In other words, a non-debtor counterparty to a rejected intellectual

property license can treat the contract as terminated *but only if* certain other conditions, having

nothing to do with bankruptcy law, are satisfied.  But what purpose is served by conditioning the

right of intellectual property licensees to treat rejection as termination if rejection automatically

terminates contracts? The answer is obvious.  Clearly, conditioning, in any way, the right of an

intellectual property licensee to terminate a rejected intellectual property license is wholly

inconsistent with any notion that rejection automatically causes termination.

Moreover, the legislative history of Section 365(n) of the Bankruptcy Code

provides no support for Exide's negative inference argument.  In fact, the opposite is true.

Section 365(h) of the Bankruptcy Code affords post-rejection rights to non-

debtor lessees of real estate which are very similar to the protections afforded to non-debtor

intellectual property licensees under Section 365(n) of the Bankruptcy Code.[6]  In the Senate

Report on Section 365(n) of the Bankruptcy Code, the drafters, in discussing the protections

afforded to real property lessees under Section 365(h) of the Bankruptcy Code, noted:

> That section <u>clarified</u> that, although a bankrupt lessor could
> avoid performance of future obligations under an unexpired
> lease, it could not cause through rejection of the lease an
> innocent lessee to forfeit the remainder of the leasehold.
> (emphasis supplied).

---

[6]    In fact, given the similarities between Section 365(h) and 365(n) of the Bankruptcy Code,
it would appear that accepting the Bankruptcy Court's view of negative inferences would be
inconsistent with this Court's holding in *Teleglobe Communications Corp.*, 304 B.R. at 79 that
non-debtor lessors retain rights post-rejection. Since Section 365(h) of the Bankruptcy Code only
provides protection to non-debtor lessees of real property, by negative inference, the Bankruptcy
Court's reasoning would require a holding that non-debtor lessors of real estate (like the non-
debtor in *Teleglobe*) lose all rights after rejection.

5 U.S.C.C.A.N. 3200, 3203 (1988). So, according to the Senate drafters of Section 365(n) of the Bankruptcy Code, the very similar provisions of Section 365(h) of the Bankruptcy Code protecting a real estate lessee simply "clarified" the law and did not change it. Similarly, in specifically addressing Section 365(n) of the Bankruptcy Code itself, the Senate drafters noted that:

> [t]he bill corrects the perception of some courts that Section 365 was ever intended to be a mechanism for stripping innocent licensees of rights essential to the operations of their ongoing business and stripping the American licensing system of its dependability and flexibility.

*Id.* In other words, the Senate drafters believed that (a) prior to the enactment of Section 365(n) of the Bankruptcy Code, licensees (including trademark licensees) were not stripped of rights by rejection, (b) Section 365(n) of the Bankruptcy Code was simply correcting a general misconception as to how Section 365 of the Bankruptcy Code works, and (c) Section 365(n) of the Bankruptcy Code was not effecting a substantive change in the law. Those beliefs of the Senate drafters are entirely inconsistent with the negative inference drawn by the Bankruptcy Court. In fact, the Senate report clearly supports the proposition that rejection of a contract, regardless of the subject matter, does not terminate the contract or strip non-debtors of rights.

To the extent any doubt concerning the validity of Exide's negative inference argument remains, one last excerpt from the Senate report on Section 365(n) of the Bankruptcy Code is instructive. It states:

> Nor does the bill address or intend any inference to be drawn concerning the treatment of executory contracts which are unrelated to intellectual property.

*Id.* at 3204.

Since the term "intellectual property", as used in Section 365(n) of the Bankruptcy Code, does not include trademark agreements, the Senate drafters effectively stated that Section 365(n) of the Bankruptcy Code was not intended to raise any inference as relates to

20

trademark agreements.  It is hard to imagine a clearer statement of legislative intent precluding the application of a negative inference.

Finally, Professor Andrew's view of the negative inference argument is instructive:

> Avoiding power rejection is, I suggest, simply more freight than negative inference will bear.  It requires that "rejection" be assigned a meaning fundamentally at odds with both the history and purpose of the executory contracts doctrine, with no legislative history and support.  It requires a corresponding abatement of the general principle, explicit in the statute and its legislative history, that a bankruptcy estate succeeds only to the debtor's rights and interests in property, and dictates that the result in each depend not on some articulable policy or principle, but instead upon happenstance of "executoriness."  That absurdity is not compelled by the statute and should not be read between the lines.

> Michael T.  Andrew, *Executory Contract in Bankruptcy: Understanding Rejection*, 59 U. Colo. L. Rev. 845, 929 (1988).

Any studied review of the issue can lead to only one conclusion.  Neither Section 365(n) of the Bankruptcy Code nor its legislative history lend any support to drawing a negative inference related to the post-rejection rights of non-debtor trademark licensees.  As a result, there can be no principled basis for the Bankruptcy Court's conclusion that the impact of rejection varies depending on the type of contract being rejected.  Either rejection terminates all executory contracts or it does not terminate any.  Since the authority cited above clearly precludes a finding that all contracts are terminated by rejection, the inescapable conclusion is that no contracts are terminated by rejection.

One final thought:  the Bankruptcy Court's conclusion that rejection of a trademark license must equate to termination also seems to have been driven, at least in part, by its concern that, otherwise, rejection of a trademark license could never benefit a debtor.  (ENAR 341 p. 41).  The Bankruptcy Court viewed that as an absurd result.  Initially, EnerSys sees nothing absurd in a rule which would preclude a debtor from obtaining the type of pure windfall which would result from the reversion of rights for which the debtor has been fully paid.  In fact,

21

from EnerSys' perspective, exactly the opposite is true. Nor is it clear to EnerSys that rejection of a trademark license could never yield meaningful benefits to a debtor unless rejection results in termination. For example, to the extent a debtor had obligations under a trademark license which required it to expend funds, rejection might allow the debtor to breach such obligations and relegate any resulting damages to treatment as pre-petition unsecured claims. In any event, even if a debtor could not obtain meaningful benefits by rejecting a trademark license absent termination, that fact is not determinative. The legal impact of rejection is not a results driven answer based upon the presence or absence of a benefit to the debtor.

So, it is clear. Professors Andrew and Westbrook are right. Rejection is not an avoidance power and does not terminate contracts. As a result, the Bankruptcy Court's holding that rejection of the Agreements strips EnerSys of any of its rights, including its exclusive right to continue to use the Marks, including the Exide trademark, is erroneous and must be reversed.

### B.    The Bankruptcy Court Erred in Concluding That the Agreements Are Executory

Whether a contract is executory is a legal issue subject to *de novo* review on appeal. *In re Midwest Portland Cement Company*, 174 Fed. Appx. 34 (3rd Cir. 2006).

### 1.    The Agreements Are Not Executory Because Substantial Performance Has Occurred.

In order to reject a contract under Section 365 of the Bankruptcy Code, the party seeking rejection (in this case, Exide) bears the burden of proving that the contract is executory. *In re Hamilton Roe Int'l, Inc.*, 162 B.R. 590, 593 (Bankr. M.D. Fla. 1993). The Bankruptcy Court found that the Agreements were executory but, for the reasons discussed below, its conclusion was in error and, as a result, its decision to grant Exide's rejection request must be reversed.

The Third Circuit engaged in a thorough analysis of the distinction between executory and non-executory contracts in *Columbia Gas*, 50 F. 3d at 233. Taken as a whole, the *Columbia Gas* opinion reflects a cautionary approach to identifying executory contracts. The

22

Court begins by noting that the legislative history of Section 365 of the Bankruptcy Code would support a very broad definition of executory contracts. That broad definition would include contracts "on which performance remains due to some extent on both sides". *Id.* at 238 *quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977). However, the *Columbia Gas* Court rejected the broad definition contained in the House Report "since it is the rare agreement that does not involve unperformed obligations on either side" *Id.* at 238, *quoting In re Streets & Beard Farm Partnership*, 822 F. 2d 233, 235 (7th Cir. 1989). Instead, the *Columbia Gas* Court reaffirmed the "*Countryman* standard" first adopted by the Third Circuit in *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F. 2d 36 (3d Cir. 1989). The *Countryman* standard provides that "An executory contract is a contract under which the obligations of both the bankrupt and the other party are so far under performed that the failure of either to complete performance would constitute a material breach <u>excusing the performance of the other</u>." (emphasis supplied) *Columbia Gas,* 50 F.3d at 233, 239. The *Columbia Gas* Court also held that, to determine whether a breach is material, including whether such breach would excuse performance by the non-breaching party, bankruptcy courts look to controlling state law. *Id.* at 240. New York law controls interpretation of the Agreements. (ENAR 212 § 16.7).

Of critical importance in this case is the fact that, under controlling New York law, a breach cannot excuse performance by the non-breaching party, and so cannot meet the *Countryman* standard, if the breaching party has already substantially performed. *See Hadden v. Consolidated Edison Co.*, 34 N.Y. 2d 88, 96, 312 N.E. 2d 445, 449 (1974). Further, as noted in *Hadden*,

> There is no simple test for determining whether substantial performance has been rendered and several factors must be considered, <u>including the ratio of performance already rendered to that unperformed</u>, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and <u>the extent to which the aggrieved party has already received the substantial benefit of the promised performance</u>.

23

34 N.Y. 2d at 88, 96 (emphasis supplied).

In a single paragraph consisting of five sentences, the Bankruptcy Court determined that the Agreement had not been substantially performed by either party. (ENAR 341 p. 20). However, the Opinion does not reveal any attempt by the Bankruptcy Court to apply the test required under *Hadden*. In particular, this Court should focus on the fact that the Bankruptcy Court failed to engage in the comparison, required under *Hadden*, of performance rendered versus performance remaining due. That failure was particularly harmful to EnerSys given that so much performance had taken place under the Agreements prior to Exide's attempt to reject.

