# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re: Exide Technologies, *et al.*

| | |
|---|---|
| EnerSys Delaware, Inc., | ) |
| Appellant, | ) Civil Action No. 06-302 (SLR) |
| | ) |
| v. | ) |
| | ) Bankruptcy Case No. 02-11125 (KJC) |
| Exide Technologies, | ) (Jointly Administered) |
| Appellee. | ) AP 06-33 |

---

## APPELLEE'S OPPOSITION BRIEF
## ON APPEAL FROM BANKRUPTCY COURT

---

Dated: October 5, 2006

Laura Davis Jones (Bar No. 2436)
James O'Neill (Bar No. 4042)
PACHULSKI STANG ZIEHL YOUNG
 JONES & WEINTRAUB LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Fax: (302) 652-4400

EXIDE TECHNOLOGIES, *et al.*

Matthew N. Kleiman
MATTHEW N. KLEIMAN, P.C.
2506 North Clark Street
Suite 307
Chicago, Illinois 60614
Telephone: (312) 543-0412
Fax: (312) 868-4844

-and-

Roger P. Furey
John P. Sieger
Peter J. Young
KATTEN MUCHIN ROSENMAN LLP
1025 Thomas Jefferson Street, N.W.
East Lobby: Suite 700
Washington, D.C. 20007-5201
Telephone: (202) 625-3630
Fax: (202) 339-8268

*Co-Counsel for Appellee*

# TABLE OF CONTENTS

**Page**

I.    STATEMENTS OF NATURE AND STAGE OF PROCEEDING, JURISDICTION AND APPELLATE REVIEW ................................................................ 1

II.   SUMMARY OF ARGUMENT................................................................................ 4

III.  STATEMENT OF FACTS..................................................................................... 6

IV.  ARGUMENT AND AUTHORITIES ................................................................... 9

    A.    The Bankruptcy Court Correctly Held that Exide's Obligation to Allow EnerSys to Use the EXIDE Mark Was Extinguished Upon Rejection. ................................................................................................. 9

          1.    The Cases Relied Upon by EnerSys Are Inapposite. ............... 12

          2.    The Propositions Contained in the Law Review Articles EnerSys Cites Are Contrary to the Bankruptcy Code . ........... 13

          3.    The Bankruptcy Court Correctly Relied on the Negative Inference Contained in Section 365(n) of the Bankruptcy Code.......................................................................................... 16

          4.    Allowing EnerSys to Retain Rights Under the Rejected Trademark License Agreement Would Violate Fundamental Principles of Trademark and Bankruptcy Law.......................................................................................... 18

    B.    Bankruptcy Court's Determination that the Integrated Agreement Is Executory Was Proper. ....................................................................... 19

          1.    The Integrated Agreement Unambiguously Imposes Mutual Ongoing Obligations.................................................. 20

          2.    The Integrated Agreement Unambiguously Demonstrates that the Ongoing Obligations Are Material to the 1991 Transaction. ............................................................................. 23

          3.    The Quality Standards Provision and the Use Restriction Are Obligations and Executory. ............................................. 27

          4.    Exide Did Not Waive the Quality Standards Provision. .......... 29

    C.    Failure to Seek Rejection of All Contracts Does Not Preclude Rejection of the Integrated Agreement. ............................................... 31

    D.    Exide Did Not Sell Its Trademark to EnerSys Under the Trademark License Agreement........................................................... 32

**TABLE OF CONTENTS**
*(Cont.)*

E.    The Bankruptcy Court Did Not Err When It Concluded that Exide
      Satisfied the Business Judgment Test. .................................................................. 35

      1.    The Bankruptcy Court Correctly Set Forth the Business
            Judgment Test. ....................................................................................... 35

      2.    There Was More Than Sufficient Evidence in the Record
            to Support the Bankruptcy Court's Business Judgment
            Finding. ................................................................................................... 37

      3.    Exide's Business Projection Data Were Admissible and
            Relevant. ................................................................................................. 40

V.    CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bank of Montreal v. Bailey,*
  No. 91 CIV 0128 (MJL), 1992 WL 8342 (S.D.N.Y. Jan. 14, 1992) ...................................... .......29

*Carita v. Kandianis,*
  No. CIV. A. 93-2850, 1994 WL 583213 (E.D. Pa. Oct. 20, 1994), *aff'd* 65
  F.3d 161 (3d Cir. 1995)................................... ...................................... ................................ .............24

*Cary Oil Co. v. MG Refining & Marketing, Inc.,*
  257 F. Supp. 2d 751 (S.D.N.Y. 2003)................................ ...................................... ...................... 29

*Chatlos Sys., Inc. v. Kaplan,*
  147 B.R. 96 (D. Del. 1992), *aff'd,* 998 F.2d 1005 (3rd Cir. 1993).................................. ...........14

*Conde Nast Publ'ns, Inc. v. U.S.,*
  575 F.2d 400 (2d Cir. 1978)................................. ...................................... .............................. 32, 33

*CPC Int'l Inc. v. Archer Daniels Midland Co.,*
  831 F.Supp. 1091 (D. Del. 1993)................................... ...................................... ......................... 24

*Creative Gifts, Inc. v. UFO,*
  235 F.3d 540 (10th Cir. 2000) ................................... ...................................... ......................... .30

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
  267 F.2d 358 (2d Cir. 1959)................................. ...................................... .............................. .....18

*Estate of Presley v. Russen,*
  513 F. Supp. 1339 (D. N.J. 1981) .................................. ...................................... ......................... 33

*Everex Syss., Inc. v. Cadtrak Corp. (In re CFLC, Inc.),*
  89 F.3d 673 (9th Cir. 1996) .................................. ...................................... ............................ .....26

*Fenix Cattle Co. v. Silver (In re Select-A-Seat Corp.),*
  625 F.2d 290 (9th Cir. 1980) .................................. :.................................. ...................................26

*Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.,*
  No. 99-7778, 2003 WL 23144859 (N.D. Ill. 2003) ................................ ................................. .34

*Greener v. The Cadle Co.,*
  298 B.R. 82 (Bankr. N.D. Tex. 2003)................................... ...................................... ...................... 44

*In re 6177 Realty Assocs., Inc.,*
  142 B.R. 1017 (Bankr. S.D. Fla. 1992)................................ ...................................... ...................14

# TABLE OF AUTHORITIES
*(Cont.)*

*In re Access Beyond Tech., Inc.,*
   237 B.R. 32 (Bankr. D. Del. 1999) ................................ ................................ ................ 21, 26

*In re Ames Dept. Stores,*
   287 B.R. 112 (Bankr. S.D.N.Y. 2002) ................................ ................................ ................ 43

*In re Blackstone Potato Chip Co.,*
   109 B.R. 557 (Bankr. D.R.I. 1990) ................................ ................................ ................ 11, 16

*In re Carlton Rest., Inc.,*
   151 B.R. 353 (Bankr. E.D. Pa. 1993) ................................ ................................ ................ 14

*In re Centura Software,*
   281 B.R. 660 (Bankr. N.D. Cal. 2002) ................................ ................................ ........ 10-11, 16

*In re Chipwich,*
   54 B.R. 427 (Bankr. S.D.N.Y. 1985) ................................ ................................ ................ 26

*In re Columbia Gas Sys., Inc.,*
   50 F.3d 233 (3d Cir. 1995) ................................ ................................ ................ . 12-13

*In re Cont'l Airlines,*
   203 F.3d 203 (3d Cir. 2000) ................................ ................................ ................ ....... 4

*In re Couture,*
   202 B.R. 837 (Bankr. D. Vt. 1996) ................................ ................................ ................ 14

*In re Drexel Burnham Lambert Group, Inc.,*
   138 B.R. 687 (Bankr. S.D.N.Y. 1992) ................................ ................................ ................ 19

*In re Elephant Bar Rest., Inc.,*
   195 B.R. 353 (Bankr. W.D. Pa. 1996) ................................ ................................ ................ 14

*In re Elm Inn, Inc.,*
   942 F.2d 630 (9th Cir. 1991) ................................ ................................ ................ ...14

*In re Exide Techs.,*
   340 B.R. 222 (Bankr. D. Del. 2006) ................................ ................................ ................ 32

*In re Fed. Mogul Global, Inc.,*
   293 B.R. 124 (Bankr. D. Del. 2003) ................................ ................................ ................ 36

*In re Gucci,*
   126 F.3d 380 (2d Cir. 1997) ................................ ................................ ................ .....12

*In re Harborview Dev. 1986 Ltd. P'ship,*
   152 B.R. 897 (D.S.C. 1993) ................................ ................................ ................ .....14

TABLE OF AUTHORITIES
*(Cont.)*

*In re HQ Global Holdings, Inc.,*
    290 B.R. 507 (Bankr. D. Del. 2003) ........................... .......................... ............... *Passim*

*In re Ionosphere Clubs, Inc.,*
    98 B.R. 174 (Bankr. S.D.N.Y. 1989)........................ ..................................... ......................... 9

*In re Kmart Corp.,*
    290 B.R. 614 (Bankr. N.D. Ill. 2003) ................. ................................. ....................... 26

*In re Lavigne,*
    114 F.3d 379 (2d Cir. 1997)..................... ...................................... ............................. .....13

*In re Memorex Telex Corp.,*
    242 B.R. 826 (D.C. Del. 1999) ........................... ................................... ....................... 41

*In re Nat'l Trust Group, Inc.,*
    98 B.R. 90 (Bankr. D. Fla. 1989)....................... ................................... ....................... 45

*In re Novon Int'l. Inc.* No. 98-06773,
    2000 WL 432848 (W.D.N.Y. 2000) ........................ ................................... ............. 26, 29

*In re Philip Services (Delaware), Inc.,*
    284 B.R. 541 (Bankr. D. Del. 2002)....................... ................................ ...... 23, 25-26, 32

*In re Top Grade Sausage, Inc.,*
    227 F.3d 123 (3d Cir. 2000)...................... ........................................ ............................ .......4

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.,*
    756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986)................................ *Passim*

*N.L.R.B. v. Bildisco & Bildisco,*
    465 U.S. 513 (1984).............................. ..................................... ........................ ........9, 17, 20

*Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.,*
    794 F.2d 850 (3d Cir. 1986) *cert. denied*, 479 U.S. 950 (1986) .................................. ............34

*Sana v. Hawaiian Cruises, Ltd.,*
    181 F.3d 1041 (9th Cir. 1999) ........................... ....................................... .......................... 41-42

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,*
    872 F.2d 36 (3d Cir. 1989)................................ ..................................... ............................ .......20

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,*
    932 F.2d 1113 (5th Cir. 1991), *aff'd on other grounds*, 505 U.S. 763 (1992)......................... 31

*U.S. v. Console,*
    13 F.3d 641 (3d Cir. 1993)............................... ..................................... ......................... .......41

iii

TABLE OF AUTHORITIES
*(Cont.)*

*United States Jaycees v. Philadelphia Jaycees,*
   639 F.2d 134 (3d Cir. 1981)...................................................................................18

*Westco Group Inc. v. K.B. & Assoc. Inc.,*
   128 F. Supp. 2d 1082 (N.D. Ohio 2001).................................................................30

**STATE CASES**

*Ananta Group, Ltd. v. Moss Shamask, Ltd.,*
   182 A.D.2d 499 (N.Y. App. Div. 1992) ...................................................................34

*City of New York v. Skyway-Dyckman, Inc.,*
   256 N.Y.S.2d 840 (N.Y. App. Div. 1965) ...............................................................22

*Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth Ave., LLC,*
   767 N.Y.S.2d 99 (N.Y.S.2d 2003) ...........................................................................29

*Hadden v. Consol. Edison Co.,*
   34 N.Y.2d 88 (1974) ................................................................................................22

**FEDERAL STATUTES**

11 U.S.C. § 365(a) .........................................................................................................13

11 U.S.C. § 365(b) .........................................................................................................13

28 U.S.C. § 158(a) ...........................................................................................................4

11 U.S.C. § 101(52)........................................................................................................10

11 U.S.C. § 365(n) ................................................................................................*Passim*