The trial record establishes that, at the closing on June 10, 1991, (i) Exide transferred to Yuasa its entire industrial battery business, including four pieces of owned real estate, 33 real estate leases, inventory, equipment, accounts receivable and six pages of trademarks and patents, (ENAR 212 § 2.1, Schedules 5.5(a), 5.7(a), 9.1 and 9.2) and (ii) Yuasa transferred to Exide $98 million dollars in cash and assumed substantial liabilities. (ENAR 212 §§ 2.3 and 2.5). The trial record also establishes that, between 1991 and 2000, Exide fully performed its obligation under the Noncompetition Agreement to refrain from competing in the industrial battery business and, since the Closing Date, Exide and EnerSys have each rendered fifteen years of performance under the Trademark Agreement. (ENAR 193 at 97-98).

Focusing first on the EnerSys side of the transaction, it is difficult to understand how one could credibly argue that the remaining EnerSys "obligations" identified by the Bankruptcy Court as material (maintenance of quality standards, registration obligations, further assurances, etc.), even if in fact they are obligations and remain outstanding, bear any reasonable relationship, on a qualitative or quantitative basis, to the EnerSys obligations which were performed at, and have been performed since, the closing in 1991.[7] Further, while substantial performance by EnerSys would be enough, alone, to preclude a finding that the Agreements are

---

[7]    For the reasons stated below, neither the Quality Standard Provision nor the Use Restriction is an obligation.

24

executory, Exide has also substantially performed. Such conclusion is particularly easy to reach if this Court were to agree with Exide's view that the value today of the "Exide" Mark to EnerSys (and so the value to EnerSys of continued performance by Exide under the Trademark Agreement, the only Exide obligation of any importance remaining outstanding under the Agreements) is something less than $10.0 million.

In considering whether a New York state court applying New York law would find the Agreements to have substantially performed, it is instructive to consider the facts and holding in *Hadden*. Mr. Hadden was an employee of Consolidated Edison ("**Con Ed**") for over thirty years. Towards the end of his tenure, he began accepting bribes from contractors. Con Ed argued that accepting bribes was a material breach of Mr. Hadden's employment agreement excusing Con Ed from its pension obligations to Mr. Hadden. The *Hadden* Court acknowledged that Mr. Hadden's willful misconduct could well have been a material breach of his employment agreement. *Hadden*, 34 N.Y. 2d at 88, 98 fn. 9. However, the Court declined to excuse Con Ed from it pension obligation stating:

> Weighing the factors involved, we find that Hadden's performance has been substantial. Con Edison received the benefit of his 37 years of employment, and to excuse its obligation to pay pension benefits at this point, on the basis of a breach of a constructive condition, would create both forfeiture and unjust enrichment. The value of Hadden's performance to Con Edison over the course of nearly four decades is not substantially impaired by his disloyalty in some of those later years. In so stating, we do not condone his actions or disregard the fact that his breach was willful. We say merely that an analysis of the various factors involved leads to the conclusion that despite Hadden's financial dealings with contractors, Con Edison obtained substantially what it had bargained for in offering a Pension Plan – long and continuous employment.

> *Id.* at 97.

EnerSys submits that, if EnerSys or Exide were to today breach any, or even all, of the obligations that the Bankruptcy Court found remain outstanding, a New York Court applying New York law would engage in the *Hadden* analysis and conclude that (a) both EnerSys

25

and Exide have long since received substantially what they bargained for under the Agreements (in the case of Exide over $130.0 million in consideration for the sale of its industrial battery business and, in the case of EnerSys, one of the leading industrial battery businesses in the world), and (b) under the circumstances, excusing remaining performance by Exide as a consequence of a breach by EnerSys would result in unjust enrichment of Exide and visit an enormous forfeiture on EnerSys. Based on that analysis and those conclusions, EnerSys submits that a New York court applying New York law would find that the Agreements have been substantially performed and decline to excuse either EnerSys or Exide from all further performance under the Agreements.[8]

EnerSys' research has failed to disclose, and Exide has failed to cite, any case with facts remotely resembling those in this case in which rejection was granted or, for that matter, sought and denied. EnerSys asserts that no such cases exist because, in situations in which entire businesses have been transferred and fully paid for, the parties have recognized that substantial performance has occurred and rejection is not an option.

> **2.    Even if the Agreements Have Not Been Substantially Performed, the Agreements Are Not Executory Because the Exclusive Remedies Provisions Preclude the Possibility That Any Remaining Obligations Are Material.**

Under New York law, parties to a contract may agree to exclusive remedies for breach. *See Palazzetti Import/Export, Inc. v. Morson*, 2001 U.S. Dist. LEXIS 20243, *30 (S.D.N.Y. 2001) (*citing In re Hale Desk Co.,* 97 F.2d 372, 373 (2d Cir. 1938); *see also* 17A Am Jur 2d Contracts § 748 (2004). Where parties incorporate in a contract stated remedies for breach, such remedies are exclusive unless the result would be unreasonable. *See Hale Desk,*

---

[8]    That is not to say that a New York court applying New York law would refuse to impose damages or enter injunctions, if appropriate. Nor is it to say that a New York court would refuse to enforce the termination provisions in the Trademark Agreement were EnerSys to fail to maintain quality standards. However, (a) such enforcement would effect termination of only one of the Agreements and would not excuse Exide's remaining performance under the other Agreements, and (b) such is irrelevant to any analysis of whether Exide has substantially performed.

26

97 F.2d at 373. In 1991, Exide and EnerSys incorporated wholly reasonable exclusive remedies for breach into the Agreements, and those exclusive remedies preclude any finding that the Agreements remain executory.

> Section 13.6 of the APA provides as follows:
>
> Exclusive Remedies. The indemnification provided for in this Article A(XIII) shall be the exclusive remedy available to any indemnitee against any indemnitor for any Damages hereunder to the exclusion of all other common law or statutory remedies...; provided, however, that notwithstanding the foregoing, the parties hereby agree that failure of the parties to perform certain of their respective obligations under this Agreement or the Ancillary Agreements may result in consequences to the nonbreaching party for which money damages may not be sufficient. In such case, the nonbreaching party shall be entitled to seek specific performance and other equitable relief...
>
> (ENAR 212 § Section 13.6)

Section 13.6 is a clear reflection of the parties' intent that remedies for failure, after Closing, to perform under the Asset Purchase Agreement or any of the Ancillary Agreements, including the Trademark Agreement, be limited. That limitation relegated the parties to claims for indemnification or, if money damages were insufficient, seeking specific performance or other equitable relief. Specifically excluded from the limited remedies available to a non-breaching party under Section 13.6 of the APA for failure of the other party to perform under any of the integrated Agreements is the right to declare a default and terminate all future performance under all of the integrated Agreements. Indeed, no default provisions even exist under the integrated Agreements.

In order to satisfy the *Countryman* standard, an obligation, if breached, must give rise to a right on the part of the non-breaching party to terminate all remaining performance under the contract in question, in this case, all of the integrated Agreements. *See Columbia Gas,* 50 F.3d at 233. Simply stated, Section 13.6 of the APA precludes a finding that failure by EnerSys or Exide to perform any post-closing obligation, no matter how important, could ever satisfy the

27

*Countryman* standard. Such result is wholly consistent with the fact that, as discussed above, at closing the parties both rendered substantial performance, making inequitable any wholesale termination by either party of its post-closing obligations based on a failure of the other party to complete its performance.

In the Opinion, the Bankruptcy Court rejects EnerSys' argument that Section 13.6 precludes satisfaction of the *Countryman* standard. In reaching his conclusion, the Bankruptcy Court states "When viewing paragraph 13.6 in relation to the other provisions of the Asset Purchase Agreement, it is apparent that paragraph 13.6 relates solely to claims for indemnification. The Asset Purchase Agreement contains a separate article regarding termination." (ENAR 341 p. 8). Taking the Bankruptcy Court's analysis in pieces, it is clear that it was mistaken.

First, EnerSys reads the Bankruptcy Court's statement that Section 13.6 deals solely with claims for indemnification as saying, in effect, that Section 13.6 does not deal with the remedies of either Exide or EnerSys for failure of the other to perform post-closing obligations. Of course, if true, the Bankruptcy Court's conclusion would be important since, if Section 13.6 does not deal with the consequences of post-closing breach of obligations, it is irrelevant to application of the *Countryman* standard. However, the Bankruptcy Court's proposition cannot be right since fully two thirds of Section 13.6 (everything after the word "provided") deals exclusively with the consequences of the failure of either party to perform its post-closing obligations to the other under the Asset Purchase Agreement or the Ancillary Agreements. Any fair reading of the portions of Section 13.6 which follow the proviso can lead to only one conclusion: the parties specifically agreed that, if either party failed to perform any of its obligations post-closing, its exclusive remedy was to seek money damages and, if money damages were insufficient, to seek specific performance or other equitable relief. Significantly, termination of all remaining performance is not a remedy which the parties agreed to make

available in the event of breach of any post-closing obligations. As a result, the *Countryman* standard cannot be satisfied.

Second, the Bankruptcy Court's reference to "a separate article regarding termination" is puzzling. The only "article" in the Asset Purchase Agreement which deals with termination is Article XIV. The operative Section in Article XIV is Section 14.1. Section 14.1 provides:

> This Agreement and the transactions contemplated hereby may be terminated and/or abandoned at any time:
>
> (a) by mutual consent of Purchaser and Seller; or
>
> (b) by either Purchaser or Seller on or after June 10, 1991, if all Regulatory Conditions have been fulfilled but the Closing has not occurred by such date, provided such failure to close was not due to the breach or default of the party seeking to terminate the Agreement.

(ENAR 212 § 14.1).

So, Section 14.1(a) has nothing to do with the unilateral rights of either party to terminate upon failure of the other to perform, the only relevant question when applying the *Countryman* standard. Rather, Section 14.1(a) deals solely with termination upon mutual consent of both parties. Similarly, Section 14.1(b) has nothing to with the unilateral rights of either party to terminate upon failure of the other to perform. To the contrary, Section 14.1(b) only deals with the rights of the parties to terminate if Closing had not occurred by June 10, 1991. Of course, Closing did occur on June 10, 1991. As such, Section 14.1(b) is just as irrelevant to the issues presented in this case as Section 14.1(a). Clearly, the termination provisions of Article XIV are not inconsistent with, and do not trump, the exclusive remedy provisions of Section 13.6. Rather, the fact that the only termination provision included in the APA effectively expired when the transaction closed supports EnerSys' proposition that, post-closing, the parties intended neither party could terminate all remaining performance as the result of a breach.