**RULES**

Fed. R. Bankr. P. 8009 .....................................................................................................1

Fed. R. Bankr. P. 8010......................................................................................................1

Fed. R. of Evid. 803(6) .............................................................................................41, 45

**TREATISES**

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
   n.5 (4th ed. 2006)..............................................................................................32, 34

MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE (6th ed. 2006) ...................42,45

## TABLE OF AUTHORITIES
*(Cont.)*

**OTHER AUTHORITIES**

Laura B. Bartell, *Revisiting Rejection: Secured Party Interests in Leases and Executory Contracts*, 103 DICK. L. REV. 497 (1999).................................. ........................... 15-16

Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. COLO. L. REV. 1 ................................. .................................... ....................... 15-16

Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 MINN. L. REV. 227, 230 (1989)................................ .................................. .................................. 15

S. Rep. No. 100-505, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200 ................................. .................................. ................................. ............ 11, 17

S. Rep. No. 989, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787................................ ................................. ................................. ............................... 20

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Exide Technologies, *et al.*

| | |
|---|---|
| EnerSys Delaware, Inc., | ) |
| Appellant, | ) Civil Action No. 06-302 (SLR) |
| | ) |
| v. | ) |
| | ) Bankruptcy Case No. 02-11125 (KJC) |
| Exide Technologies, | ) (Jointly Administered) |
| Appellee. | ) AP 06-33 |

### APPELLEE'S OPPOSITION BRIEF ON
### APPEAL FROM BANKRUPTCY COURT

Appellee, reorganized Exide Technologies and its debtor affiliates (collectively,

"Exide"), by and through its attorneys, respectfully submits its Opposition[1] to Appellant's

Opening Brief on Appeal from Bankruptcy Court pursuant to Fed. R. Bankr. P. 8009 and

8010 and Del. LR 7.1.3 (the "EnerSys Opening Brief"). For the reasons set forth herein,

Exide respectfully requests that this Court deny the appeal and affirm the order dated

April 3, 2006 (Bankruptcy Court D.I. 5378, the "Rejection Order") entered by the

Honorable Kevin J. Carey of the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court"), the related opinion (Bankruptcy Court D.I. 5377, the

"Opinion") issued by the Bankruptcy Court and the order dated June 30, 2006

(Bankruptcy Court D.I. 5521, the "Transition Order") entered by the Bankruptcy Court.

### I.    STATEMENTS OF NATURE AND STAGE OF
### PROCEEDING, JURISDICTION AND APPELLATE REVIEW

On April 15, 2002, Exide filed for bankruptcy protection under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code"). Pursuant to section 365 of the

---

[1]    By Order dated August 31, 2006 (District Court D.I. 13), this Court approved *EnerSys' Emergency Motion for an Order Granting EnerSys Delaware, Inc. f/k/a EnerSys, Inc. Leave to File an Opening Brief Exceeding the 40 Page Limit Within Local Rule 7.1.3(D)*, included within which was Exide's request to be afforded the same right to exceed the forty-page limit.

Bankruptcy Code and that certain Bankruptcy Court order dated April 17, 2002 (establishing procedures for rejection of executory contracts), Exide filed a series of notices on March 14, 2003 (EnerSys Designation Appeal Record ("ENAR") 2-6, the "Rejection Notices") to reject certain agreements between Exide and Yuasa Battery (America), Inc. (predecessor in interest of EnerSys Delaware, Inc. f/k/a EnerSys, Inc. ("EnerSys"[2]). These rejected agreements included:[3] (1) The Trademark and Trade Name License Agreement dated June 10, 1991 (the "Trademark License Agreement"); (2) the Asset Purchase Agreement dated June 10, 1991 (the "Asset Purchase Agreement"); (3) the Administrative Services Agreement dated June 10, 1991 (the "Services Agreement"); and (4) a letter agreement dated December 27, 1994, between Ernest J. Choquette and Bernard F. Stewart (the "Letter Agreement"). The Bankruptcy Court previously found that the four referenced agreements constituted a "fully integrated, unambiguous document" (Opinion at 2, citing ENAR 89 at 25:23-26:4; Exide's Counter Designation Appeal Record ("EXAP") 46 at 3:18-4:22) (the Trademark License Agreement, Asset Purchase Agreement, Services Agreement and Letter Agreement are collectively referred to herein as the "Integrated Agreement").

On April 14, 2003, EnerSys filed its objection to the rejected agreements. (ENAR 12) "After an arduous and lengthy pre-trial period, hearings were held on March 3, 4, 5, 12, 17, 25, 26, and 31, 2004, to consider Exide's rejection of the agreements." (Opinion

---

[2]    At the time at which the agreements were entered, EnerSys was known as Yuasa Battery (America), Inc. and later changed its name to Yuasa-Exide, Inc., which then merged with Yuasa, Inc. in 1998. In 2000, Yuasa, Inc., changed its name to EnerSys. EnerSys and its predecessor entities are collectively referred to herein as EnerSys unless otherwise noted.

[3]    On April 14, 2003, EnerSys objected to Exide's request to reject five of the six agreements. EnerSys did not object to Exide's rejection of the Miscellaneous Service Agreement dated April 1, 1992, between Exide and Yuasa-Exide, Inc. (ENAR 12) and withdrew its objection to the Administrative Services Agreement dated April 1, 1992 between Exide and Yuasa-Exide, Inc. (Opinion at 2 n.3)

at 1-2)  On April 3, 2006, almost three years after Exide filed its Rejection Notices, the Bankruptcy Court authorized Exide's rejection of the Integrated Agreement pursuant to the Rejection Order and related Opinion.  On April 11, 2006, EnerSys filed a Notice of Appeal of the Rejection Order (District Court D.I. 1) and a motion to stay the Rejection Order pending the Appeal along with a motion for an order expediting time for the hearing to consider such stay.  (ENAR 344-345)  On April 20, 2006, Exide filed its objection to the stay pending appeal motion.  (ENAR 348)

On April 21, 2006, EnerSys filed its Designation of Items for Record on Appeal and Statement of Issues on Appeal.  (District Court D.I. 2-6)  On August 28, 2006, EnerSys filed its Supplemental Designation of Items for Record on Appeal and Supplemental Statement of Issues on Appeal.  (District Court D.I. 15)  On May 1, 2006, Exide filed its Designations of Items on Appeal and filed its Amended Designations of Items on Appeal on May 31, 2006.  (District Court D.I. 9)

On April 27, 2006 and June 29, 2006, the Bankruptcy Court held hearings to address issues relating to the transition plan as required by the Rejection Order.  (ENAR 4)  On or about June 30, 2006, the Bankruptcy Court entered the Transition Order, which, *inter alia*, denied EnerSys' stay motion without prejudice, and established a transition plan (the "Transition Plan") to facilitate the transition of the EXIDE mark from EnerSys back to Exide and to mitigate the potential damages to EnerSys that might arise therefrom.  Pursuant to the Transition Plan, no later than eighteen months from April 3, 2006, EnerSys must cease all new uses of the EXIDE mark, and two years after April 3, 2006, Exide may recommence using the EXIDE mark for industrial batteries.

3

On July 11, 2006, EnerSys filed an Amended Notice of Appeal of the Rejection Order and Order Granting Transition Plan (District Court D.I. 8) (together with the Notice of Appeal of the Rejection Order filed on April 11, 2006, the "Appeal").

The Appeal had been referred to Appellate Mediation on May 11, 2006. On July 27, 2006, the mediation was conducted, and, on August 3, 2006, a Notice of Completion was filed with the Court reporting that the parties were unable to resolve their dispute in the mediation process.

On August 8, 2006, this Court entered a briefing schedule pursuant to which EnerSys filed its Opening Brief.

### *Statement of Jurisdiction*

This Court has jurisdiction to hear this Appeal pursuant to 28 U.S.C. § 158(a).

### *Standard of Appellate Review*

This Court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof. *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 125 (3d Cir. 2000); *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000). For the matter on review in this Appeal, the record is replete with factual findings.

## II.    SUMMARY OF ARGUMENT

Exide asserts the following arguments in opposition to this Appeal:

1.    The Bankruptcy Court correctly held that Exide's obligation to allow EnerSys to use the EXIDE mark is extinguished upon rejection. Trademarks, such as the EXIDE mark, are expressly excluded from the protection afforded by section 365 of the Bankruptcy Code, which, upon rejection, allows licensees of *other* types of intellectual property to retain rights granted prior to the filing of bankruptcy. Consistent with

4

Congress' expressed intention, courts universally hold that a trademark licensee does not retain its right to use a mark once a debtor rejects the underlying trademark license.

2.    The Bankruptcy Court's determination that the Integrated Agreement is executory, and thus subject to rejection, was proper.    The Bankruptcy Court, in a thorough forty-two page opinion, following an "arduous and lengthy pre-trial period" and eight days of hearings, correctly ruled that the plain language of the Integrated Agreement unequivocally imposes on both Exide and EnerSys numerous mutual ongoing obligations, that such obligations are material under the relevant standard and that Exide did not waive any material obligations.

3.    Failure to seek rejection of all contracts related to the 1991 transaction does not preclude rejection of the Integrated Agreement.    Given that the Bankruptcy Court found that four of the agreements constituted one integrated agreement, Exide was not required to reject all of its parts separately—as if not integrated—to effectuate a rejection of the entire agreement.    Other than the four agreements comprising the Integrated Agreement, the Bankruptcy Court has made no ruling that any contracts from the 1991 transaction are integrated, and thus there was no need for Exide to seek rejection of any other contracts.

4.    Exide did not sell the EXIDE mark to EnerSys under the Trademark License Agreement.    The Integrated Agreement clearly and unambiguously provides that Exide *licensed* the EXIDE mark to EnerSys.    Moreover, because Exide continues to use the EXIDE mark pursuant to the Integrated Agreement, traditional notions of trademark law prevent EnerSys from obtaining ownership of the EXIDE mark.

5

5.    The Bankruptcy Court did not err when it concluded that Exide satisfied the business judgment test when it sought rejection of the Integrated Agreement. The Bankruptcy Court correctly set forth the business judgment test and Exide proffered more than enough evidence to support the Bankruptcy Court's proper conclusion that Exide had met its burden under such test.

### III.    STATEMENT OF FACTS

The trademark EXIDE, first introduced in 1900 for use in electric taxi cabs, has been critical to Exide and Exide's branding strategy for over 100 years. (EXAP 26) Even as Exide has entered, exited and re-entered various business segments and markets throughout its long history, the EXIDE mark remains the central unifying component of the company.

The facts underlying this Appeal derive from one such corporate transaction. On June 10, 1991, Exide sold substantially all of its industrial battery business to EnerSys pursuant to a series of agreements. *Id.* The assets Exide sold to EnerSys as part of the 1991 transaction included physical manufacturing plants, equipment and certain items of intellectual property, including some specifically enumerated trademarks. (EXAP 56) However, Exide did *not* transfer ownership of all of its trademarks to EnerSys. Exide expressly retained ownership, control and possession of certain trademarks, most notably the EXIDE mark, which it continued to use in connection with its other ongoing battery businesses. (EXAP 56, 64) Exide did, however, contractually license EnerSys to use the EXIDE mark subject to certain obligations (such as limiting use to the industrial market) and subject to revocation under certain circumstances (such as if EnerSys used the EXIDE mark outside the industrial market). *Id.*

6

Over the course of the next nine years, both parties performed their respective ongoing obligations arising out of the 1991 transaction without major dispute. In 2000, Exide and EnerSys mutually agreed to the early termination of a ten-year non-competition agreement, thereby allowing Exide to re-enter the industrial battery business. In September 2000, Exide purchased GNB Technologies Inc. (including GNB Industrial Battery Company) and returned to the North American industrial battery market in direct competition with EnerSys. (EXAP 56) However, Exide remained bound by the ongoing obligations of the 1991 transaction with EnerSys, including the obligation to forebear from utilizing the EXIDE mark in certain industrial battery markets for as long as the license continued in effect. For many years following Exide's re-entry into the industrial battery business, Exide found itself in the unenviable position of competing against a company that had the right to use Exide's own name. Not surprisingly, executives from EnerSys conceded during discovery that EnerSys has long received a windfall from Exide's advertising and marketing efforts in the non-industrial battery market and that there was spillover between the industrial and non-industrial markets, from which EnerSys benefited. (EXAP 56 at Ex. 40, Ex. 600, Webb Dep. 138:18-139:16 ("Q: So it was sort of like free advertising for your company [EnerSys]? A: You could say that, yes.")).