29

The Bankruptcy Court completes its analysis of the impact of Section 13.6 by stating "It [Section 13.6] does not, as EnerSys argues, limit a non-breaching party's remedies under the Agreement solely to indemnification or equitable relief." (ENAR 341 p. 14). This wholly unsupported assertion stands in direct contradiction to the plain language, and obvious sole purpose, of Section 13.6.[9]

---

[9]      In footnote 7 of the Opinion, the Bankruptcy Court notes Exide's argument that EnerSys is precluded from arguing that the Agreements are not executory based on the provisions of Section 13.6 due to the alleged failure by EnerSys to identify the argument in response to Exide's contention interrogatories. It is not clear from the footnote if the Bankruptcy Court, in fact, accepted Exide's position and ruled that the Section 13.6 argument was precluded. EnerSys submits that, given the ambiguity of the Bankruptcy Court's statements in the footnote, this Court should not conclude that any evidentiary ruling was actually made. However, to the extent this Court believes that the Bankruptcy Court did rule that the Section 13.6 argument is precluded, such ruling was in error and must be reversed. The contention interrogatory in question asked EnerSys to identify all legal and factual bases for EnerSys' contention that none of the Agreements was executory. EnerSys responded that "All material obligations of both Exide and EnerSys under the Agreements which, if not performed would give the counterparty the right to terminate its remaining performance have been performed." (Debtors' Amended Designated Appeal Record ("DAAR") 4, p.5). The impact of Section 13.6 is just one of many subsidiary reasons supporting EnerSys' response to the Exide contention interrogatory. Exide never sought to compel a more specific response. In any event, even if this Court should conclude that the EnerSys response failed to adequately identify the Section 13.6 argument, such failure does not warrant automatic preclusion of the argument. The two cases cited by the Bankruptcy Court in the Opinion both involved joint pre-trial orders in addition to contention interrogatories. In this case, the Bankruptcy Court excused the parties from entering into a joint pre-trial order. Further, even in cases in which failures to identify arguments were associated with pre-trial orders, controlling case-law in the Third Circuit requires the trial court to consider: (a) prejudice to the other party, (b) ability to cure any prejudice, (c) impact on the orderly conduct of the trial, and (d) the presence or absence of bad faith before deciding whether preclusion is warranted. *Beissel v. Pittsburgh & Lake Erie R.R. Co.,* 801 F. 2d 143 (3d Cir. 1986). The Opinion does not reflect any attempt by the Bankruptcy Court to apply the *Beissel* criteria. Such failure supports EnerSys' primary position that the Bankruptcy Court did not actually rule on the issue. Further, to the extent he did rule, the Bankruptcy Court clearly erred, as a matter of law, by applying a strict rule precluding the Section 13.6 argument without regard to the *Beissel* criteria. Finally, had the *Beissel* criteria been applied, Exide would not have been able to satisfy the test. The Section 13.6 argument did not involve any fact issues requiring further discovery. Nor did the Section 13.6 argument require consideration of any new documents. To the contrary, the Section 13.6 argument simply required the Court to consider a provision of the central document in the case, the APA, and apply that provision to the issue at hand. Once the argument was raised by EnerSys, Exide had ample opportunity to respond and point out why, in Exide's view, EnerSys' Section 13.6 argument was wrong. Exide did respond on the merits in its post-trial brief and can point to no prejudice it suffered in crafting its response. In fact, the Bankruptcy Court accepted Exide's substantive arguments relating to the impact of Section 13.6. Nor has Exide pointed to any bad faith on the part of EnerSys or negative impact which the Section 13.6 argument had on the conduct of the trial. In fact, no such bad faith or negative impact exist.

30

And Section 13.6 is not the only exclusive remedy provision agreed to by the parties. Section 8 of the Trademark Agreement provides, in relevant part:

> Licensor shall have the right to terminate this Trademark License if (a) products covered hereunder and sold by Licensee in connection with the Licensed Marks fail to meet the Quality Standards, or (b) Licensee uses, assigns or sublicenses its rights under the Licensed Trade Name or the Licensed Marks outside the scope of the licensed business and, in either such case, reasonable measures are not initiated to cure such failure or improper use within ninety (90) days after written notice from the Licensor....

(ENAR 210).

Section 8 impacts the *Countryman* analysis in two ways. First, pursuant to Section 8, the parties agreed that only two events could ever permit Exide to terminate its performance under one of the integrated Agreements, the Trademark Agreement. Those two events are the failure to observe the quality standards described in Section 5 of the Trademark Agreement (the "**Quality Standard Provision**") and the use of the Marks outside of the industrial battery business (the "**Use Restriction**"). Second, the parties also agreed that the failure by EnerSys to observe the Quality Standards Provision or the Use Restriction would result in just one remedy for Exide: the ability to terminate performance under the Trademark Agreement. As a result, by the express terms of Section 8 of the Trademark Agreement, (a) no failure by EnerSys to perform any post closing obligation under any of the Agreements, other than performance due in connection with the Quality Standard Provision and the Use Restriction, can possibly satisfy the *Countryman* standard, since no other failure to perform would permit Exide to terminate its performance under the Trademark Agreement, and (b) no failure by EnerSys to perform in connection with the Quality Standard Provision or the Use Restriction can possibly satisfy the *Countryman* standard, since no such failure to perform would permit Exide to

terminate its performance under any of the integrated Agreements other than the Trademark Agreement.[10]

Exide did not present any evidence at trial that the exclusive remedies provided for in Section 8 of the Trademark Agreement are unreasonable. In fact, the trial record establishes that forfeiture by EnerSys of its rights under the Trademark Agreement is a very severe sanction and an eminently reasonable exclusive remedy for failure by EnerSys to satisfy the Quality Standard Provision or observe the Use Restriction. Further, such conclusion is wholly consistent with the general intent of the parties to limit remedies post closing reflected in Section 13.6 and Article XIV of the APA.

In the Opinion, the Bankruptcy Court devotes only two sentences to the exclusive remedy issues raised by Section 8. It states: "Contrary to EnerSys's contentions, a breach of its Use Restriction or the Quality Standards allows Exide to terminate the Agreement, not simply the Trademark License, because the Agreement is an integrated contract. Consequently, Exide may terminate the performance of any of its remaining obligations under the Agreement upon the breach of either obligation." (ENAR 341 p.10)

With due respect, the Bankruptcy Court's analysis of the impact of Section 8 is flawed. First, the mere fact that the Agreements are integrated does not mean that the parties were not free to negotiate for an exclusive remedy (i.e., termination of the Trademark Agreement but not any of the other integrated Agreements) in the event EnerSys failed to satisfy either the Use Restriction or the Quality Standard Provision. In fact, the plain language of Section 8 reflects that they did just that. Second, the Bankruptcy Court fails to address the second exclusive remedy issue raised by Section 8. Specifically, since the parties negotiated only two circumstances under which the Trademark Agreement could be terminated (i.e., failure to perform under the Quality Standards Provision or violation of the Use Restriction), no other

---

[10]    For reasons stated *infra* at 38-40, neither the Quality Standard Provision nor the Use Restriction is an obligation.

failures by EnerSys to perform post-closing under any of the other Agreements could result in termination of the Trademark Agreement and, so, no other post-closing obligation of EnerSys can possibly satisfy the *Countryman* standard.

The exclusive remedy provisions of Section 13.6 of the Asset Purchase Agreement and Section 8 of the Trademark Agreement preclude satisfaction of the *Countryman* standard.

> **3.    Even if the Agreement Has Not Been Substantially Performed and the Exclusive Remedy Provisions Do Not Preclude the Existence of Any Remaining Material Obligations By Either Party, None of the Remaining "Obligations" Identified By the Bankruptcy Court Are Material.**

For a breach to be material it must go to the "root or essence of the contract" and deprive the non-breaching party of the benefit of its bargain. *See, e.g., Lavigne*, 114 F.3d at 379, 387 (discussing standard for material breach in terms of when rescission of a contract is appropriate); *see also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000) (breach is material if it defeats the object of the party in making the contract and deprives the injured party of the benefit that it justifiably expected), *aff'd*, 294 F.3d 383 (2d Cir. 2002). Further, according to the Restatement Second, *Contracts*, in determining whether a breach is material, a court should consider "the extent to which the party failing to perform or to offer to perform will suffer forfeiture." Restatement Second, *Contracts*, § 241(c) (1981). *See also Canada Dry Corp. v. Nehi Beverage Co.*, 723 F. 2d 512, 517 (7th Cir. 1983) (quoting jury instruction which was taken from Restatement Second, *Contracts*, § 241).

In the Opinion, the Bankruptcy Court held that the following obligations were material and required treatment of the Agreement as an executory contract:

- Exide's alleged obligation to maintain registration of the Marks pursuant to Section 12 of the Trademark Agreement (the **"Registration Obligation"**);
- The obligations of Exide and EnerSys to indemnify each other pursuant to Section 13.1 of the APA (the **"Indemnity Obligations"**);

33

- The obligations of EnerSys and Exide to provide further cooperation after the closing to facilitate the 1991 Transaction (the "**Further Assurances Obligations**");
- Exide's alleged obligations relating to a pension plan maintained for the benefit of Exide employees (the "**Pension Plan Obligation**").
- EnerSys' alleged obligation to satisfy the Quality Standard Provision;
- EnerSys' alleged obligation to observe the Use Restriction; and
- Exide's obligation to permit EnerSys to use the Marks pursuant to the Trademark Agreement (the "**Use Grant**");

Before analyzing the individual "obligations," it is important to note that, in order to satisfy the *Countryman* standard, material obligations must be outstanding on both the Exide and the EnerSys side of the Agreements. In other words, rejection has to be denied if material obligations remain outstanding on just one or the other side.

### The Registration Obligation Does Not Satisfy The *Countryman* Standard.

At trial, Exide argued that, pursuant to Section 12 of the Trademark Agreement, it has an outstanding obligation to EnerSys to maintain registration of the Marks. However, a quick review of Section 12 of the Trademark Agreement reveals that no such absolute obligation ever existed. In fact, all that is required of Exide is that it "maintain the Licensed Marks in accordance with [its] usual and customary business practices" or, in the event Exide ever decided to stop paying maintenance fees, it notify EnerSys at least 120 days in advance. (ENAR 210 § 12).