Prior to and as Exide was poised to re-enter the industrial battery market — indeed, well before it filed for bankruptcy protection — Exide began a worldwide campaign to unify its image and brand under a single mark. Naturally, Exide wanted that single mark to be EXIDE. Exide explored various ways to develop a strategic plan to establish an umbrella brand worldwide and to establish a sense of unity within the

company. (EXAP at Exs. 64, 69, 72) At that time, Exide's brand unification aspirations were frustrated because its ongoing obligations under the Trademark License Agreement prohibited Exide from using the EXIDE mark in connection with the industrial side of its business. Long before rejection of the Integrated Agreement became a possibility, Exide had invested substantial time and effort evaluating its plan and strategy for brand unification.

When Exide filed for bankruptcy protection in 2002, section 365 of the Bankruptcy Code provided Exide with the legitimate means of accomplishing its goal of unifying its brands under the EXIDE mark. The prospect of rejecting the Integrated Agreement in bankruptcy was perfectly consistent with Exide's preexisting strategic vision for the company worldwide. Therefore, Exide's decision to reject the Integrated Agreement was not a difficult one. Indeed, EnerSys' strenuous opposition to rejection makes clear that Exide's reclamation of the EXIDE mark in the industrial battery market would be extremely valuable and beneficial to Exide.

As part of its restructuring process, Exide reviewed thousands of executory agreements to decide which agreements to assume and which agreements to reject. (EXAP 56 at Ex. 601, Donahue Dep. 63:32-64:2) In the early part of 2003, Exide Chairman and Chief Executive Officer Craig Muhlhauser sought guidance from his senior staff as to whether Exide should reject the Integrated Agreement. (EXAP 56 at Ex. 602, Muhlhauser Dep. 42-43, 46-51) Given Exide's preexisting strategic plans, the senior staff's response was swift and unanimous: if Exide had an opportunity under bankruptcy law to reject the Integrated Agreement, which permitted EnerSys to compete against Exide using Exide's own name, then Exide should take advantage of that

8

opportunity and exercise its right of rejection. (EXAP 56 at Ex. 603, Bregman Dep.
67:10-68:6) Thus, on March 14, 2003, Exide submitted notice under section 365 of the
Bankruptcy Code to reject all components of the Integrated Agreement. (EXAP 56, Exs.
2-7)

## IV.    ARGUMENT AND AUTHORITIES

### A.    The Bankruptcy Court Correctly Held that Exide's Obligation to Allow EnerSys to Use the EXIDE Mark Was Extinguished Upon Rejection.

Exide sought rejection of the license for the EXIDE mark to free itself from the
obligation of permitting one of its biggest competitors to use its most important
trademark and to allow Exide to accomplish its long-sought goal of unifying its company
under the EXIDE brand. The Bankruptcy Court correctly recognized that granting this
request would serve the primary goals of the chapter 11 reorganization process. *N.L.R.B.
v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[T]he authority to reject an executory
contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can
release the debtor's estate from burdensome obligations that can impede a successful
reorganization."); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr.
S.D.N.Y. 1989) ("[T]he paramount policy and goal of Chapter 11, to which all other
bankruptcy policies are subordinated, is the rehabilitation of the debtor."), citing *Bildisco*,
465 U.S. at 528.

Notwithstanding these fundamental and overarching principles of chapter 11 of
the Bankruptcy Code, EnerSys argues that rejection does not relieve Exide from the
primary obligation of a trademark license — the obligation to allow EnerSys use of the
EXIDE mark. In fact, under EnerSys' view of the law, rejection does not entitle Exide to
relief from *any* obligation, or to obtain *any* benefit, as it uses this "vital" tool in the

reorganization process.   EnerSys would have this Court rule that, notwithstanding rejection under section 365 of the Bankruptcy Code, EnerSys can continue to use the EXIDE mark as if nothing has changed following rejection. EnerSys' position is not only contrary to the fundamental policies underlying bankruptcy law, it is contrary to the clear language of the statute and all case law dealing with the rejection of trademark licenses.

Congress has carefully addressed the rejection of intellectual property licenses by enacting section 365(n) of the Bankruptcy Code.  Pursuant to section 365(n), when a debtor rejects certain types of intellectual property licenses, the licensee can either:  (1) treat the license as terminated; or (2) retain the rights granted prior to the filing of the bankruptcy petition.   11 U.S.C. § 365(n).   However, the definition of "intellectual property" for purposes of section 365(n) is limited in scope and *trademarks are expressly excluded.  In re HQ Global Holdings, Inc.*, 290 B.R. 507, 513 (Bankr. D. Del. 2003). Specifically, section 101(52) of the Bankruptcy Code defines "intellectual property" for purposes of section 365 as including a:

(A)     trade secret;

(B)     invention, process, design, or plant protected under title 35;

(C)     patent application;

(D)     plant variety;

(E)     work of authorship protected under title 17; or

(F)     mask work protected under chapter 9 of title 17.

11 U.S.C. § 101(52).  "By using the more limiting term 'means' instead of 'includes,' Congress has deliberately limited § 365(n) protection only to the intellectual property enumerated by the Statute." *In re Centura Software,* 281 B.R. 660, 669-70 (Bankr. N.D.

Cal. 2002). The statute is clear on its face — a licensee can retain rights under a patent license, or a license for one of the other enumerated forms of intellectual property, but *cannot* retain rights under a trademark license. *HQ Global Holdings, Inc.*, 290 B.R. at 513; *see also Centura Software,* 281 B.R. at 670 (language of section 365(n) is unambiguous; there is no need to delve into legislative history), citing *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002).

Even if it were necessary to examine the legislative history of section 365(n) of the Bankruptcy Code, the legislative history provides clear evidence that Congress intended to do exactly what the plain language of the statute provides: "the bill does not address the rejection of executory trademark, trade name or service mark licenses." *See* S. Rep. No. 100-505, 100th Cong., 2d Sess. (1988), at 5, *reprinted in* 1988 U.S.C.C.A.N. 3200, 3206. In deciding to exclude trademark licenses, Congress explained that trademark licensing arrangements are different from other forms of intellectual property licensing because of unique quality control issues. *Id.*; *see also Centura Software*, 281 B.R. at 670.

In every reported decision prior to and following enactment of section 365(n), in which a court has addressed the effect of rejection on a trademark license, each court has held that the licensee has no rights to continue using the mark once a license has been rejected. *See HQ Global Holding*, 290 B.R. at 513-14 (as a "result of the Debtors' rejection of the [trademark license] [a]greements . . . [licensees'] rights to use the marks are thereby extinguished."); *Centura Software*, 281 B.R. at 674-75 ("[b]ecause Section 365(n) plainly excludes trademarks, the court holds that [licensee] is not entitled to retain any rights in [the licensed trademarks] under the rejected . . . trademark agreement"); *In*

11

*re Blackstone Potato Chip Co.*, 109 B.R. 557, 561 (Bankr. D.R.I. 1990) (holding that the trademark license was executory and authorizing the licensor to reject the trademark license agreement; licensed marks were returned to debtor).

### 1.    The Cases Relied Upon by EnerSys Are Inapposite.

In the face of this unambiguous and controlling statutory authority, and the uniform treatment of the issue by all of the courts that have dealt with rejection of trademark licenses, EnerSys puts forth a number of executory contract cases that do not even involve trademark licenses, with only one exception.[4]    In so doing, EnerSys disregards the fact that by enacting section 365(n) of the Bankruptcy Code, Congress deliberately chose to treat trademark licenses differently from other forms of executory contracts; consequently, none of the cases relied upon by EnerSys have any legal relevance to the issues decided by the Bankruptcy Court.

Moreover, some of the decisions upon which EnerSys relies suggest serious flaws in EnerSys' position.  For example, EnerSys seeks to portray the Bankruptcy Court (both in this case and in its previous ruling in *HQ Global Holdings*), as somehow acting contrary to the Third Circuit's decision in *In re Columbia Gas Sys., Inc.*, 50 F.3d 233 (3d Cir. 1995).  (EnerSys Br. at 15, 17)  In *Columbia Gas*, however, the court simply made the unremarkable statement that rejection is equivalent to a non-bankruptcy breach. *Columbia Gas*, 50 F.3d at 239.  That decision does not, as EnerSys suggests, stand for the proposition that rejection does not terminate a debtor's obligations under the rejected contract.  If anything, it supports the opposite view — that the debtor *either* assumes and accepts the obligations of the contract, *or* rejects and does not accept those obligations:

---

[4]    The exception being *In re Gucci*, in which the court briefly questioned, in *dicta*, what the effect of rejection of a trademark license might be, but deferred an answer to future litigation. *In re Gucci*, 126 F.3d 380, 394 (2d Cir. 1997).

> The debtor (or trustee that has stepped into the debtor's shoes) may elect to assume an executory contract, in which case § 365(b) mandates that the debtor accept the liability with the asset and fully perform his end of the bargain. 11 U.S.C. § 365(b). The debtor will assume an executory contract when the package of assets and liabilities is a net asset to the estate. When it is not the debtor will (or ought to) reject the contract. 11 U.S.C. § 365(a).

*Columbia Gas*, 50 F.3d at 238. The court also explained that a claim for breach will not be paid in full if the debtor is insolvent, "thus [benefiting] the creditors as a whole at the expense of the nonbankrupt." *Id.*, citing *In re Taylor*, 913 F.2d 102, 107 (3d Cir. 1990). The court's decision in *Columbia Gas* therefore supports the general proposition that rejection relieves a debtor of its obligation to perform under a contract, leaving the non-debtor with a pre-petition claim, and benefiting the general pool of creditors who can share in the increased benefits of a bankruptcy estate that is no longer encumbered with burdensome obligations. Similarly, in another case relied upon by EnerSys, *In re Lavigne*, 114 F.3d 379 (2d Cir. 1997), the court acknowledged that rejection *relieves the estate from its duty to perform* under the contract, thus giving rise to a claim that the non-debtor can assert for damages suffered as the result of non-performance. *Id.* at 387.

> **2.    The Propositions Contained in the Law Review Articles EnerSys Cites Are Contrary to the Bankruptcy Code .**

In addition to relying on cases that are not relevant to the issues before this Court, EnerSys goes to great length to present the (sometimes inconsistent) views of two law school professors who have published law review articles on the subject of executory contracts. (EnerSys Br. at 10-15) EnerSys portrays the law on contract rejection as being all but settled (in EnerSys' favor of course) since the publication of those articles, saying there has been "a steady stream of cases adopting the Andrew/Westbrook series of articles" and "no law professor or practitioner has presented any reasoned basis on which

13

to dispute the Andrew/Westbrook conclusions." (EnerSys Br. at 13, 15) In fact, subsequent to the publication of the law review articles upon which EnerSys so heavily relies, numerous decisions have been rendered in which courts held that executory contracts are terminated or the non-debtor's rights extinguished. *See, e.g., In re Elm Inn, Inc.*, 942 F.2d 630, 633 (9th Cir. 1991) (upon rejection of lease by debtor/lessee, "the debtor's possessory interest in the lease terminated"); *In re Couture*, 202 B.R. 837, 842 (Bankr. D. Vt. 1996) (lease "terminated by operation of the Bankruptcy Code" when it was not assumed); *In re Elephant Bar Rest., Inc.*, 195 B.R. 353, 356 (Bankr. W.D. Pa. 1996) ("On the basis of the Chapter 7 trustee's deemed rejection of the lease . . . , such lease is hereby legally terminated with respect to the debtor."); *In re Harborview Dev. 1986 Ltd. P'ship*, 152 B.R. 897, 900 (D.S.C. 1993) (where insider relationships were involved, rejected lease was deemed terminated); *In re Carlton Rest., Inc.*, 151 B.R. 353, 356-57 (Bankr. E.D. Pa. 1993) (following rejection by debtor/lessor, a lessee has only those rights provided under section 365(h), not those set forth in lease); *Chatlos Sys., Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992), *aff'd*, 998 F.2d 1005 (3rd Cir. 1993) (table) ("Following rejection of the Lease, [debtor/lessee] had no statutory, contractual or possessory rights in the Property . . . .); *In re 6177 Realty Assocs., Inc.*, 142 B.R. 1017 (Bankr. S.D. Fla. 1992) (rejection of a non-residential lease results in termination of the lease).