In the Opinion, the Bankruptcy Court incorrectly treated the maintenance and the notification of termination of maintenance aspects of Section 12 as concurrent obligations of Exide.[11] In fact, the plain language of Section 12 demonstrates that the obligations are not

---

[11]     "I conclude that the affirmative duty to maintain the Licensed Marks <u>and the added</u> duty to give notice to EnerSys upon any expected lapse of the Licensed Mark..." (ENAR 341 p. 18).

concurrent but, rather, are in the alternative. In other words, Exide had no obligation whatsoever to maintain the marks. Exide's only real obligation was to notify EnerSys in the event Exide terminated maintenance of the marks.

In the Opinion, the Bankruptcy Court also held that "failure to maintain the marks or give the appropriate notice to EnerSys could very well deprive EnerSys of the benefit of its bargain." (ENAR 341 p. 18). As noted above, this Court should ignore the Bankruptcy Court's conclusion related to failure to maintain the marks since no such obligation ever existed. However, even if Exide had concurrent obligations to maintain the mark and notify EnerSys of Exide's intent to terminate maintenance, the Bankruptcy Court does not cite to any evidence in the record as to what, if any, negative impact EnerSys would experience as a result of either such failure, let alone evidence which quantifies such impact. In fact, no such evidence exists in the now closed record.

Absent some evidence in the record quantifying (or at least describing) the impact on EnerSys in the event Exide were to fail to maintain the Marks or provide EnerSys with notice of Exide's intent to stop maintaining a particular mark, it is obviously impossible to reach any conclusion that such failure goes to the "root or essence" of the integrated Agreements and whether such failure would deprive EnerSys of the benefit of its bargain. As a result, the Bankruptcy Court's conclusion that the Registration Obligation is an outstanding material obligation of Exide is in error.

### The Indemnity Obligations Do Not Satisfy The *Countryman* Standard.

Pursuant to Section 13.2 of the APA, Exide and EnerSys each agreed to indemnify the other party for certain claims. At trial, Exide presented evidence that, since the closing in 1991, EnerSys has made only three indemnity claims, none of which was made in the last five years. (DAAR 97). At trial, Exide did not present any evidence that any of the indemnity claims asserted by EnerSys are still pending, nor did it present any evidence that Exide has ever asserted a single indemnity claim against Yuasa or EnerSys. Further, pursuant to the

35

terms of the APA, all representations and warranties expired on June 10, 1994, all indemnity claims for environmental liabilities had to be asserted by June 10, 1996 and all indemnity claims for tax liabilities had to be asserted by the expiration of the applicable statute of limitations. (ENAR 212 § 13.1). Therefore, it is not at all surprising that no indemnity claims have been asserted in the last five years.

In the Opinion, the Bankruptcy Court found that the outstanding indemnity obligations of each party to the other are material since they "carry significant burdens and benefits," *see In re Phillips Services*, 284 B.R. 541, 549 (Bankr. D. Del. 2002) and since "unperformed obligations remain under the Agreements for both parties". (ENAR 341 pp. 18-19). However, the Bankruptcy Court fails to identify any of the supposedly significant benefits or burdens related to the indemnity obligations. The obligation of Exide and EnerSys to indemnify each other against such unknown future claims cannot fairly be said to go to the root or essence of the integrated Agreements. In any event, indemnity obligations, by themselves, are an insufficient basis for finding that a contract is executory. *See In re THC Financial Corp.*, 686 F.2d 799, 802-803 (9th Cir 1982); *In re Chateaugay Corp.*, 102 B.R. 335, 346-347 (Bankr. S.D.N.Y. 1989).

### The Further Assurances Obligations Do Not Satisfy The *Countryman* Standard.

Perhaps the most strained of the Bankruptcy Court's conclusions relates to the Further Assurances Obligations. Without citation to a single case or any analysis whatsoever, the Bankruptcy Court concludes that the Further Assurances Obligations satisfy the *Countryman* standard. Since such innocuous, boilerplate provisions are nearly universal and rarely expire, the Bankruptcy Court's holding would make virtually every contract executory forever. The Bankruptcy Court's ruling is also inconsistent with the holdings of the Third Circuit in *Midwest Portland Cement*, 174 Fed. Appx. 311 (holding unperformed obligation to record notice of easement after having recorded deed was non-material obligation) and *Columbia Gas*, 50 F. 3d at 233 (citing with approval to the holding in *In re Sudbury, Inc.*, 153 B.R. 776 (Bankr. N.D. Ohio

1993)(holding cooperation clauses in insurance policies not enough to make the policies executory)).

The Further Assurances Obligations do not go to the root and essence of the integrated Agreements and do not satisfy the *Countryman* standard. The Bankruptcy Court's conclusion to the contrary was in error.

### The Pension Obligation Does Not Satisfy The *Countryman* Standard.

At trial, Exide provided testimony from Lisa Donahue to the effect that, since the closing in 1991, Exide has contributed about $1.5 million to a pension plan. (ENAR 195 pp. 107-09; DAAR 134). Ms. Donahue also testified that, absent funding waivers, Exide estimated that about $1.8 million of additional contributions would be made in the next two years. (DAAR 134)

The only pension plan to which Ms. Donahue made reference is the Exide Hourly Employees Pension Plan (the "**Hourly Plan**"). (DAAR 134). The Hourly Plan is a defined benefit plan and is referenced only once in the APA, at Section 7.2(b). Section 7.2(b) provides, in relevant part,

> ...Seller agrees that it shall be solely responsible to employees and former employees of the Division with respect to pension benefits <u>accrued thereunder as of the Closing Date</u>. Seller agrees to vest the Subject Employees immediately after such Closing Date in their accrued benefits, if any, under the Exide Hourly Employees Pension Plan...(emphasis supplied)

(ENAR 212 § 7.2(b)).

The Bankruptcy Court found that Exide's obligations under Section 7.2(b) were material and ongoing. However, the record does not support either conclusion.

First, to the extent Exide had any obligations to EnerSys under Section 7.2(b), they are limited by the express terms of Section 7.2(b) to "pension benefits <u>accrued...as of the Closing Date</u>." (ENAR 212 § 7.12(b)(emphasis supplied)). At trial, Exide failed to present evidence which would tie any of the estimated $1.8 million in future Exide funding obligations to which Ms. Donahue testified to benefits which were already accrued by employees as of the

Closing Date, June 10, 1991.[12]  Exide's failure to link the future pension funding obligations to which Ms. Donahue testified to benefits accrued as of June 10, 1991, and so at least arguably link them to obligations imposed under Section 7.2(b), renders the evidence presented by Exide related to the Pension Obligation irrelevant and precludes any conclusion that the Pension Obligation satisfies the *Countryman* standard.

Second, even if one were to assume that the future obligations to which Ms. Donahue testified relate to benefits accrued as of June 10, 1991, the limited magnitude of the future obligations which were quantified at trial, about $1.8 million dollars, cannot be said to go to the root or essence of the integrated Agreements, pursuant to which a business valued at over $100 million dollars was transferred.

For the reasons stated above, the Pension Obligations do not satisfy the *Countryman* standard.

### The Quality Standard Provision and the EnerSys Use Restriction Are Conditions Subsequent Which Cannot Satisfy the *Countryman* Standard.

Where a party to a contract is bound to a matured obligation which may be extinguished upon the occurrence of a specified future event, the future event is a condition subsequent. Restatement of Law, 2d, *Contracts* § 230.  Conditions subsequent are not obligations which can satisfy the *Countryman* standard. *See Columbia Gas*, 50 F.3d at 233.

Both the Quality Standard Provision and the Use Restriction are conditions subsequent.  On June 10, 1991, Exide's obligation to permit EnerSys the exclusive use of the Marks on industrial batteries matured.  However, that obligation was subject to being

---

[12]     Given the passage of thirteen years since the Closing, it seems highly unlikely that contributions to the Hourly Plan still to be made by Exide could relate to benefits accrued as of the Closing Date. In any event, it was Exide's burden to prove the connection and Exide failed to even attempt to do so.

38

extinguished pursuant to Section 8 of the Trademark Agreement if EnerSys used the Marks outside of the industrial battery business or failed to satisfy the Quality Standard Provision.

Characterization of the Use Restriction as a condition subsequent is supported by a number of additional considerations. First, as acknowledged by the Bankruptcy Court in the Opinion, nowhere in the Trademark Agreement can one find any affirmative promise by EnerSys not to use the Marks outside of the industrial battery business. (ENAR 341 p. 13). Rather, the only references to the Use Restriction in the Trademark Agreement are (a) in Section 2, where Exide grants to EnerSys the exclusive right to use the Marks in the industrial battery business, and (b) in Section 8 of the Trademark Agreement where EnerSys grants Exide the right to terminate the Trademark Agreement and trigger a two year period during which EnerSys would be required to discontinue its use of the Marks, in the event EnerSys were to use the Marks outside of the industrial battery business. The language of the Trademark Agreement requires the conclusion that the Use Restriction is not an obligation but, rather, is a limitation on the rights granted by Exide to EnerSys and a condition subsequent pursuant to which Exide would be permitted to terminate that grant. *See Kronner v. United States*, 110 F. Supp. 730 (Ct. Cl. 1953) (interpreting termination clause as a condition subsequent).

Second, characterization of the Use Restriction as an obligation yields absurd results. If (i) the Use Restriction is, as Exide argues, a remaining material obligation owed by EnerSys to Exide, and (ii) as Exide also argues, Exide has remaining material obligations it owes to EnerSys, then, since under New York law, breach by Exide of any of its remaining material obligations would relieve EnerSys of its remaining obligations, EnerSys would be relieved of its obligation to observe the Use Restriction and be free to use the Marks outside of the industrial battery business upon any such breach by Exide. In fact, since rejection is a breach, if Exide is right and the Use Restriction is a remaining obligation of EnerSys (as opposed to a condition subsequent) entry of the rejection order itself would relieve EnerSys of the Use Restriction and the obligation not to use the Marks outside the industrial battery business.