Nor is it true that there has been no academic debate on the issues addressed by Andrew and Westbrook in their law review articles. Even Andrew and Westbrook disagreed on many issues involved in their academic debate. In his second article, published in reply to the arguments made by Westbrook in his article, Andrew spent

sixteen pages discussing areas where the two of them disagreed. *See* Michael T. Andrew,

*Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. COLO. L. REV. 1,

19-35 ("Areas of Disagreement").    As just one example, Andrew rejects the basic

Countryman standard for determining whether a contract is executory, saying

Countryman ignored history and misunderstood the law, thereby muddling the law on

rejection. *See, e.g., Id.* at 31-32. Westbrook, on the other hand, embraced Countryman's

formulation of the rule on executoriness and found it most helpful in determining whether

contracts are executory. Jay Lawrence Westbrook, *A Functional Analysis of Executory*

*Contracts*, 74 MINN. L. REV. 227, 230 (1989). Although Andrew claims in his second

article that he and Westbrook agree on "essentially all" of the important consequences of

rejection, a reader of both articles might have difficulty coming to the same conclusion,

especially given what Andrew himself describes as the "conceptual gymnastics" that

were required for both authors to explain their positions. Andrew, *supra*, at 2, 34. If

nothing else, it is clear that the question of whether rejection leads to (or should lead to)

termination of an executory agreement was not an easy one for either Andrew or

Westbrook to answer, as evidenced by the fact it took them hundreds of pages to set forth

their arguments and interpretations.

Additionally, there has been at least one other member of academia who has

sharply disputed the conclusions reached by both Andrew and Westbrook. *See* Laura B.

Bartell, *Revisiting Rejection: Secured Party Interests in Leases and Executory Contracts*,

103 DICK. L. REV. 497 (1999).    Professor Bartell argues forcefully that the

"[Andrew/Westbrook] assertion that rejected leases and contracts remain intact for some

purposes after rejection and discharge is unsupported either by the language of the

[Bankruptcy] Code or by bankruptcy policy." *Id.* at 516. Bartell presents a detailed and logical explanation of why the position that executory contracts are effectively terminated by rejection is supported by a plain reading of the Bankruptcy Code and its legislative history (*Id.* at 526-32), as well as the "fresh start" and "equality" policies of bankruptcy law. *Id.* at 535-43.

Exide will not belabor the issue by presenting here a point-by-point rebuttal to the Andrew/Westbrook arguments, many of which are set forth in EnerSys' Opening Brief, as Bartel has so capably done in her article. Suffice it to say that Congress writes the laws, and the courts enforce them. Whether the law should be different is a matter for the legislature, not academia. At least one of the sources for EnerSys' arguments agrees. *See*, Andrew, *supra*, at 3 ("As before, the conclusion I draw from the continuing confusion over this crucial area of bankruptcy law is that a thorough legislative reform of Section 365 is essential."). The Bankruptcy Court here necessarily and properly relied on the plain reading of the Bankruptcy Code and on the cases that have applied the Bankruptcy Code to the rejection of trademark licenses. *See HQ Global Holding*, 290 B.R. 507; *Centura Software,* 281 B.R. 660; *Blackstone Potato Chip Co.*, 109 B.R. 557.

### 3.    The Bankruptcy Court Correctly Relied on the Negative Inference Contained in Section 365(n) of the Bankruptcy Code.

In addition to relying on the plain language of section 365(n) and the relevant case law, the Bankruptcy Court correctly relied on a negative inference in its interpretation of section 365(n), drawn from the decision by Congress not to include trademark licenses within the scope of that section. EnerSys complains loudly that the Bankruptcy Court did not explain in detail in its ruling why it did not accept the negative inference arguments

presented by EnerSys in its trial briefs, but there was no reason or necessity for the court to do so.

In 1985, the Fourth Circuit ruled that rejection of executory technology licensing agreements deprived the non-debtor licensees of intellectual property rights in the covered technology. *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986). Owners of technology rights lobbied Congress for a change in the law, and, on the theory that the property underlying intellectual property is "unique," Congress accommodated them by enacting section 365(n). S. Rep. No. 100-505, 100th Cong., 2d Sess. (1988), at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3203. As the Bankruptcy Court noted, Congress certainly could have included trademark licenses when it moved to protect the rights of licensees, but it elected not to do so. Under very similar circumstances to those present here, the Supreme Court has not hesitated to draw a negative inference. *See Bildisco*, 465 U.S. at 522-23 ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA."). In that decision, the Supreme Court held that a collective bargaining agreement subject to the National Labor Relations Act could be rejected because Congress had not provided an exclusion for such contracts when it amended section 365 to provide an exclusion for collective bargaining agreements subject to the Railway Labor Act. *Id.*

Analogously, the Bankruptcy Court here was clearly entitled to make and rely on the negative inference derived from Congress' decision to exclude trademarks from the

17

protections afforded in section 365(n). Simple logic dictates that having excluded trademarks from special treatment, the normal rules applicable to the rejection of executory contracts apply. The holding in *Lubrizol*, as it relates to trademark licenses, therefore continued to be good law after Congress amended the Bankruptcy Code in 1988 — if a trademark license is rejected, the licensee loses its rights to use the licensed mark.

**4.    Allowing EnerSys to Retain Rights Under the Rejected Trademark License Agreement Would Violate Fundamental Principles of Trademark and Bankruptcy Law.**

Having granted Exide's request to reject the Trademark License Agreement, the Bankruptcy Court correctly ruled that Exide's obligation to allow EnerSys to use the EXIDE mark and EnerSys' right to use it, are extinguished once the transition period ordered by the Bankruptcy Court ends. *HQ Global Holdings, Inc.*, 290 B.R. at 513. At that point, it would be an illegal act of trademark infringement for EnerSys to continue using the mark. As the Third Circuit has explained, "[o]nce a license has expired, use of the formerly licensed mark constitutes infringement. To say that the licensee has acquired rights that survive the legal termination of the license, destroys the entire concept of a license." *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) (*internal citations omitted*).

Continued use of the EXIDE mark by EnerSys in the absence of a formal license agreement, with all of the attendant responsibilities and duties, would also be contrary to the fundamental policies behind chapter 11 for two other reasons. First, EnerSys' continued use of the mark without a license would jeopardize Exide's rights to the mark. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959) (use of a trademark by a third party without a proper trademark licensing arrangement is an uncontrolled or "naked" license, which could cause a loss of trademark rights). Any

injury to Exide's primary trademark would, of course, operate to the detriment of Exide's creditors.    Second, EnerSys' continued use of the mark would be the equivalent of obtaining specific performance of the rejected contract, which would allow EnerSys to effectively obtain 100 cents on the dollar for its claim for breach.  This would unfairly affect the rights of the other unsecured creditors, in violation of the "equality" principle. *See* Bartell, *supra*, at 538-39; *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992).

In sum, EnerSys' position is contrary to the fundamental policies behind chapter 11, the plain language of section 365(n), and all of the relevant case law on the subject. The Bankruptcy Court's holding that EnerSys' right to use the EXIDE mark is extinguished following the transition period should be affirmed.

**B.    The Bankruptcy Court's Determination that the Integrated Agreement Is Executory Was Proper.**

As the Bankruptcy Court correctly ruled, the Integrated Agreement is executory and thus subject to rejection.    The plain language of the Integrated Agreement unequivocally imposes on both Exide and EnerSys mutual ongoing material obligations, which render the contract executory under the relevant standard.    Moreover, Exide engaged in a deliberate and extensive analysis before seeking rejection of the Integrated Agreement, thus categorically clearing the business judgment threshold.    For these reasons, in a well-reasoned and thorough forty-two page opinion, following an "arduous and lengthy pre-trial period" and eight days of hearings, the Bankruptcy Court rejected each of the arguments set forth in EnerSys' Brief and approved Exide's request to reject the Integrated Agreement.  (Opinion at 2)

1.    **The Integrated Agreement Unambiguously Imposes Mutual Ongoing Obligations.**

The Bankruptcy Court correctly concluded that both Exide and EnerSys had "a number of material obligations under the [Integrated] Agreement to perform as of the petition date and, therefore, could not have rendered substantial performance." (Opinion at 20)  Although the Bankruptcy Code does not specify what constitutes an "executory contract," the United States Supreme Court has defined an executory contract as simply one "on which performance is due, to some extent on both sides." *Bildisco*, 465 U.S. at 522 n.6, citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977) and S. Rep. No. 989, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 6303. Further refining this characterization, courts generally follow the "Countryman definition," which defines an agreement as executory if the obligations of "both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting Countryman, V., *Executory Contracts in Bankruptcy, Part 1*, 57 MINN. L. REV. 439, 460 (1973)).

The Integrated Agreement unambiguously imposes on both parties numerous ongoing obligations.  For the reason that the obligations are *ongoing*, they cannot be substantially performed.  *Sharon Steel Corp.*, 872 F.2d at 39.  Perhaps most fundamentally, the Integrated Agreement requires EnerSys to restrict the use of the EXIDE and other licensed marks to industrial battery products.  Trademark License Agreement §§ 1(A) & (B) (defining "Products" and "Licensed Business").  This ongoing obligation — incapable of being substantially performed at any time during the life of the

contract — prohibits EnerSys from using the licensed marks on any product outside of the Licensed Business.  The converse is true as well; the Integrated Agreement precludes Exide from enforcing its ownership rights against EnerSys for its use of the licensed marks as permitted under the Trademark License Agreement.  An agreement requiring the grantor, *if nothing else*, to refrain from enforcing its ownership rights against the licensee – as is the case here – is executory.  *In re Access Beyond Tech., Inc.*, 237 B.R. 32, 43 (Bankr. D. Del. 1999).

Moreover, in this case, the Integrated Agreement contains numerous other mutual ongoing obligations, each of which is incapable of being substantially performed during the life of the contract.  In the Opinion, the Bankruptcy Court held that the following obligations were in fact material and required treatment of the Integrated Agreement as executory:

- Exide's obligation to maintain registration of the Marks pursuant to Section 12 of the Trademark License Agreement (the "Registration Obligation");

- The obligations of Exide and EnerSys to indemnify each other pursuant to Section 13.1 of the Asset Purchase Agreement (the "Indemnity Obligations");

- The obligations of EnerSys and Exide to provide further cooperation after the closing to facilitate the 1991 Transaction (the "Further Assurances Obligations");

- Exide's obligations relating to a pension plan maintained (the "Pension Plan Obligations");

- EnerSys' obligation to satisfy the Quality Standards Provision;

- EnerSys' obligation to observe the Use Restriction; and

- Exide's obligation to permit EnerSys to use the Marks pursuant to the Trademark License Agreement (the "Use Grant").

21

Each of the foregoing obligations are ongoing, cannot be substantially performed during the life of the contract and have not been substantially performed during the life of the contract. For example, the quality control provisions of the Trademark License Agreement, which are ongoing by their very nature in that they require that every battery sold by EnerSys under the EXIDE mark comply with certain manufacturing standards, render the Integrated Agreement executory.