39

Clearly, the parties never intended that, regardless what happened after the closing, EnerSys' right to use the Marks could expand outside the industrial battery business. In order to accommodate that mutual expectation, and avoid an absurd result, it is necessary that the Use Restriction be characterized as a condition subsequent rather than an obligation.

Research has not disclosed any case finding that a duty to refrain from exercising rights which were not granted is a material obligation supporting a finding of executoriness. The reason for the lack of case-law to support this proposition seems clear. Such restrictions are not continuing obligations. Rather, these restrictions merely define the limits of what was granted.

In the Opinion, the Bankruptcy Court, immediately after acknowledging that the Agreements contain no affirmative undertaking on the part of EnerSys to abide by the Use Restriction, nevertheless concludes that the Use Restriction is an affirmative, material EnerSys obligation. (ENAR 341 pp. 13-14). However, the Opinion provides no insight into why the Bankruptcy Court elected to read an affirmative obligation into the Trademark License that the parties did not include. For the reasons stated above, the Bankruptcy Court was mistaken. The Use Restriction is a classic condition subsequent and cannot support a finding that the *Countryman* standard has been met.

### The Quality Standard Provision Has Been Waived By Exide And, So, Cannot Satisfy the *Countryman* Standard.

As stated in a leading treatise on New York Law, "An unexplained delay in enforcing a contract may constitute evidence of waiver and acquiescence in non performance." 22 NY Jur. CONTRACTS § 370 (2002). In the Bankruptcy Court, EnerSys asserted that, under New York law, Exide waived its rights under the Quality Standards Provision. In support of its waiver assertion, EnerSys provided evidence at trial that since 1991, Exide has never: (a) requested any samples of EnerSys or "Exide" batteries (ENAR 194 pp. 138, 229) and (b) Exide has never engaged EnerSys in a single conversation about Quality Standards. (ENAR 194 pp. 157-58). Further, while it is difficult to prove a negative, nothing in the trial record establishes

40

that, prior to seeking to reject the Trademark Agreement, current management of Exide was even aware that the Quality Standard Provision existed. Certainly, Exide provided no evidence at trial that current management was aware that the Quality Standard Provision existed prior to its decision to seek rejection.

In the Opinion, the Bankruptcy Court concluded that Exide has not waived the Quality Standards Provision. (ENAR 341 p. 12). Its conclusion appears to be based, primarily, on its understanding that over the years, Exide did some monitoring of EnerSys batteries. (Id.) However, the evidence relied upon by the Bankruptcy Court does not support the conclusion that any such monitoring was done in order to enforce EnerSys' obligations under the Quality Standard Provisions. To the contrary, Neil Bright, the head of Exide's Industrial Battery Division, testified that, to the extent EnerSys produced quality batteries, that was EnerSys' decision and that it was not Exide's job to monitor product quality. (ENAR 193 pp. 149-50). Further, Mr. Bright testified that Exide bench tests all of its major competitors' batteries and that testing of EnerSys batteries was unrelated to any quality obligations contained in the Trademark Agreement. (ENAR 193 pp. 68, 159-60).

The Bankruptcy Court also seemed influenced by evidence that EnerSys produced quality batteries. (ENAR 341 p. 12). However, the fact that EnerSys produced quality batteries would excuse Exide's complete and utter lack of attention to (and apparent lack of knowledge of) the Quality Standard Provision only if Exide produced evidence of some link between the two. Exide failed to even attempt to establish any such link.

### Even if the Quality Standard Provisions and the Use Restriction are Obligations, and the Quality Standard Provisions were not Waived by Exide, neither the Quality Standard Provisions nor the EnerSys Use Restriction can Satisfy the *Countryman* Standard.

In the Opinion, the Bankruptcy Court held "For the reasons set forth, EnerSys' Use Restriction and the Quality Standard are ongoing material obligations." (ENAR 341 pp. 14-15). However, despite that reference, the Opinion does not contain any "reasons" why the

Bankruptcy Court concluded that the Use Restriction and the Quality Standard Provisions are material obligations of EnerSys. Rather, all discussion in the Opinion concerning the Quality Standard Provisions and the EnerSys Use Restriction relates simply to whether they are obligations at all.

The root and essence of the 1991 Transaction was the sale by Exide of its industrial battery division, not the production by the buyer of quality batteries. Stated differently, had EnerSys failed to satisfy the Quality Standards Provisions or abide by the Use Restriction after closing, Exide would have had the termination rights stated in the Trademark Agreement, but would not have been deprived of the very substantial benefits (i.e., over $130.0 million in consideration) of the bargain it struck in 1991. To the contrary, Exide would actually have obtained more than it bargained for since it would have retained the $130.0 million plus of consideration and regained control over the "Exide" Mark. Further, even if the Quality Standards Provisions were not waived by Exide, the trial record is strong evidence that, prior to seeking rejection of the Agreements, the Quality Standard Provisions were not of any real importance to Exide. Based on the foregoing, the Bankruptcy Court's unsupported conclusion that the Quality Standard Provisions and the EnerSys Use Restriction are material was in error.

### D.    Even if the Agreement Would Otherwise Be Executory, Rejection Must Be Denied Because Exide Failed to Seek Rejection of All of the Contracts Which Were Integrated Into the Agreement.

If a document is but one contract in a group of integrated agreements, executoriness can only be analyzed by reference to the group of integrated documents as a whole. *See, e.g., Phillips Services, Inc.*, 284 B.R. at 541 (Bankr. D. Del. 2002) (a note and an agreement were inseparable and must be analyzed together to determine whether there were any material obligations remaining). This makes sense because analysis of the factors relevant to determining executoriness, discussed in detail above, can be different depending on whether the focus is on a single agreement or on a group of agreements.

42

As noted above, the Debtors are only seeking to reject four of the contracts executed in connection with the 1991 Transaction, specifically the Asset Purchase Agreement, the Trademark Agreement, the Administrative Services Agreement and the 1994 Letter Agreement. However, many other contracts (the "**Other 1991 Contracts**") were executed on June 10, 1991, in connection with the 1991 Transaction including, among others, the following: Reading Office Lease, Laureldale Office Lease, Administrative Services Agreement, Supply Agreement, Agreement Not to Compete, Golf Cart Battery Agreement, Trademark Assignment Agreement, Patent Assignment Agreement, Trademark License Agreement, Patent License Agreement, Grant-Back Patent Agreement, Bill of Sale, Instrument of Assignment and Assumption, Security Agreement, Agreement Providing for Amendment and Continuation of Exide Hertner Division Employees' Pension Plan, Employment Agreement of Ira Baeringer, Employment Agreement of Raymond J. Kenny, Employment Agreement of Richard Phillips, Assignment of Part of Sales Representative Agreement, Partial Assignment and Assumption of Equipment Lease Agreement and Consent, Consent to Use of Name Exide (New Hampshire), Replacement of Sonnenschein Process Agreement, Agreement for Transfer of NPDS Permit Responsibility. (ENAR 275-299).

Whether multiple documents should be considered a single contract is a question of fact and is determined by reference to applicable state law. *See F & K Supply Inc. v. Willowbrook Dev. Co.*, 288 A.D.2d 713, 716 (App. Div. 3d Dep't 2001) (whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted); *In re Integrated Health Services, Inc.*, 2000 Bankr. LEXIS 1310, *10 (Bankr. D. Del. 2000) (severability is determined by state law).

Under New York law, integration of multiple documents is a question of intent of the parties and can be determined by reference to surrounding facts and circumstances as well as the language of the agreements. *See F & K Supply,* 288 A.D.2d at 716.

43

The language of the Asset Purchase Agreement not only supports but, in fact, requires its integration with the Other 1991 Contracts. Most, if not all, of the Other 1991 Agreements are defined in the Asset Purchase Agreement as "Ancillary Agreements." (ENAR 212 § 3.1(e)). Further, each is specifically integrated into the Asset Purchase Agreement. (ENAR 212 § 16.3).

Courts have considered the following surrounding facts and circumstances in evaluating integration issues:

1. Whether the agreements were executed by the same parties;
2. Whether the agreements were executed at the same time;
3. Whether there was separate consideration for each agreement;
4. Whether the agreements covered separate subject matter; and
5. Whether the agreements involved separate objectives.

22 NY Jur. 2nd CONTRACTS § 269 (2002).

The Other 1991 Contracts were all executed on the same day and by the same parties as executed the Asset Purchase Agreement. Further, no separate consideration was paid for the Other 1991 Agreements. Rather, all consideration for all of the Agreements was paid under the APA. Finally, it is clear that all of the Other 1991 Contracts and the Asset Purchase Agreement addressed a single subject matter and objective, the sale of the Exide's industrial battery business.

This is not a close case. The Other 1991 Contracts and the Asset Purchase Agreement are clearly a series of integrated agreements. In fact, EnerSys thought the Bankruptcy Court had ruled as much in connection with his denial of Exide's motion for summary judgment seeking a determination that the Trademark Agreement, analyzed alone, was executory. (ENAR 89 pp. 25-26, 64). However, the Bankruptcy Court apparently intended only to rule that the four Agreements which Exide sought to reject were integrated. Of course, exactly the same considerations which supported the Bankruptcy Court's accurate conclusion that the four Agreements were integrated (a) support the conclusion that the Other 1991 Contracts are

44

integrated with the four Agreements, and (b) require denial of Exide's attempt to reject the four

Agreements due to Exide's failure to seek rejection of the Other 1991 Contracts.

In an interesting twist, the Bankruptcy Court held that Exide's failure to seek

rejection of the Other 1991 Contracts was not fatal to Exide's request to reject the four

Agreements since it had ruled that the four Agreements were integrated. However, even if the

Bankruptcy Court only ruled that the four Agreements were integrated, it clearly did not rule that

the Other 1991 Contracts were not integrated. (ENAR 89 pp. 25-26). As a result, the

Bankruptcy Court's summary judgment ruling did not preclude EnerSys' continuing to pursue the

argument that all of the contracts executed on June 10, 1991 were integrated. EnerSys did pursue

that argument, that argument was correct, and the Bankruptcy Court erred in failing to deny

rejection of the four Agreements based on Exide's failure to seek rejection of the Other 1991

Contracts.