EnerSys asserts that "under controlling New York law, a breach cannot excuse performance by the non-breaching party, and so cannot meet the Countryman standard, if the breaching party has already substantially performed." (EnerSys Br. at 23, citing *Hadden v. Consol. Edison Co.*, 34 N.Y.2d 88 (1974)) EnerSys directs that "this Court should focus on the fact that the Bankruptcy Court failed to engage in the comparison, required under *Hadden*, of performance rendered versus performance remaining due." *Id.* The Bankruptcy Court did not fail to engage in any such comparison; rather, EnerSys advances a superfluous test that is completely irrelevant here. Under New York law, "[t]he doctrine of substantial performance has principal application to building contracts." *City of New York v. Skyway-Dyckman, Inc.*, 256 N.Y.S.2d 840, 842 (N.Y. App. Div. 1965); *see also Hadden*, 34 N.Y.2d at 96 (noting that the doctrine of substantial performance is familiar in construction contract, but also applies to employment contracts as well). In *Hadden*, the plaintiff Hadden worked for defendant-employer for thirty-seven years and retired with the expectation of receiving his full pension. After learning that Hadden testified in court that he had accepted bribes, the board of defendant-employer passed a resolution authorizing the termination of Hadden's pension. As demonstrated, the Bankruptcy Court correctly chose not to apply the test

22

"required" under *Hadden* because the test under *Hadden* does not apply; the Integrated

Agreement is neither a construction contract nor an employment contract and the holding

of *Hadden* is irrelevant.

2.    **The Integrated Agreement Unambiguously Demonstrates that the Ongoing Obligations Are Material to the 1991 Transaction.**

The Bankruptcy Court correctly found that each of the ongoing obligations

described above go to the essence of the 1991 transaction, the primary purpose of which

was to permit EnerSys to sell EXIDE-branded products in the industrial battery market as

part of its purchase of Exide's industrial battery division.  In other words, the obligations

contained in the Integrated Agreement are material to the transaction as a whole.  *See In*

*re Phillip Services (Delaware), Inc.*, 284 B.R. 541, 547 (Bankr. D. Del. 2002).  For

confirmation of such materiality, this Court needs to look no further than Section 8 of the

Trademark License Agreement, which provides that the Trademark License Agreement is

subject to termination if EnerSys fails to fulfill its ongoing obligation to make a battery of

the established quality under the licensed mark.    Trademark License Agreement § 8.

This is *per se* materiality, that is, materiality that is self-evident from the four corners of

the Integrated Agreement.

Ignoring this self-identifying materiality provision, EnerSys erroneously argues

that, even if the ongoing obligations contained in the Integrated Agreement have not been

substantially performed (which, for the reasons set forth above, they have not), the

ongoing obligations described above are not material because of Section 13.6 of the Asset

Purchase Agreement.  Section 13.6 of the Asset Purchase Agreement provides:

> Exclusive Remedies.  The indemnification provided for in this Article XIII
> shall be the exclusive remedy available to any Indemnitee against any
> Indemnitor for any Damages hereunder to the exclusion of all other
> common law or statutory remedies, including without limitation the right

23

to contribution under CERCLA or analogous state law; provided, however, that notwithstanding the foregoing, the parties agree that failure of the parties to perform certain of their respective obligations under this Agreement or the Ancillary Agreements may result in consequences to the non-breaching party for which money damages may not be sufficient. In such case, the non-breaching party shall be entitled to specific performance and other equitable relief, which shall be cumulative and non-exclusive of any other remedy available to such non-breaching party pursuant to this Article XIII.

Asset Purchase Agreement § 13.6.

Failing to identify the foregoing argument in its response to Exide's contention interrogatories or at any time prior to its closing argument at the Bankruptcy Court's hearing on Exide's motion to reject the Integrated Agreement,[5] EnerSys waived its right to assert such argument. *See, e.g., CPC Int'l Inc. v. Archer Daniels Midland Co.*, 831 F.Supp. 1091, 1102-03 (D. Del. 1993) (finding that ADM waived the right to assert certain matters as defenses to CPC's claims of infringement by failing to include them in a draft pretrial order); *Carita v. Kandianis*, No. CIV. A. 93-2850, 1994 WL 583213, at *4 (E.D. Pa. Oct. 20, 1994) (holding that "because this issue was never raised in the pleadings, nor at any time during trial, making a closing argument on this theory would have been improper"), *aff'd* 65 F.3d 161 (3d Cir. 1995).

More importantly, however, the Bankruptcy Court correctly noted that, even if it were to consider EnerSys' argument with respect to Section 13.6 of the Asset Purchase Agreement, the "argument fails." (Opinion at 8) The Bankruptcy Court aptly recognized that the scope of Section 13.6 of the Asset Purchase Agreement is limited. In fact, the section merely provides that on account of claims for *damages* based on alleged

---

[5]    EnerSys did not cite Section 13.6 of the Asset Purchase Agreement in its twenty-six-page brief opposing summary judgment that the Trademark License Agreement is executory (Bankruptcy Court D.I. 2416), in its lengthy oral argument at the hearing on Exide's and EnerSys' cross motions for summary judgment (ENAR 89 at 19-62); in any of its several motions *in limine*; in its fifty-two-page pre-trial brief (Bankruptcy Court D.I. 3460); or during arguments on its motion for directed verdict (ENAR 194 at 51-72).

violations of certain warranties under Article XIII of the Asset Purchase Agreement, specific performance and other equitable relief is available in addition to the remedies provided in that Article. Section 13.6's authorization of "other equitable relief" of course encompasses a myriad remedies under the law that could affect the parties' fulfillment of ongoing obligations under the Integrated Agreement. Regardless, Section 13.6 does not and cannot trump Section 8 of the Trademark License Agreement, which is perfectly clear with respect to the consequence of EnerSys' failure to perform either the Use or Quality obligations: termination of the Trademark License Agreement.

In short, the material obligations set forth in the Integrated Agreement and recognized by the Bankruptcy Court, individually and collectively, "go to the essence of the contract" *In re Philip Servs. (Delaware), Inc.*, 284 B.R. 541, 547 (Bankr. D. Del. 2002) (citing cases); permitting, but limiting, EnerSys' use of the EXIDE mark to the industrial market. Ultimately, as the Bankruptcy Court noted at the hearing on November 20, 2003, the very vigor with which EnerSys opposed the rejection of the Trademark License Agreement attests to its materiality to the 1991 Transaction as a whole:

> If I then turn – in a way given the vigor with which EnerSys has resisted the rejection of the license agreement by Exide I could almost conclude from that alone that as that component which is the license agreement gets pushed into the rest of them is an important enough component of the whole that if I looked at the factors that Exide wants me to look at to conclude that there are, under the license agreement alone, material obligations remaining on each side that I could make that decision even if I agree with EnerSys that, and I think I do, that the series of agreement are really one integrated agreement. This is an important enough component that I think the factors are all there from which I could make a decision. Now I might or might not agree with Exide's position about the materiality of those provisions which it cites in its papers in its argument today. But I think it's all there.

(ENAR 89 at 21:15-22:5)

EnerSys' attempt to portray each of the parties' material obligations as falling outside of the scope of the Countryman standard runs contrary to substantial case law precedent in the context of intellectual property cases. Courts routinely hold that such obligations are executory. *See, e.g., In re Chipwich*, 54 B.R. 427, 430 (Bankr. S.D.N.Y. 1985) (finding that, among other things, debtor-licensor's continuing duty to indemnify licensee for damages incurred by licensee as a result of suits against licensee arising out of its use of the licensed products was executory); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046 (4th Cir. 1985) (finding that contingent duties that the debtor-licensor owed of giving notice, defending infringement suits and indemnifying licensee for certain losses were executory); *Fenix Cattle Co. v. Silver (In re Select-A-Seat Corp.)*, 625 F.2d 290, 292 (9th Cir. 1980) (finding debtor-licensor's obligation to refrain from selling a product under an exclusive licensing agreement to be executory); *Philip Servs. Corp., et al. v. Luntz, et al. (In re Philip Servs. (Delaware), Inc.)*, 284 B.R. 541, 550 (Bankr. D. Del. 2002) (rejecting plaintiff's argument that indemnification obligations were not material because they were contingent and might never materialize); *Access Beyond Techs.*, 237 B.R. 32, 43 (Bankr. D. Del. 1999) (finding licensor's promise to refrain from suing the licensee for infringement to be executory); *In re Novon Int'l. Inc.*, No. 98-0677E, 2000 WL 432848 *1, at *4 (W.D.N.Y. Mar. 31, 2000) (same); *Everex Syss., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 677 (9th Cir. 1996) (same); *In re Kmart Corp.*, 290 B.R. 614, 618 (Bankr. N.D. Ill. 2003) (finding debtor-licensor's continuing duty to notify licensee of any claims, allegations of infringements or legal suits that may arise to be executory).

Significantly, EnerSys does not contend in EnerSys Opening Brief that Exide's obligation to permit EnerSys to use the EXIDE mark pursuant to the Trademark License Agreement, to prosecute all substantial claims of infringement and to oppose all attempted registrations of potentially confusing trademarks, trade names or service marks cannot satisfy the Countryman definition of an executory contract. EnerSys' omission is not an oversight; EnerSys neglects to address these obligations because they *are* material. *See, e.g., Lubrizol Enters., Inc.*, 756 F.2d at 1046 (holding that the licensor's contingent duty to defend infringement suits was a material obligation). The Opinion is thus correct under established case law and the facts and the Bankruptcy Court's determination that the obligations of the Integrated Agreement are material and ongoing should be upheld.

### 3.    The Quality Standards Provision and the Use Restriction Are Obligations and Executory.

The Bankruptcy Court correctly recognized that both the Quality Standards provision and the Use Restriction are affirmative undertakings as opposed to conditions. (Opinion at  11-14)  EnerSys, in its Opening Brief, recognizes the disparate effects resulting from the failure of a condition subsequent to materialize and a party's breach of an obligation, but misidentifies the Quality Standards Provision and the Use Restriction as conditions rather than obligations.

The Quality Standards Provision provides, in relevant part, that "[l]icensee shall maintain the standards of quality set by Licensor for the conduct of the Licensed Business under the Licensed Trade Name and the goods bearing the Licensed Marks which Licensor established prior to the execution of this Trademark License" (the "Quality Standards"). Having analyzed this language, the Bankruptcy Court found that EnerSys' agreement affirmatively to maintain the standards of quality for the mark set by Exide

27

indicates that "the parties intended the Quality Standards to be an affirmative undertaking rather than a condition." (Opinion at 11) As such, the Quality Standards are an obligation. *See, e.g., HQ Global Holdings*, 290 B.R. at 510 (noting that franchisees' duty to maintain quality standards under license was an affirmative obligation).

The Use Restriction, which appears in paragraph 2 of the Trademark License Agreement, provides, in relevant part, that:

> Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, . . . a perpetual, exclusive, world-wide, royalty-free license to use the Licensed Trade Name as a corporate name or trade name within the scope of the Licensed Business, and a non-exclusive, perpetual, world-wide, royalty-free license to use the Licensed Trade Name in connection with the motorcycle battery business, but only as part of the trade name or corporate name "Yuasa-Exide, Inc." While retaining the corporate name "Yuasa-Exide, Inc.", Licensee may sell products in businesses other than the Licensed Business and the motorcycle battery business but Licensee shall not sell such products under the Licensed Trade Name and shall sell such products under an assumed name, fictitious name or through some other mechanism whereby the Licensed Trade Name is not used before the public or trade in relation to such products.

> Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, . . . a perpetual, exclusive, world-wide, royalty-free license to use the Licensed Marks within the scope of the Licensed Business on and in connection with the goods for which such Licensed Marks are registered or as otherwise permitted under applicable law within the scope of the Licensed Business . . . .

Furthermore, paragraph 8 of the Trademark License provides, in relevant part, that:

> Licensor shall have the right to terminate this Trademark License if . . . Licensee uses, assigns, or sublicenses its rights under the Licensed Trade Name or the Licensed Marks outside the scope of the Licensed Business . . . .

These two provisions are an integrated component of the license under which EnerSys is permitted to use the EXIDE mark within the industrial battery market. Although there is no affirmative undertaking by EnerSys actually to use the EXIDE mark, EnerSys is obliged to use the mark only in accordance with all of the terms of Integrated Agreement.