**E.    Even if the Agreement Would Otherwise Be Executory, Rejection Must Be Denied Because Exide Sold Its Rights to Use the "Exide" Mark on Industrial Batteries to EnerSys.**

To the extent assets or rights were sold by Exide to EnerSys in 1991, rejection of

the Agreements would not affect the transfer of title. For instance, even Exide does not argue that

rejection would cause the industrial battery plants sold to EnerSys in 1991 to revert to Exide. So,

if the Agreements effected a closed sale of Exide's rights to use the "Exide" Mark on industrial

batteries, rejection could not impact EnerSys's vested rights in the mark.

In the Opinion, the Bankruptcy Court ruled that the rights to use the "Exide"

Mark on industrial batteries were not sold to EnerSys in 1991. (ENAR 341 pp. 20-21). Its

conclusion appears to be driven by two erroneous considerations.

First, the Bankruptcy Court made a factual finding that "EnerSys cannot transfer

or sublicense it [the "Exide" Mark] without Exide's consent." (ENAR 341 p. 21). The

Bankruptcy Court's factual finding was clearly erroneous as it relates to sublicensing. Section 11

of the Trademark Agreement provides, in relevant part, "This Trademark License shall be

45

assignable by Licensee [EnerSys] with Licensor's consent and Licensee shall have the right to grant sublicenses of the Licensed Marks within the scope of the Licensed Business." (ENAR 210 § 11). Clearly, while assignment of the Licensed Marks does require Exide's consent, sublicensing does not.

The second consideration upon which the Bankruptcy Court rests its holding that the rights in the "Exide" Mark were licensed and not sold is that, under the Asset Purchase Agreement, certain marks were assigned while certain others (including the "Exide" Mark) were licensed. While true, the Bankruptcy Court's observation is just the beginning of the sale/license analysis. Unfortunately, the Bankruptcy Court failed to proceed beyond the first step.

New York state courts have consistently held that, when interpreting a contract, substance must prevail over form. *See Heller v. Pope*, 250 N.Y. 132, 164 N.E. 881 (N.Y. 1928); *William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 246 N.Y. 519, 159 N.E. 418 (N.Y. 1927). The substance over form principle has been regularly applied to intellectual property transfers. In *Waterman v. Mackenzie*, the Supreme Court held: "Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." 138 U.S. 252, 256 (1891). Although *Waterman* is a patent case, courts have held that the principle is equally applicable in trademark cases. *See, e.g., A. Bourjois Co. v. Katzel*, 260 U.S. 689 (1923); 2 McCarthy on Trademarks § 18.5 ("Even though a contract states that it is a 'license,' a court will not be governed by form, and the contract will be upheld as an assignment of trademark rights if that is its actual legal effect."). Several courts have held that agreements labeled "trademark licenses," with characteristics like those found in the Trademark Agreement, were, in substance, sales and not licenses. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870 (Fed. Cir 1991), *reh'g denied*, 1991 U.S. App. LEXIS 28620 (Fed. Cir. Dec. 3, 1991); *Conde Nast Publications, Inc. v. United States*, 575 F.2d 400 (2d Cir 1978).

The *Conde Nast* case involved facts which are remarkably similar to those in this case. In 1961, Conde Nast Publications, Inc. ("**Conde Nast**"), sold its dress pattern business to Butterick Company ("**Butterick**"). In connection with the sale, Conde Nast granted Butterick "the sole and exclusive right and license to use the trademark 'Vogue' in the United States, Canada, England and Australia, as well as anywhere else in the world where it could lawfully do so in connection with its paper dress pattern business." Conde Nast retained the mark for use in its publishing and other businesses. *Id.* at 402. Butterick paid Conde Nast a lump sum at closing plus an on-going annual royalty. Under the "license agreement," (1) Butterick was only allowed to use the mark on materials of high quality, (2) Conde Nast had the right to inspect the materials to ensure such quality, (3) Conde Nast had the right to terminate the agreement under certain circumstances, (4) Butterick's right to transfer the mark was restricted, and (5) Conde Nast retained the right to bring infringement actions. *Id.* at 403. However, because Conde Nast licensed the mark at the same time as it sold its dress pattern business to Butterick and retained no significant continuing interest or participation in the business which was sold, the court held the license was, in fact, a sale. *Id.* at 406.

Like *Conde Nast*, Exide granted EnerSys the exclusive right to use the Marks anywhere in the world in connection with the business that it sold to EnerSys. The Trademark Agreement, like the *Conde Nast* agreement, imposed quality requirements and imposed use restrictions on the Marks. However, unlike the *Conde Nast* agreement, under the Trademark Agreement EnerSys has no ongoing royalty obligations and, as noted above, has the right to sublicense the Marks without Exide's consent.

The absence of royalties and the right to sublicense without consent make this an even stronger case for characterization of the transaction involving the Exide Marks as a sale than existed in *Conde Nast*. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372,1380 (Fed. Cir. 2000) ("A licensee's right to sublicense is an important consideration in evaluating whether a license agreement transfers all substantial rights").

47

It is also important to emphasize that the agreement in *Conde Nast* was found to have effected a sale notwithstanding the fact that Conde Nast, like Exide in this case, had certain limited contractual rights to terminate the agreement. *See, e.g., Kenyon v. Automatic Instrument Co.*, 160 F.2d 878, 882 (6th Cir. 1947) (holding that agreement assigning patent rights was not executory despite ongoing performance obligations and a right of termination); *Kronner v. United*, 110 F. Supp. at 730 (holding that right of termination did not make a sale a license and interpreting termination clause as a condition subsequent).

The Rejection Order must be reversed because the Bankruptcy Court erred in concluding that the right to use the "Exide" Mark on industrial batteries had not been sold to EnerSys in 1991.

## F.  The Bankruptcy Court Erred When It Concluded That Debtors Satisfied The Business Judgment Test

The Bankruptcy Court erred when it concluded that Debtors satisfied the business judgment test. Foremost, the Bankruptcy Court improperly admitted and relied upon DAAR 215-17 and related testimony in support of Exide's proposition that rejection of the Agreements would yield a substantial sales benefit to Exide.[13]  Absent those documents and related testimony, the record is entirely devoid of evidence of any quantification of the claimed benefit from rejection and likewise lacking any real analysis – other than Exide's conclusory "say-so" – that rejection would result in a benefit to Exide. In fact, given the heavy redaction of DAAR 215-17, even if they were properly admitted, the record would still contain (a) no comprehensible analysis of the benefit of rejection to Exide, and (b) no evidence of any real analysis by Exide of the costs of rejection.

After reviewing certain testimony regarding Exide's decision making process (*see* ENAR 341 pp. 23-34), the Bankruptcy Court concluded:

---

[13]    This Court's review of the Bankruptcy Court's evidentiary rulings is plenary. *Staples*, 307 B.R. at 784-85.

48

Based upon the foregoing, I conclude that Exide undertook appropriate steps in reaching its decision to reject the Agreement. Exide's decision took into account the potential benefits, as well as the harms, in rejecting the Agreement.

(ENAR 341 pp. 24-25).

It is well-settled that an executory contract may only be rejected if the proponent satisfies the business judgment test. (ENAR 341 p. 22; *Sharon Steel Corp.* 872 F.2d at 39-40). That test requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances. (ENAR 341 p. 22, *In re Vencor*, 2003 Bankr. LEXIS 659, *8-*9 (Bankr. D. Del. 2003); *see also* ENAR 195 pp. 41-42; ENAR 194 pp. 53-55).

Because the Bankruptcy Court's conclusion that Debtors satisfied the business judgment test required both the selection and application of legal precepts to historical facts and the finding of those facts, EnerSys' appeal of that conclusion presents a mixed question of law and fact. *Staples, Inc.,* 307 B.R. at 785. Specifically, the Bankruptcy Court erred in applying a legal principle to the facts, making that ruling subject to a plenary review. *Staples, Inc.*, 307 B.R. at 785 (*citing American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999)). The Bankruptcy Court also erred in finding credible certain facts, and those findings are subject to a clearly erroneous standard of review. *Id.*

As noted above, the Bankruptcy Court erred when it based (in large part) its conclusion that the business judgment standard was satisfied on DAAR 215-17 and testimony from Neil Bright and Bruce Cole regarding those exhibits, all of which was inadmissible. (ENAR 341 pp. 27-32). Absent those documents and that testimony, the record contains no evidence of any analysis by Debtors of a quantifiable benefit from rejection or, indeed, any benefit from rejection other than Debtors' conclusory "say-so."

The parties agree that DAAR 215-17 are out-of-court statements offered for the truth of the matter. As a result, they are classic hearsay under Federal Rule of Evidence 801(c) and are inadmissible under Federal Rule of Evidence 802.

49

The Bankruptcy Court admitted DAAR 215-17 into evidence under the business records exception contained in Fed. R. Evid. 803(6), which provides that records of regularly conducted activity are not inadmissible "if kept in the course of a regularly conducted activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." (ENAR 341 pp. 29-30 and n.32). That admission was in error because DAAR 215-17 were not kept in the regular course of Exide's business but, rather, were created expressly for this litigation. As a result, DAAR 215-17 are not covered by the business records exception. *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943), *reh'g denied*, 318 U.S. 800 (1943); *United States v. Casoni*, 950 F.2d 893, 898 (3d Cir. 1991) (Hutchinson, J.) (a document created for litigation did not have the element of trustworthiness that the business records exception of Rule 803(6) requires); *see also Ebenhoech v. Koppers Indus.*, 239 F. Supp. 2d 455, 463 (D.N.J. 2002) (Simandle, J.). The Bankruptcy Court acknowledged this binding legal principle. (ENAR 341 pp. 29-30).

DAAR 215-17 were not created until January 2004, well after Exide sought to reject the Agreements and after the close of discovery in this case. They were actually copied to Exide's counsel for production to EnerSys at the same time they were sent to Exide's senior management. (*See* ENAR 195 pp. 237-39). Further, on their face, the exhibits address "favorable" and "unfavourable" outcomes of this case, hardly something Exide assesses in the ordinary course of its business. DAAR 215-17.