*See Novon Int'l, Inc.*, 2000 WL 432848, at *4. EnerSys must observe the restrictions imposed by the grant of the license; thus, EnerSys' Use Restriction is an affirmative undertaking or obligation. *Id.*

### 4.    Exide Did Not Waive the Quality Standards Provision.

EnerSys' argument that, under New York law, Exide waived its rights under the Quality Standards Provision, was properly rejected by the Bankruptcy Court as a matter of law. Under both controlling New York law and the express terms of the Trademark License Agreement, an alleged "waiver" or abandonment could only be effectuated in writing, not by some conduct or inaction. Trademark License Agreement § 15 ("This Trademark License may not be released, discharged, abandoned, changed or modified in any manner except by an instrument in writing signed by a duly authorized representative of each of the parties hereto."); *Cary Oil Co. v. MG Refining & Marketing, Inc.*, 257 F. Supp. 2d 751, 765-66 (S.D.N.Y. 2003) ([W]ithout a written waiver signed by Plaintiffs, Defendants cannot establish a defense of waiver as a matter of law."); *Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth Ave., LLC*, 767 N.Y.S.2d 99, 103 (N.Y.S.2d 2003) (holding that written waiver clause controlled over any course of conduct by the parties); *Bank of Montreal v. Bailey*, No. 91 CIV 0128 (MJL), 1992 WL 8342 at *2 (S.D.N.Y. Jan. 14, 1992) ("New York law is clear that in the presence of such a merger clause, without a writing to change the note's terms, there is no basis for a [waiver] defense.") (internal quotations and citations omitted). Moreover, it is black letter law that a trademark licensee cannot assert that the licensor has relinquished its trademark rights by failing to engage in adequate quality control over the licensee, which would result in what is called

a "naked license." *Westco Group Inc. v. K.B. & Assoc. Inc.*, 128 F. Supp. 2d 1082, 1089 (N.D. Ohio 2001); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000).

EnerSys' indefensible position notwithstanding, even if there was a contractual requirement that Exide monitor the quality of EnerSys' EXIDE-branded batteries (which there was not), the evidence presented at the trial conducted by the Bankruptcy Court demonstrated that Exide clearly did so. In the Bankruptcy Court hearings, Mr. Zuidema, Executive Vice President of EnerSys at the time, testified that "the only method" of which he is aware to make sure EnerSys satisfied the quality standards is based on the lack of any reported significant quality problems. (ENAR 195 at 316:25 – 317:9) Mr. Bright, President of Exide Industrial Europe at the time, testified that the industrial battery business is insular, that word of quality problems travels fast, and that Exide was not aware of any reports of significant quality problems with EnerSys' EXIDE-branded batteries. (ENAR 193 at 69:2-19) Given these statements, inaction on the part of Exide would have been understandable; however, Exide did act, which acts included Exide's technical exchanges with EnerSys during which, among other things, Exide inspected EnerSys' plants and received testing data and information about the quality of EnerSys' batteries. (ENAR 193 at 62:13-63:5, 64:1-68:10) Mr. Bright testified that the information Exide received from EnerSys during these technical exchanges was correlative to EnerSys' satisfaction of minimum quality standards. (ENAR 193 at 68:4-10) Exide also broke down, inspected, and tested EnerSys' batteries to evaluate their quality. (ENAR 195 at 68:11-69:1) Further, EnerSys' batteries on their face indicate that they satisfy the ISO industry standards, which further demonstrates a threshold level of quality. (ENAR 193 at 63:6-25) Finally, because of the parties' historical and close

working relationship, Exide was entitled to rely on EnerSys' own quality control measures. *See, e.g.,* ENAR 193 at 58:25-62:12; *see also Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991) (holding that even a complete failure to control quality of a trademark licensee does not invalidate the license if the licensor reasonably relies on the licensee's own quality control efforts where the parties enjoy a close working relationship), *aff'd on other grounds*, 505 U.S. 763 (1992). Practically speaking, EnerSys was manufacturing EXIDE-branded batteries using Exide's former plants and machinery acquired in the 1991 transaction, utilizing technical plans and processes developed by Exide. Exide was naturally permitted to rely on EnerSys' own quality control efforts when many (if not all) of those efforts were originally designed and implemented by Exide. Thus, the Bankruptcy Court correctly rejected EnerSys' claim that Exide "waived" the quality control provision.

### C.    Failure to Seek Rejection of All Contracts Does Not Preclude Rejection of the Integrated Agreement.

EnerSys argues that "the Bankruptcy Court erred in failing to deny rejection of the four Agreements based on Exide's failure to seek rejection of the other 1991 Contracts." (EnerSys Br. at 45) EnerSys alleges that because all of the contracts executed in connection with the 1991 transaction are a single integrated agreement, failure to reject all of the contracts *individually* prevents rejection of any of the agreements. The argument is self-defeating. If there is one integrated agreement, Exide would not be required to reject every one of its parts separately—as if not integrated—to effectuate a rejection of the entire agreement. Notably, EnerSys fails to cite any authority that stands for such a proposition and the Bankruptcy Court properly rejected the argument.

The Bankruptcy Court noted that "all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract." *In re Exide Techs.*, 340 B.R. 222, 228 (Bankr. D. Del. 2006), citing *Philip Servs. Corp. v. Luntz (In re Philip Servs. (Delaware), Inc.)*, 284 B.R. 541, 547-48 (Bankr. D. Del. 2002) *aff'd* 303 B.R. 574 (D. Del. 2003). Here, the Bankruptcy Court found that the four agreements were integrated and Exide sought to reject those four agreements. Notably, the Bankruptcy Court made no other ruling as to integration or non-integration of any other agreement. If the Bankruptcy Court had ruled that there were eight (or three or twelve) integrated agreements rather than four, then Exide would have simply sought rejection of eight (or three or twelve) agreements.[6] Here, the Bankruptcy Court ruled that exactly four agreements were integrated, and thus, Exide rejected exactly all four of those agreements.

### D.    Exide Did Not Sell Its Trademark to EnerSys Under the Trademark License Agreement.

EnerSys boldly suggests that it is now the proper owner of the EXIDE mark and that rejection of the Integrated Agreement is therefore without legal effect. As support for its proposition, EnerSys cites *Conde Nast Publ'ns, Inc. v. U.S.*, 575 F.2d 400 (2d Cir. 1978), a case which explicitly limited its decision to determining if royalty payments should be treated as capital gains for tax purposes under the Internal Revenue Code. *Id.* at 404. Unfortunately for EnerSys, "[i]ncome tax law has its own definition of the difference between an assignment and a license." J. THOMAS MCCARTHY, MCCARTHY

---

[6]    EnerSys never obtained any ruling from the Bankruptcy Court that any other agreement related to the 1991 transaction is or is not integrated with the Integrated Agreement. As such, EnerSys cannot now contend that additional contracts are part of the Integrated Agreement. EnerSys' argument that Exide is seeking to reject only part of an integrated contract is not only untimely — it is also factually and legally wrong.

ON TRADEMARKS AND UNFAIR COMPETITION § 18:1 n.5 (4th ed. 2006) (citing *Conde Nast*, 575 F.2d 400). As the Bankruptcy Court properly concluded, ownership of the EXIDE mark is more appropriately determined with reference to the Asset Purchase Agreement and to trademark law.

An "assignment" of a trademark passes legal and equitable title to the trademark while a "license" is a mere permission to use the trademark. *Estate of Presley v. Russen*, 513 F. Supp. 1339, 1350 (D.N.J. 1981). "An assignment presupposes the transfer of the entire interest in a trademark, while a license involves the transfer of something less than the entire interest, and does not affect the licensor's title." *Id.* At 1350-51 (citing CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 78.2 (3d ed. 1969)). EnerSys asserts that "when interpreting a contract, substance must prevail over form" (EnerSys Opening Brief at 46), but the Integrated Agreement is clearly not deficient in either substance or form. The Integrated Agreement clearly and unambiguously provides that the EXIDE mark is *licensed* to EnerSys. As the Bankruptcy Court notes, "[t]he Agreement makes clear which marks were assigned (*see* paragraph and schedule 9.1 of the Asset Purchase Agreement) and which marks were licensed, such as the EXIDE mark (*see* paragraphs 2.1[c] and 9.5 and schedule 9.5 of the Asset Purchase Agreement)." (Opinion at 21) The Bankruptcy Court correctly states that "[w]hile there was a sale aspect to the Agreement, the EXIDE mark was not one of the assets that EnerSys purchased. Rather, the Agreement granted to EnerSys only a right to use the EXIDE mark. Title to the EXIDE mark remained with Exide despite the fact that EnerSys was granted a royalty-free, exclusive license." *Id.* at 20-21. The Integrated Agreement could not be more clear: the EXIDE mark was contractually licensed to

EnerSys. *See Ananta Group, Ltd. v. Moss Shamask, Ltd.*, 182 A.D.2d 499, 499 (N.Y. App. Div. 1992) (holding that "the distinction between a "sale" and a "license" is not only obvious from the words' inherent meanings but also from their usage in the respective contracts").

Moreover, an outright assignment of the EXIDE mark to EnerSys, as EnerSys now alleges, would be unenforceable according to trademark law. A fundamental premise of trademark law is that a "trademark cannot be sold or assigned apart from the good will it symbolizes" and a trademark divorced from its good will is an unenforceable "assignment in gross." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:2-3 (4th ed. 2006). The Third Circuit defines good will as "the advantage obtained from use of a trademark. This includes public confidence in the quality of the product and in the warranties made on behalf of the product, and the 'name recognition' of the product by the public that differentiates that product from others." *Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 853 n.3 (3d Cir. 1986) *cert. denied*, 479 U.S. 950 (1986).

Here, after the Integrated Agreement was executed Exide continued to use the *same* EXIDE mark in connection with the production and sale of numerous products across many different industries. Therefore, the good will associated with the EXIDE mark continued to inure to the benefit of Exide. *See also Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*, No. 99-7778, 2003 WL 23144859, at *9 (N.D. Ill. 2003) (seller of business unit was held to have licensed trade name as provided in the asset purchase agreement and because continued use of name precluded finding of assignment); J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR

34

COMPETITION § 18:21 (4th ed. 2006) (explaining that a trademark can be assigned with the sale of a "distinct and separate" line of business, but such assignment will not be valid if it "seems likely that consumers will continue to assume that the same company is selling *both* lines of goods under the same [] mark"). EnerSys itself conceded that the license could not have been structured as a sale because Exide also continued to use the mark for itself. (Opinion at 21 n.21) As the Bankruptcy Court concluded, for EnerSys to now argue that it is the rightful owner of the EXIDE mark as a result of the Integrated Agreement is simply unsupportable.

### E.    The Bankruptcy Court Did Not Err When It Concluded that Exide Satisfied the Business Judgment Test.

EnerSys argues that Exide failed to justify its decision to reject the Integrated Agreement under the business judgment test — in particular, because Exide relied upon improperly admitted, or otherwise irrelevant, evidence to show that the estate would derive a quantitative benefit from rejection. (EnerSys Br. at 48-58) However, EnerSys' argument relies on a serious misstatement of the business judgment test and incorrect evidentiary arguments that, even if accepted, would only impugn a small fraction of the total evidence provided by Exide, which the Bankruptcy Court found persuasive. Because the Bankruptcy Court applied the proper formulation of the business judgment test, and because Exide submitted ample proof of a benefit to the estate from rejection, the Bankruptcy Court's ruling on this aspect of the Debtor's motion to reject is unassailable.

### 1.    The Bankruptcy Court Correctly Set Forth the Business Judgment Test.

The Bankruptcy Court accurately enunciated the business judgment standard as it is applied in this Circuit. The business judgment test requires the Court to determine

whether a reasonable business person would make a similar decision under similar circumstances. *See In re Vencor*, Nos. 99-3199 (MFW), 99-3327 (MFW), 2003 WL 21026737, at *3 (Bankr. D. Del. Apr. 30, 2003). Ordinarily, absent a showing of bad faith or gross abuse of discretion, a debtor's decision to assume or reject an executory contract will be respected by the courts. *See Lubrizol Enters*, 756 F.2d at 1047.