Plainly, DAAR 215-17 are not "records of regularly conducted activity" and are "not kept in the course of regularly conducted activity." They are classic litigation documents created with an eye toward the litigation and in an effort to bolster Exide's chances of achieving rejection of the Agreements. Any such analysis inherently lacks the reliability and trustworthiness traditional business records possess. Simply stated, DAAR 215-17 are litigation documents, not business documents, and are inadmissible.

Nor does the Opinion provide any reasoning which could justify admitting DAAR 215-17. To the contrary, what limited reasoning is provided either fails to address the issue altogether or, more likely, actually requires exclusion of DAAR 215-17. In ruling that the exhibits were admissible, the Bankruptcy Court stated:

> The Forecasts [DAAR 215-17] are a part of Exide's continual decision-making efforts concerning the proposed rejection. Obviously, it was important for Exide to conduct the analyses to quantify, as best it could, the effect of its decision to reject the Agreement and determine whether its decision to reject was appropriate.

(ENAR 341 p. 30).

In other words, the Bankruptcy Court recognized that DAAR 215-17 related to Exide's decision to reject rather than to normal, day-to-day, business planning. What more is needed to understand that DAAR 215-17 are inadmissible litigation documents?

Even if this Court were to conclude that DAAR 215-17 satisfied the business records exception to the hearsay rule, in order to be admissible, they must also be relevant. Fed. R. Evid. 401 and 402. In order to be relevant, evidence must have a tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence. Fed R. Evid. 401. As noted *infra* at 53-54, DAAR 215-17 went through two full rounds of substantive redactions for alleged confidentiality concerns, (ENAR 193 pp. 24-25), and have been so emasculated that at this point they add nothing, and do not make any fact more or less probable. *See infra* at 53-54. Looking at these documents, as redacted, there is little or no meaningful information that can be gleaned therefrom. As a result, as redacted, DAAR 215-17 are not relevant under Fed. R. Evid. 401, and are therefore inadmissible under Fed. R. Evid. 402.

For all the reasons stated above, this Court must reverse the Bankruptcy Court's ruling admitting DAAR 215-17 and exclude them and all testimony regarding them.

Even if DAAR 215-17 were properly admitted, the testimony of Messrs. Bright and Cole at trial regarding these documents and the analysis contained therein must be stricken.

51

Neither Mr. Bright nor Mr. Cole made the calculations contained in DAAR 215-17 nor performed the analysis concerning what increases or decreases Exide would have in sales under certain scenarios. (ENAR 195 pp. 245-46 -- Cole testifying that DAAR 215 was prepared by Neil deCarteret); (ENAR 193 pp. 172-73 -- Bright did not know the instructions given to the forecasters, and did not "do the exercise directly" himself). Therefore, they lacked any reasonable foundation for their testimony (in the case of Mr. Cole, lay opinion testimony under Fed. R. Evid. 701) and were not basing that testimony on firsthand knowledge. In fact, Cole acknowledged that he did not even know the exact criteria used in selecting the customers or other information for these exhibits. (ENAR 195 pp. 252-53, 256). Cole admitted that there were errors in the data and that he discarded a document containing some analysis incorporated into the documents. (ENAR 195 pp. 250-51, 257). Neil Bright not prepare the exhibits and testified that "as to the actual specifics of the results analyzed and gathered in the field," Bruce Cole would be "better able to talk about" than Mr. Bright. (ENAR 193 p. 111).

Both of these witnesses were simply reading into the record these heavily redacted inadmissible hearsay documents from which no reasonable person could have determined the accuracy of the information. As a result, the testimony of Bruce Cole and Neil Bright concerning these issues, (*see* ENAR 195 pp. 184-201, 209; ENAR 193 pp. 110-114) should have been stricken, and the Bankruptcy Court's failure to do so (ENAR 341 pp. 30-31) was in error. The Bankruptcy Court's reasoning that these witnesses were familiar with the electronic data warehouse system ("**System**") used to create the documents (ENAR 341 p. 31) is beside the point. They were wholly unfamiliar with the basic criteria and methodology used, and did not perform the analysis, use that unknown methodology, or create the analysis or for the most part, the documents (Cole created the table in DAAR 217), regardless if they know about the System. The record simply does not support a finding that these witnesses are "other qualified witnesses" under Fed. R. Evid. 803(6), and as a result, these witnesses lack a proper

52

foundation to testify regarding them. Accordingly, their testimony regarding DAAR 215-17 must be stricken.

Even if this Court allows DAAR 215-17 and the related testimony of Mr. Bright and Mr. Cole to remain in evidence, the record still does not support the Bankruptcy Court's conclusion that the business judgment rule was satisfied.

Exide argues that DAAR 215-17 provide the required evidence of benefits Exide would obtain through rejection of the Agreements. Exide is wrong because: (i) the exhibits were so heavily redacted that they are incomprehensible and not helpful to the trier of fact; and (ii) the exhibits attempted to incorporate results of several forecasts that used fundamentally different criteria.

At trial, EnerSys' expert Brian Blonder described, in detail, why DAAR 215-16 have no credible basis and should not have been given any weight. (ENAR 202 pp. 119-29; Demonstrative Exhibit ENAR 312 at Charts 31-33). Those reasons include the following:

- Neither EnerSys nor the Court knows the methodology used in making the underlying forecasts that were consolidated in DAAR 215-17. (ENAR 193 pp. 157-58).
- As noted, DAAR 215-17 have been so heavily redacted by Debtors that they are virtually meaningless. (ENAR 202 pp. 124-28; Demonstrative Exhibit ENAR 312 at Charts 31-33). For example, Debtors redacted the current year's sales figures, and provided only the sales forecasts. Without knowing the base, it is impossible to understand the implications of the forecasts and to question why, in certain instances, there is no impact. (ENAR 202 p. 124). By way of further example, Debtors redacted the names of the customers examined (which are only a small subset of Exide's customer base). Without knowing these customers' identities, there is no way for the Court to know (or for EnerSys to challenge) whether this subset is, in fact, representative of Debtors' entire customer base. (ENAR 202 pp. 126-27). The importance of this failure becomes glaringly clear when one examines how Debtors reach their $ _____ - (**REDACTED** at Exide's request pending Exide Motion for Protective Order ("**REDACTED**"). What Debtors actually show on the third page of DAAR 216 reveals a "swing" or forecasted purported benefit of only **$REDACTED**, which Debtors extrapolate to **$REDACTED** and then to **$REDACTED**. (ENAR 202 pp. 125-26; Demonstrative Exhibit ENAR 312 at Chart 31). Similarly, on the second page of DAAR 215, what Exide shows is a "swing" or forecasted purported benefit of only **$REDACTED**, which Exide extrapolates first to **$REDACTED** and then to $RED.. (ENAR 202 pp. 126-27; Demonstrative Exhibit ENAR 312 at Chart 32). In sum, on DAAR 215-17, Debtors show a

total of $**REDACTED**, extrapolate to $**REDACTED** and then to $**REDACTED** (ENAR 202 p. 128; Demonstrative Exhibit ENAR 312 at Chart 33). This methodology, calculating the forecasts on data that has not been provided and/or has been redacted, and extrapolating from approximately $**REDACTED** to approximately $**REDACTED**, simply has no merit and is unfairly prejudicial to EnerSys because it cannot challenge or validate the calculations. Accordingly, it should be given no weight, though the Bankruptcy Court gave it considerable weight. (ENAR 341 pp. 27-32).

- The failure to identify customers also leaves the Court and EnerSys unable to understand how much of the $**REDACTED** sales swing in Europe is attributable to customers in the United Kingdom, Netherlands, or Nordic countries where, regardless of the outcome of these proceedings, Exide admits it is precluded from using the Exide Mark. (ENAR 193 pp. 133, 192; ENAR 195 p. 212).

In addition to the issues noted by Mr. Blonder, DAAR 215-17 should be given no weight because they only analyze sales. Even if the sales analysis were accepted as reliable, it does not help the Court understand the impact of rejection on Exide's enterprise value which must increase dollar for dollar with the EnerSys rejection damage claim to avoid diluting the pre-confirmation unsecured creditors. (Demonstrative Exhibits ENAR 312 -13, referenced in ENAR 205 pp. 56-57). In order to get to the crucial enterprise value impact, Exide would have first needed to add to its sales analysis a quantification of both recurring costs of producing the additional sales as well as one-time costs to rebrand. The record is devoid of any evidence of such costs. Further, even if Exide had produced <u>any</u> evidence of such costs, it would have had to produce evidence of the impact of such costs on profits and enterprise value. Exide failed to produce any such evidence.

In sum, even if, theoretically, an analysis of the impact on sales (without considering any costs or impact on enterprise value) would be relevant, the sales analysis proffered by Exide to show benefit to the estate is impossible to understand or test, is based on

faulty methodology, and cannot be properly relied upon.[14]  *See In re Chestnut Ridge Plaza Assocs.*, 156 B.R. 477, 480 (Bankr. W.D. Pa. 1993) (debtor's motion to reject denied where failure of proof of benefit to the estate).  DAAR 215-17 also lack a proper foundation because the employees who performed the analysis, created the documents and had knowledge of the criteria and methodologies used did not testify at trial. As a result, even if admissible, DAAR 215-17 and the related testimony should not have been given any weight.

Once DAAR 215-17 and related testimony are either excluded or weighted at zero, the record reveals a capricious, largely non-existent process in which Debtors exercised no business judgment at all.  Neil Bright, the president of Exide's Industrial Energy Business Unit, testified that the rejection decision was made after just 5-10 minutes of discussion on a weekly conference call. (ENAR 193 p. 146).  Mr. Bright further testified that he did not provide a single document to the participants in that call to review before making that important decision.  (*Id.*). He was not asked on the call how Exide would use the name. (*Id.* at 147).  Similarly, the cost to transition to the name was not discussed.  (*Id.*).  Finally, Mr. Bright was not asked about what additional sales, if any, would be gained by retrieving the rights to use the Exide name.  (*Id.*).