As the Bankruptcy Court correctly observed, this test is "not a difficult standard to satisfy" – despite EnerSys' attempts to make it so for purposes of its arguments. (Opinion at 22); *see also In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126-27 (Bankr. D. Del. 2003) (rejecting argument that, as a prerequisite step to rejecting an executory contract, a debtor need first establish that the contract would impose a severe financial burden or hardship). Indeed, absent a demonstrated defect in the decision-making process, there is no reason for any court to substitute its judgment for a debtor's business decision in choosing to reject a contract such as the one at issue. The Bankruptcy Court recognized that this presumption of correctness was essential to applying the business judgment test:

> Well, I think there is an underlying thread that is common and that is the notion that courts shouldn't second guess the business decision of corporations unless the process wasn't properly followed . . . because the presumption is that if you follow the appropriate process the judgment should stand.

(ENAR 194 at 80:14-20)

Based upon the above, the Bankruptcy Court divided its analysis of whether the business judgment test had been satisfied into two general areas: (a) whether the rejection decision was "the result of a deliberative and thoughtful process" (Opinion at 23) and (b) whether the rejection could be demonstrated to benefit the estate. (Opinion at 23 – 32) The second area of the test was further separated into four sub-inquiries: (i) whether

Exide could demonstrate qualitative benefits from rejection; (ii) whether Exide could demonstrate quantitative benefits; (iii) whether Exide had adequately taken into account rejection damages which could be asserted by EnerSys; and (iv) whether Exide was correct in its belief that rejection would result in its obtaining exclusive use of the EXIDE mark.  (Opinion at 25 – 41)  After applying the facts to the foregoing analytical framework, the Bankruptcy Court correctly concluded that rejection was justified under the business judgment standard.

The EnerSys Opening Brief does not contend that this recitation of the elements of the business judgment rule, as it is applied in the bankruptcy context and in this Circuit, is incorrect.  Rather, EnerSys' focus on appeal is primarily whether Exide could establish any *quantitative* benefit to be derived from rejection.[7]  This narrowly-focused challenge completely ignores the fact that the Bankruptcy Court ruled that, merely based upon the *qualitative* proof provided by Exide as well as the evidence it provided about its deliberative process, Exide had met its burden.  (Opinion at 26)  Regardless, as a matter of law, it is clear that the business judgment test is far broader, and less onerous, than the version EnerSys wishes this Court to embrace.

### 2.    There Was More Than Sufficient Evidence in the Record to Support the Bankruptcy Court's Business Judgment Finding.

Review of the evidence offered during trial demonstrates that the Bankruptcy Court had more than enough proof before it to find that the business judgment test was

---

[7]    Although EnerSys does purport to challenge the finding that rejection would not result in an excessively large damages claim against the estate, it does so in conclusory fashion, arguing the point in only two paragraphs of the ten-page section of the EnerSys Opening Brief devoted to the business judgment standard.  More tellingly, it grants the Bankruptcy Court's point that, in considering the risks posed by a damages claim against the estate stemming from rejection, "substantial weight" should be given to the fact that the committee of unsecured creditors *supported* the decision to reject.  *Compare* Opinion at 37 *with* EnerSys Br. at 57 ("EnerSys does not dispute that it is appropriate for a bankruptcy court to consider the position of a creditors' committee on issues which directly impact unsecured creditors, such as rejection of a contract").

satisfied.  (ENAR 194 at 82:6-9 (". . I think the debtor has made a showing sufficient to convince me that it  undertook appropriate steps to reach the conclusion that it did in deciding to reject these series of agreements."))

Applying the first aspect of the test, the Bankruptcy Court easily reached the conclusion that the decision to reject the Integrated Agreement was the result of extensive and detailed deliberations.  To that end, the Bankruptcy Court heard testimony from Neil Bright, the employee responsible for Exide's worldwide industrial battery business outside of North America, regarding Exide's internal discussion of unification under a single brand — discussions that originated as early as 1999.  (ENAR 193 at 85:4-110:22)  These discussions included consideration of Exide's concern that the trademark license was an impediment to Exide's long-range goals, as well as Exide's evaluation of purchasing EnerSys as a means of reuniting with the Exide name in the industrial battery industry.  (ENAR 193 at 85:4-110; 99:1-100:6)  Additionally, the Court heard testimony from Mitch Bregman, Exide's President of the Industrial Energy Americas Business, that Exide had been examining global branding strategies and unification for years — "One Team, One Vision" had become the company motto.  (ENAR 193 at 82:21-83:11; 161:14-22)

Given such a history, it is unsurprising that when an opportunity to reject the Integrated Agreement arose in the bankruptcy proceedings, Messrs. Bright's and Bregman's recommendation to CEO Craig Muhlhauser that rejection be pursued was swift and conclusive.  (ENAR 193 at 115:20-117:6, 180:11-183:12)  The decision to reject the Integrated Agreement was thereupon discussed by numerous individuals with experience and familiarity with the challenges facing Exide.  (ENAR 193 at 115:20-

116:13, 183:19-184:12; ENAR 195 at 22:14-23:6, 27:20-29:18)  Lisa Donohue, Exide's Chief Restructuring Officer, who had years of experience evaluating hundreds of agreements for rejection in the context of approximately twenty bankruptcy proceedings, similarly confirmed that the process in which Exide engaged was proper and routine — if not more extensive than usual.  (ENAR 195 at 111:11-113:5)

The Bankruptcy Court next evaluated the "qualitative" benefits to be derived from rejection — again finding more than sufficient evidence to support Exide's decision under the low threshold of the business judgment test.  (Opinion at 25-27)  Such evidence included: (i) proof of the likelihood that unification of the brand would have competitive benefits (as discussed above); (ii) consideration of the risks of not unifying; and (iii) the benefits to be derived from a reduction in marketplace confusion about products bearing the EXIDE mark.  (ENAR 195 at 75:9-76:10, 78:15-79:6, 96:14-97:3, 100:21-101:8, 108:12-109:9, 177:5-8, 181:17-182:16, 170:5-24,  171:1-24,172:12-20, 172:23-173:12; ENAR 201 at 89:8-22, 90:4-9) Notably, the Bankruptcy Court ruled that, based upon the evidence provided, "the qualitative benefits alone . . . are sufficient to support the Debtor's decision to reject." (Opinion at 26)

Finally, and despite its confidence that Exide had already met its burden of proof under the business judgment standard, the Bankruptcy Court looked at quantitative proof supporting rejection.  In particular, the Bankruptcy Court credited the testimony of Mr. Bright, as well as Exide's expert, Scott Phillips, in finding that brand unification was likely to reduce Exide costs through increased efficiency.  (Opinion at 27-28)  It also concluded that economic forecasts provided by Exide, and based on existing sales data, were persuasive on this point.  *Id.* at 28.

3.    **Exide's Business Projection Data Were Admissible and Relevant.**

As noted above, EnerSys' argument is wholly dependent on an inaccurate and incomplete application of the business judgment rule. EnerSys would have this Court re-write the business judgment rule to impose a "quantitative" element and elevate this standard to the point that it overshadows, if not swallows outright, all other considerations historically relied upon by courts. The primary aim in urging such a narrow construction of the rule is that it dovetails with EnerSys' attack on some of the proof marshaled by Exide in support of the quantitative benefits of rejection — in particular, the financial projections and forecasts offered by Exide to establish quantitative benefit. (EXAR 215-17) EnerSys maintains this evidence was inadmissible, and/or lacked relevance, because of the manner in which these documents were created and then authenticated, as well as the fact that certain business information contained in those documents (in particular, financial numbers) had been redacted from the reports at issue. Of course, given that the Bankruptcy Court was persuaded that Exide had met its burden under the *overall* business judgment test even without consideration of the quantitative aspect of the test,[8] EnerSys' arguments on these narrow issues are of little avail in undermining the Bankruptcy Court's considered judgment. Nevertheless, EnerSys' evidentiary arguments are themselves faulty in several respects.

As a threshold matter in considering the admissibility of these pieces of evidence, it should be noted that EnerSys has incompletely stated the applicable standard for reviewing the Bankruptcy Court's evidentiary decision. Although EnerSys is correct

---

[8]   Notably, the financial projection documents were offered also to demonstrate that Exide had engaged in the necessary deliberative process to evaluate the benefits of rejection. (ENAR 193, 195)

that, generally speaking, a bankruptcy court's findings of law are subject to plenary review (EnerSys Br. at 49), in the Third Circuit a trial court's rulings based on a permissible interpretation of the Federal Rules of Evidence is limited to the abuse of discretion standard. *In re Memorex Telex Corp.*, 242 B.R. 826, 830 (D.C. Del. 1999), citing *U.S. v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994).

The Bankruptcy Court's admission of these materials into evidence under a hearsay exception did not constitute an abuse of discretion. Under Federal Rule of Evidence 803(6), business records which might otherwise fall under the definition of hearsay may still be admitted into evidence if: (a) they are created in the regular course of business; (b) it was the regular practice of that business activity to keep the record; (c) the participant is acting in her regular business role; and (d) the information is recorded contemporaneously. Fed. R. Evid. 803(6); *see also U.S. v. Console*, 13 F.3d 641, 657 (3d Cir. 1993). The mere fact that a document might have come into existence after commencement of litigation does not automatically render it as having been created "in anticipation of litigation," so long as the document at issue has other "circumstantial guarantees of trustworthiness." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999), quoting *U.S. v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999). Indeed, "[c]ourts have considered the business significance of records *apart* from their use in litigation as an indicia of trustworthiness." *Memorex Telex Corp.*, 242 B.R. at 832 (call log was admitted into evidence under F.R.E. 803(6), even though document was prepared after possibility of litigation existed and had utility in proving claim against customer/defendant).

41

Here, such "trustworthiness" could be measured by the extent to which the documents were created in an "ordinary course fashion" — meaning as part of a routine business function. *See, e.g., Sana,* 181 F.3d at 1047 ("Although 'regular' can mean 'recurring . . . at fixed or uniform intervals,' it can also mean 'usual' or 'ordinary.'"). Courts have admitted such materials, despite their implementation in contested matters, if it appears that the means by which the document was created was itself a normal business function. *Id.* (report of investigator for party's insurer was admitted under F.R.E. 803(6) exception, where generation of information contained in report was part of preparer's regular duties for party, was an act the party would have done in the ordinary course of business, and was done on company time); MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 803(6) (6th ed. 2006) ("[T]he reliability of business records is supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, and/or by a duty to make an accurate record as part of a continuing job or occupation.").

The Bankruptcy Court had ample reason to trust in the validity of the challenged materials. (Opinion at 29-30)  As Mr. Bright testified, the documents were created and used in the regular course of business:

> Q:    Is there anything out of the ordinary in the way the information for these three exhibits was gathered from your business?
>
> A:    No, this is something that we would do on a routine and regular basis.

(ENAR 193 at 112:17-21)

The testimony of Bruce Cole, Vice President of Marketing for the Industrial Portion of Exide, similarly confirmed that these documents were "done like that regularly

in the normal course of business." (ENAR 195 at 186:11-12)  Mr. Cole even reiterated

the point on cross-examination:

> Q:     In fact, all of these documents that we've looked at, 156, 157, 155,
>        these were all done at the request of counsel in this litigation,
>        weren't they?
>
> A:     No.

(ENAR 195 at 237: 17-20)

EnerSys repeatedly highlights the fact that these materials came into being in

2004, after the matter in dispute began.  Yet, the Bankruptcy Court acknowledged in its

ruling that information post-dating the filing of the motion at issue was quite relevant to

determining the propriety of the motion to reject.  (ENAR 154 at 102:11-19 ("[t]he

Debtor . . . is perfectly free to continue to look for support for its decision")).  This is

consistent with the business judgment test, which analyzes the extent to which a decision

*will,* after implementation, benefit the estate – not whether the decision had sufficient

support at a point in history.  It also is consistent with the broad power the Bankruptcy

Code affords debtors under section 365.  *In re Ames Dept. Stores,* 287 B.R. 112, 125-26

(Bankr. S.D.N.Y. 2002) ("there is nothing in the [Bankruptcy] Code that says *when* the

Debtor must engage in the necessary analysis" regarding a decision to assume or reject,

given that there are "nearly infinite ways by which a transaction can be structured if it

otherwise makes business sense and involves a proper exercise of business judgment").