The record also establishes that no presentation regarding the decision to reject the Agreements was ever made to Exide's Board of Directors.  (ENAR 195 p. 118).  The trial

---

[14]      Exide has argued that, because it had a legitimate business concern which caused it to seek the massive redactions in DAAR 215-17, the Court should afford the exhibits the same weight it would had the unredacted versions been offered.  While Exide may be right that it was justified in seeking and obtaining the right to redact, it cannot have it both ways. Once the documents were redacted, their admissibility and, if admitted, their weight, must be judged on the basis of what the Court and EnerSys can see, not what might be in the redacted information.  Any other approach would clearly be prejudicial to EnerSys (since one cannot challenge what one cannot see) and unworkable for the Court, since any reliance would require the Court to engage in improper speculation. *See Powhatan Mining Co. v. Ickes*, 118 F.2d 105, 107-109 (6th Cir. 1941) (It violated the "canons of fairness" to admit into evidence exhibits which contained data concerning sales but had been redacted, based on confidentiality, so that opposing party could not determine who made such sales, and therefore, prevented reasonable cross-examination).

record contains just one memorandum to the Board regarding rejection.[15]    But even that

memorandum devotes just two sentences to the issue and focuses only on the significant sales

impact on EnerSys, with no mention of <u>any</u> benefit or cost to Exide.[16] ("We rejected the Yuasa

contract this week in Bankruptcy Court to reclaim our rights to the Exide name for Motive and

Network Power in NA.  This will impact about an estimated $170 million of EnerSys sales in

North America.")(ENAR 195 p. 59); (Exide's Chief Executive Officer Craig Muhlhauser

testifying regarding ENAR 314: "Q.  Is it fair to say that this is the only document that you

prepared that was sent to the board of directors that specifically references the rejection decision?

A.  To the best of my knowledge, yes.").  (ENAR 195 p. 59).

Plainly, the Debtors have made no actual assessment of the economic benefit or

the costs that would be incurred if the Court permitted rejection. Lisa Donahue, the Debtors'

Chief Restructuring Officer, candidly admitted:

> Q.    At the time the decision was made to reject -- this is April
>        of 2003 -- did Exide do any economic benefit or cost study
>        as to the impact of rejection?
> A.    Not that I'm aware of.
> (ENAR 195 p. 59).

Finally, even if one were to assume that the trial record contains some evidence

of attempts by Exide to quantify the benefits of rejection, it is entirely devoid of any evidence that

Exide ever made any serious effort to quantify the potential EnerSys rejection damage claim and,

so, the impact of rejection of the Agreements on pre-confirmation unsecured creditors.  While

some Exide executives testified that they did not believe that rejection would hurt EnerSys in a

---

[15]    ENAR 314.  ENAR 314 was only produced following an *in camera* review by Judge
Walsh, after Debtors initially claimed the document was protected from disclosure by the
attorney-client privilege.  *See* Letter Order of the Honorable Peter J. Walsh, dated February 11,
2004, at 4 ("With respect to Document No. 14, I am unable to conclude that it is protected by the
attorney-client privilege.") (ENAR 193).

[16]    ENAR 314.

material way,[17] that testimony falls far short of establishing that any real attention was paid to quantifying the EnerSys rejection damage claim. Exide's conclusion that EnerSys would suffer only minimal harm if it lost the Exide Mark is also wholly inconsistent with Exide's own testimony that EnerSys is Exide's number one competitor in both North America and Europe (ENAR 193 pp. 56-57) and that Exide will realize a $**REDACTED** positive projected swing in sales simply by taking the Exide Mark back from EnerSys. (ENAR 195 pp. 198-99). Obviously, some significant portion of any positive swing enjoyed by Exide will come at the expense of EnerSys. Simply stated, Exide's anticipated gain in revenues must result in lost revenues to its competitors, and the bulk of the losses is likely to fall on EnerSys, the party losing the name. In fact, Bruce Cole, Exide's head of motive power marketing, conceded as much. (ENAR 195 pp. 232-33).

The failure of Exide to seriously analyze the potential EnerSys rejection damage claim is a fatal flaw in Exide's decision-making process, since it is undisputed that benefit to the estate is required in order to satisfy the business judgment test and that benefit to the estate focuses on benefit to unsecured creditors. *See, e.g.*, *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. denied*, 511 U.S. 1026 (1994). *See also In re Lan Associates XI, L.P.*, 192 F. 3d 109, 120 (3d Cir. 1999) (McKay, J.) (estate "is created for the benefit of unsecured creditors").

In the Opinion, the Bankruptcy Court notes that the Official Committee of Unsecured Creditors supports rejection of the Agreements and indicates that he affords substantial weight to the position of the Committee. EnerSys does not dispute that it is appropriate for a bankruptcy court to consider the position of a creditors' committee on issues which directly impact unsecured creditors, such as rejection of a contract. However, a

---

[17]    ENAR 193 pp. 160-62; ENAR 195 pp. 33-34, 53-54. *But see* contrary testimony of Neil Bright in ENAR 193 p. 117 ("Q. At the time you made this recommendation to Mr. Muhlhauser that the agreement should be rejected did your consider at all whether it would have any impact on EnerSys and its business. A. Not really?").

bankruptcy court may not defer entirely to a committee's position on rejection and ignore the lack of any credible trial evidence to support the debtor's decision. *In re Lionel Corporation*, 722 F.2d 1063, 1071 (2d Cir. 1983). In this case, given the obvious shortcomings of the evidence presented by Exide, EnerSys submits that just such an impermissible deferral to the Committee occurred.

Whether or not DAAR 215-17 and related testimony were properly admitted, the Bankruptcy Court erred in concluding that Exide satisfied the business judgment test in deciding to reject the Agreements. As a result, the Rejection Order must be reversed.

### G. If the Rejection Order is Reversed, the Transition Plan Order Must Also Be Reversed.

EnerSys includes this section of its Brief out of an abundance of caution and just to make certain that a housekeeping detail is not lost in the shuffle. In connection with the hearings the Bankruptcy Court scheduled after the filing of the EnerSys Notice of Appeal to consider transition issues, the parties struggled with whether or not the Rejection Order was a final order. EnerSys argued that the Rejection Order was final and Exide argued it was not (ENSAR 2-3).

At this point, it is no longer important whether the Rejection Order was or was not final. The Transition Plan Order has been entered and EnerSys does not contest that it just enforces the Rejection Order. EnerSys appealed the Transition Plan Order simply so that (a) if it were later determined that the Rejection Order was not final until entry of the Transition Plan Order, the appeal record would be complete, and (b) if the Rejection Order were reversed, an appellate court entering the reversal would also have jurisdiction to reverse the Transition Plan Order.

If the Rejection Order was not final until entry of the Transition Plan Order, it seems obvious that both orders should be affirmed or reversed as one. If the Rejection Order was final before entry of the Transition Plan Order, this Court should also reverse the Transition Plan

58

Order since, but for the Rejection Order, the Transition Plan Order would never have been entered and since the Transition Plan Order would then be inconsistent with the underlying rights of the parties. EnerSys doubts that Exide contests that, if the Rejection Order is reversed, so too must the Transition Plan Order be reversed.

## VII.    CONCLUSION

For all the foregoing reasons, Appellant EnerSys respectfully requests that this Court (a) find that rejection of the Agreements would not effect a termination of the Agreements and would not terminate EnerSys' exclusive right to use the Marks, including the "Exide" Mark under the terms of the Trademark Agreement and reverse the Bankruptcy Court Orders to the extent they hold to the contrary, (b) reverse the Bankruptcy Court Orders and render judgment in favor of EnerSys, denying Exide's request to reject the Agreements, and (c) for such other and further relief, at law and equity, to which Appellant EnerSys may be justly entitled.

Dated: September 5, 2006

Respectfully submitted,

STEVENS & LEE, P. C.

/S/

Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3304
Telecopier: (610) 371-8512
E-mail: tgw@stevenslee.com

- and –

Robert Lapowsky, Esquire
Neil C. Schur, Esquire
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 575-0100
Telecopier: (215) 851-0214
Email: rl@stevenslee.com
        ncsc@stevenslee.com

*Attorneys for EnerSys Delaware, Inc.*
*f/k/a EnerSys, Inc.*

SL1 660512v2/008444.00325

## CERTIFICATE OF SERVICE

I, Thomas G. Whalen, Jr., hereby certify that on September 5, 2006, a true and correct copy of the foregoing Opening Brief of Appellant EnerSys Delaware, Inc. f/k/a EnerSys, Inc. was served on counsel for Appellee and other interested parties as follows:

*Via Hand Delivery*
James E. O'Neill, Esquire
Pachulski, Stang, Ziehl, Young,
      Jones & Weintraub, P.C.
919 North Market Street, Suite 1600
Wilmington, DE 19801

*Via Federal Express*
Matthew N. Kleiman, Esquire
Matthew N. Kleiman, P.C.
2506 North Clark Street, Suite 307
Chicago, IL 60614

*Via Regular Mail*
Mark Kenney, Esquire
U.S. Trustee's Office
844 King Street, Room 2313
Lockbox 35
Wilmington, DE 19801

*Via Federal Express*
Roger P. Furey, Esquire
Intellectual Property Law Department
Katten Muchin Zavis Rosenman
1025 Thomas Jefferson Street, N.W.
Washington, D.C. 20007-5201

*Via Regular Mail*
Fred Hodara, Esquire
Mary R. Masella, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY 10022

*Via Regular Mail*
Mark D. Collins, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Via Hand Delivery*
David B. Stratton, Esquire
Pepper Hamilton LLP
1201 Market Street, Suite 1600
P.O. Box 1709
Wilmington, DE 19899-1709

*Via Regular Mail*
Douglas P. Bartner, Esquire
Marc B. Hankin, Esquire
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022

*Via Regular Mail*
Laurie Selber Silverstein, Esquire
Potter, Anderson & Corroon, LLP
Hercules Plaza
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951

*Via Regular Mail*
Richard S. Cobb, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, Delaware 19801

SL1 660512v2/008444.00325

*Via Regular Mail*
Marcia Landweber Goldstein, Esquire
Troy L. Cady, Esquire
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

*Via Regular Mail*
Paul Garcia, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

/s/
THOMAS G. WHALEN, JR.