The materials at issue were relevant to the quantitative aspect of the business

judgment test.  EnerSys points to the fact that certain information was redacted, thus

arguably eradicating the relevance of these materials.  But this argument displays a

fundamental misunderstanding of redaction.  These redacted documents contained

information that Exide was reluctant to allow their competitor — EnerSys — to view.

Consequently, and with permission from the Bankruptcy Court (Opinion at 29 n.30), the documents were produced to EnerSys in redacted form. The Bankruptcy Court, of course, was provided with the unredacted documents.

However, the mere fact of redaction did not deprive the materials of their probative value. Indeed, the Bankruptcy Court itself deemed them persuasive, despite its acknowledgement that their value as proof may have been diminished somewhat. The projection documents still had evidentiary value. Ultimately, this argument merely challenges the evidentiary weight that should have been given to the documents - not their admissibility. *Greener v. The Cadle Co.*, 298 B.R. 82, 92 (Bankr. N.D. Tex. 2003) (affirming bankruptcy court's admission of allegedly incomplete and inaccurate document because such challenges "go to the weight of the evidence, not its admissibility"). The argument should be rejected now, just as it was by the Bankruptcy Court.

Finally, EnerSys questions the capacity of the witnesses who authenticated these materials at trial given that they had not personally prepared them and instead were "reading into the record" the materials at issue. Yet, as observed by the court in *Greener*, "[t]here is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy." *Greener,* 298 B.R. at 92, citing *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990). Messrs. Cole and Bright are Exide employees who, during the regular course of their business, routinely utilized such materials and were well versed in the interpretation and implementation of the data they contained. (ENAR 193 at 112:22-113:1) They were similarly familiar with the methods by which the documents were generated and how the information set forth therein was

maintained.  (ENAR 193 at 111:19-115:8; ENAR 195 at 186:8-187:17, 192:3-193: 10)
Accordingly, given their knowledge pertaining to the process used in creating the
documents as well as the reliability and source of the data contained therein, Cole and
Bright were more than qualified to interpret these materials, and thereby vouch for their
authenticity.  Both could "explain and be cross-examined concerning the manner in
which the records are made and kept."  *In re Nat'l Trust Group, Inc.*, 98 B.R. 90, 92
(Bankr. D. Fla. 1989), quoting *Wallace Motor Sales, Inc. v. Am. Motor Sales Corp.*, 780
F.2d 1049, 1060-61 (1st Cir. 1985).  As such, both were qualified under Rule 803(6) to
authenticate such materials.  *See* MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE
§ 803(6) (6th ed. 2006) ("Rule 803(6) is based upon the realization that the dependability
of regular entries rests upon proof of a routine of making accurate records, rather than
upon the testimony of each participant that he himself was accurate.").  The Bankruptcy
Court correctly ruled that the documents were relevant and reliable; EnerSys has
presented this Court with no basis upon which to conclude that the Bankruptcy Court's
admission of these documents into evidence was an abuse of discretion.

### V.    CONCLUSION

For the reasons set forth herein, the Opinion is well supported in law and fact and
the Bankruptcy Court's determinations that: (a) Exide's obligation to allow EnerSys to
use the EXIDE mark was extinguished upon rejection; (b) the Integrated Agreement is
executory; (c) failure to seek rejection of all contracts does nor preclude rejection of the
Integrated Agreement; and (d) Exide did not sell its trademark to EnerSys under the
Trademark License Agreement should be upheld.  Accordingly, Exide respectfully
requests that this Court deny the appeal and affirm the Rejection Order entered by, the
Opinion issued by and the Transition Plan approved by the Bankruptcy Court.

Dated: October 5, 2006          EXIDE TECHNOLOGIES, *et al.*


Laura Davis Jones (Bar No. 2436)
James O'Neill (Bar No. 4042)
PACHULSKI, STANG, ZIEHL, YOUNG,
   JONES & WEINTRAUB P.C.
919 North Market
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Fax: (302) 652-4400

-and-

Matthew N. Kleiman
MATTHEW N. KLEIMAN, P.C.
2506 North Clark Street
Suite 307
Chicago, Illinois 60614
Telephone: (312) 543-0412
Fax: (312) 868-4844

-and-

Roger P. Furey
John P. Sieger
Peter J. Young
KATTEN MUCHIN ROSENMAN LLP
1025 Thomas Jefferson Street, N.W.
East Lobby: Suite 700
Washington, D.C. 20007-5201
Telephone: (202) 625-3630
Fax: (202) 339-8268

*Co-Counsel for Appellee*

46

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Bk. No. 02-11125 (KJC) |
| EXIDE TECHNOLOGIES, et al. | ) |
| | ) |

| | |
|---|---|
| | ) |
| ENERSYS DELAWARE, INC., | ) Civ. No. 06-302 (SLR) |
| | ) |
| Appellant, | ) |
| | ) AP No. 06-33 |
| v. | ) |
| | ) |
| EXIDE TECHNOLOGIES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I, James E. O'Neill, hereby certify that on the 5th day of October, 2006, I caused a

copy of the following document(s) to be served on the individuals on the attached service list(s)

in the manner indicated:

**Appellee's Opposition Brief on Appeal from Bankruptcy Court**

_____

James E. O'Neill (Bar No. 4042)

DOCS_DE:121395.2

| RECIPIENT | OFFICE | E-MAIL |
|---|---|---|
| U.S. Trustee<br>Mark S. Kenney, Esq. | Department of Justice<br>Office of the United States<br>Trustee | mark.kenney@usdoj.gov |
| Counsel to Exide<br>Matthew N. Kleiman, Esq. | Matthew N. Kleiman, P.C. | mkleimanpc@gmail.com |
| Counsel to Exide<br>Paul R. Garcia, Esq.<br>Michelle A. H. Francis, Esq. | Kirkland & Ellis LLP | pgarcia@kirkland.com<br>mfrancis@kirkland.com |
| Counsel to Exide<br>Roger P. Furey, Esq.<br>John P. Sieger, Esq.<br>Matthew A. Olin, Esq. | Katten Muchin Rosenman LLP | roger.furey@kattenlaw.com<br>john.sieger@kattenlaw.com<br>matthew.olins@kattenlaw.com |
| Exide<br>Holly Pritchard, Esq.<br>Barbara Hatcher, Esq. | Exide Technologies | holly.pritchard@exide.com<br>barbara.hatcher@exide.com |
| Counsel to Post Confirmation<br>Committee of Unsecured<br>Creditors<br>Fred S. Hodara, Esq.<br>David M. Zensky, Esq.<br>Mary Reidy Masella, Esq.<br>Rachel Lasky Gerstein, Esq.<br>Cheryl A. Falvey, Esq. | Akin Gump Strauss Hauer &<br>Feld LLP | fhodara@akingump.com<br>dzensky@akingump.com<br>mmasella@akingump.com<br>rgerstein@akingump.com<br>cfalvey@akingump.com |
| Counsel to Post Confirmation<br>Committee of Unsecured<br>Creditors<br>David B. Stratton, Esq.<br>David M. Fournier, Esq.<br>Adam Hiller, Esq. | Pepper Hamilton LLP | strattond@pepperlaw.com<br>fournierd@pepperlaw.com<br>hillera@pepperlaw.com |
| Counsel to Official Committee<br>of Equity Security Holders<br>Laurie Selber Silverstein, Esq. | Potter Anderson & Corroon LLP | lsilverstein@potteranderson.com |
| Counsel to Postpetition Lenders,<br>Citicorp USA, Inc.<br>Richard S. Cobb, Esq. | Landis Rath & Cobb LLP | cobb@lrclaw.com |

| Counsel to Postpetition Lenders, Citicorp USA, Inc.<br>Marcia Landweber Goldstein, Esq. | Weil, Gotshal & Manges LLP | marcia.goldstein@weil.com |
|---|---|---|
| Counsel to Prepetition Lenders, Credit Suisse First Boston<br>Mark D. Collins, Esq. | Richards, Layton & Finger, P.A. | collins@rlf.com |
| Counsel to Prepetition Lenders, Credit Suisse First Boston<br>William J.F. Roll, III, Esq.<br>Douglas P. Bartner, Esq.<br>Marc B. Hankin, Esq.<br>Lynette C. Kelly, Esq. | Shearman & Sterling | wroll@shearman.com<br>dbartner@shearman.com<br>mhankin@shearman.com<br>lkelly@shearman.com |
| Counsel to EnerSys, Inc.<br>Robert Lapowsky, Esq.<br>Thomas G. Whalen, Jr., Esq.<br>John J. Miravich, Esq. | Stevens & Lee, P.C. | rl@stevenslee.com<br>tgw@stevenslee.com<br>jjm@stevenslee.com |
| Mediator<br>J. Richard Tucker, Esq. | Maron & Marvel, P.A. | jrt@maronmarvel.com |

Exide Technologies – EnerSys Service List
Case No. 02-11125 (KJC)
Document No. 120280
07 – Hand Delivery
11 – First Class Mail

**Hand Delivery**
(Counsel to EnerSys, Inc.)
Thomas G. Whalen, Jr., Esq.
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE  19801

**Hand Delivery**
(Mediator)
J. Richard Tucker, Esq.
Maron & Marvel, P.A.
1201 Market Street, Suite 900
Wilmington, DE  19801

**Hand Delivery**
(U.S. Trustee)
Mark S. Kenney, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox 35
Wilmington, DE  19801

**Hand Delivery**
(Counsel to Prepetition Secured Lenders,
Credit Suisse First Boston)
Mark D. Collins, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19801

**Hand Delivery**
(Counsel to Post Petition Secured Lenders,
Citicorp USA, Inc.)
Richard S. Cobb, Esq.
Landis Rath & Cobb LLP
919 North Market Street, Suite 600
Wilmington, DE  19801

**Hand Delivery**
(Counsel to Post Confirmation Committee of
Unsecured Creditors)
David B. Stratton, Esq.
David M. Fournier, Esq.
Pepper Hamilton LLP
1313 Market Street, Suite 5100
Wilmington, DE  19801

**Hand Delivery**
(Counsel to Official Committee of Equity
Security Holders)
Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, DE  19801

**First Class Mail**
(Counsel to EnerSys, Inc.)
Robert Lapowsky, Esq.
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103-1702

**First Class Mail**
(Counsel to EnerSys, Inc.)
John J. Miravich, Esq.
Stevens & Lee, P.C.
111 North Sixth Street
Reading, PA  19063

**First Class Mail**
(Counsel to the Reorganized Debtor)
Matthew N. Kleiman, Esq.
Matthew N. Kleiman, P.C.
2506 North Clark Street, Suite 307
Chicago, IL  60614

**First Class Mail**
(Counsel to the Reorganized Debtor)
Paul R. Garcia, Esq.
Michelle A. H. Francis, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601

**First Class Mail**
(Counsel to the Reorganized Debtor)
Roger P. Furey, Esq.
Katten Muchin Rosenman LLP
1025 Thomas Jefferson Street, N.W.
East Lobby, Suite 700
Washington, DC 20007-5201

**First Class Mail**
(Counsel to the Reorganized Debtor)
John P. Sieger, Esq.
Matthew A. Olin, Esq.
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693

**First Class Mail**
(Counsel to Prepetition Secured Lenders,
Credit Suisse First Boston)
Douglas P. Bartner, Esq.
Marc B. Hankin, Esq.
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022

**First Class Mail**
(Counsel to Post Petition Secured Lenders,
Citicorp USA, Inc.)
Marcia Landweber Goldstein, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

**First Class Mail**
(Counsel to Post Confirmation Committee of
Unsecured Creditors)
Fred S. Hodara, Esq.
Mary R. Masella, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022

**First Class Mail**
(Counsel to Post Confirmation Committee of
Creditors)
Cheryl A. Falvey, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

**First Class Mail**
(Reorganized Debtor)
Holly Pritchard, Esq.
Barbara Hatcher, Esq.
Exide Technologies
13000 Deerfield Parkway, Building 200
Alpharetta, GA 30004