IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: Exide Technologies, *et al.* | ) | Bankr. Case No. 02-11125 (KJC) |
| | ) | |
| EnerSys Delaware, Inc., | ) | |
| Appellant, | ) | Civil Action No. 06-302 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Exide Technologies | ) | **Related to Docket Nos. 12, 17 and 20** |
| Appellee. | ) | |
| | ) | |

REPLY BRIEF OF APPELLANT
ENERSYS DELAWARE INC. f/k/a ENERSYS, INC.

STEVENS & LEE, P.C.
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Telephone: (302) 425-3304
Facsimile: (302) 654-5181
E-Mail: tgw@stevenslee.com

STEVENS & LEE, P.C.
Robert Lapowsky, Esquire
Neil C. Schur, Esquire
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 575-0100
Telecopier: (215) 851-0214
E-mail: rl@stevenslee.com
      ncsc@stevenslee.com

Dated: October 19, 2006

*ATTORNEYS FOR ENERSYS DELAWARE
INC. f/k/a ENERSYS, INC.*

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT ................................................................................................................. 1

   A. IMPACT OF REJECTION ....................................................................................... 1

      1. Exide's Failure to Address Teleglobe ........................................................... 1

      2. Exide's Policy Argument Lacks Any Merit .................................................... 3

      3. Exide's Negative Inference Argument Lacks Any Merit ................................ 4

      4. The Cases Cited by EnerSys as Supporting the Proposition that Rejection Does Not Automatically Terminate Contracts are Relevant ............................................................ 5

      5. The Trademark License Cases Cited by Exide as Supporting the Proposition that Rejection Automatically Terminates Trademark Agreements Are Not Persuasive ................... 5

      6. The Cases Cited by Exide Outside the Trademark Area in Which Courts Found that Contracts Terminated Upon Rejection Are Either Not Relevant or Support EnerSys ............... 6

      7. The Law Review Article Cited by Exide Stands Alone and Is Not Persuasive ........................... 8

      8. Treating Contracts as Not Automatically Terminated by Rejection Does Not Render Rejection an Illusory Right ........................................................................ 13

      9. Treating Contracts as Not Automatically Terminated by Rejection Does Not Violate Trademark Laws ................................................................................. 14

   B. EXECUTORINESS OF THE AGREEMENTS .......................................................... 14

      1. The Doctrine of Substantial Performance Applies to the Agreements ....................... 14

      2. Section 8 of the Trademark Agreement Does Not Support the Conclusion that the Agreements Remain Executory ......................................................... 16

      3. Section 13.6 of the Asset Purchase Agreement Requires a Determination that the Agreements Are Not Executory ......................................................... 17

      4. Exide Has Failed to Address the Sale/License Issues Raised by EnerSys .................... 17

   C. THE BUSINESS JUDGMENT TEST ....................................................................... 18

      1. Exide Has Failed to Address the Fundamental Evidentiary Defect in the Bankruptcy Court's Conclusion that Exide Satisfied the Business Judgment Test ....................... 18

III. CONCLUSION ............................................................................................................. 20

SL1 674081v2/008444.00325

## TABLE OF AUTHORITIES

CASES

*In re 6177 Realty Assocs., Inc.,*
    142 B.R. 1017 (Bankr. S.D. Fla. 1992) .................................................................................2, 7

*Almena State Bank v. Enfield,*
    954 P.2d 724 (Kan. Ct. App. 1998) ...........................................................................................15

*American Steel & Iron Co., Inc. v. L.B. Foster Co., Inc.,*
    148 Misc. 727 (N.Y. Sup. Ct. 1932) ..........................................................................................15

*Atlantic LB, Inc. v. Vrbicek,*
    905 A.2d 552 (Pa. Super. Ct. 2006) ..........................................................................................15

*In re Ben Franklin Hotel,*
    186 F.2d. 301 (3d Cir. 1999) ......................................................................................................12

*In re Blackstone Potato Chip Co.*
    109 B.R. 557 (Bankr. D.R.I. 1990) ........................................................................................5, 6

*In re Carlton House Restaurant, Inc.,*
    151 B.R. 353 (Bankr. E.D. Pa. 1993) .....................................................................................2, 7

*In re Centura Software,*
    281 B.R. 660 (Bankr. N.D. Cal. 2002) ........................................................................................5

*Chatlos Systems, Inc. v. Kaplan,*
    147 B.R. 96 (D. Del. 1992), *aff'd,* 998 F.2d 1005 (3d Cir. 1993) ..............................................7

*In re Columbia Gas Sys. Inc.,*
    50 F. 3d 233 (3d Cir. 1995) ..........................................................................................................6

*In re Couture,*
    202 B.R. 837 (Bankr. D. Vt. 1996) ..............................................................................................7

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
    267 F.2d 358 (2d Cir. 1959) .......................................................................................................14

*In re Drexel Burnham Lambert Group, Inc.,*
    138 B.R. 687 (Bankr. S.D.N.Y. 1992) ........................................................................................7

*In re Enron Corporation Securities, Derivative & Erisa Litigation,*
    2004 WL 405886 *10 (S.D. Tex. 2004) ..................................................................................3, 4

*In re Flag Telecom Holdings Ltd.,*
    320 B.R. 763 (Bankr. S.D.N.Y. 2005) ......................................................................................10

SL1 674081v2/008444.00325

*Hadden v. Consolidated Edison Co.,*
    34 N.Y. 2d 88, 312 N.E. 2d 445 (1974) ............................................................15, 16

*In re Harborview* Dev. 1986 Ltd. P'ship,
    152 B.R. 897 (D.S.C. 1993)) .........................................................................6, 7

*In re HQ Global Holding,*
    290 B.R. 507 (Bankr. D. Del. 2003) ...................................................................5

*In re Kmart Corp.*
    2003 WL 23147948 (N.D. Ill. 2003) .................................................................12

*Mastercard Int'l Inc. v. Sprint Communications Co.,*
    1994 U.S. Dist. LEXIS 3398 (S.D.N.Y. 1994) .....................................................12

*N.L.R.B. v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) .........................................................................................4

*Oppenheimer & Co, Inc. v. Oppenheim, Appel, Dixon & Co.,*
    86 N.Y.2d 685 (1995) .....................................................................................15

*In re Roberts,*
    91 B.R. 57 (E.D. Mo. 1998) ..............................................................................3

*Sana v. Hawaiian Cruises, Ltd.,*
    181 F.3d 1041 (9th Cir. 1999) ..........................................................................19

*Sheller by Sheller v. Frank's Nursery & Crafts, Inc.,*
    957 F. Supp. 150 (N.D. Ill. 1997) ....................................................................10

*Shoney's, Inc. v. Schoenbaum,*
    686 F. Supp. 554 (D. Va. 1988) .......................................................................12

*In re Teleglobe Communications Corp.,*
    304 B.R. 79 (D. Del. 2004) ...................................................................1, 2, 3, 7

*United States Jaycees v. Philadelphia Jaycees,*
    639 F.2d 134 (3d Cir. 1981) ............................................................................14

STATUTES, RULES & REGULATIONS

11 U.S.C. §365(a) .................................................................................................4

11 U.S.C. §§365(d)(4) ..............................................................................2, 6, 12, 13

11 U.S.C. §365(g) ...............................................................................................11

11 U.S.C. §365(h) ........................................................................................2, 3, 9

11 U.S.C. §365(i) ..................................................................................................9

11 U.S.C. §365(n) ...................................................................................1, 2, 4, 5, 9

SLI 674081v2/008444 00325

11 U.S.C. §502(b)(6) ................................................................................................................10,13

11 U.S.C. §502(b)(7) ...............................................................................................................10, 11

11 U.S.C. §727(a)(1) .......................................................................................................................11

11 U.S.C. §1141(d)(3) .....................................................................................................................12

Federal Rule of Evidence 401 ........................................................................................................19

Federal Rule of Evidence 402 ........................................................................................................19

**OTHER AUTHORITIES**

67A NY Jur. Injunctions § 24 (2003) .............................................................................................12

Restatement 2d, Contracts §266 (1981) .........................................................................................10

5 Williston on Contracts §9:5 .........................................................................................................10

*A Normative Theory of Bankruptcy Law: Bankruptcy As (Is) Civil Procedure*, 61 Wash & Lee L. Rev. 931 (2004) ...............................................................................................................................8

Laura B. Bartell, *Revisiting Rejection: Secured Party Interests in Leases and Executory Contracts*, 103 Dick. L. Rev. 497 (1999)............................................................................................8

*Rejection Versus Termination: A Sublessee's Rights in a Lease Rejected in a Bankruptcy Proceeding Under 11 U.S.C. §365(d)(4)*, 99 Mich. L .Rev. 853 .........................................................8

SL1 674081v2/008444.00325

# I. **INTRODUCTION**

EnerSys Delaware Inc., f/k/a EnerSys, Inc. ("EnerSys") respectfully submits this Reply

Brief in order to respond to certain arguments raised by Exide Technologies in its Brief.

# II. **ARGUMENT**

## A. **IMPACT OF REJECTION**

In its Brief, Exide argues that the Bankruptcy Court correctly determined that rejection of

the Agreements effects their automatic termination. While Exide devotes about ten pages of its

Brief to a defense of the rejection as termination proposition, only two substantive arguments are

advanced, neither of which supports the result Exide seeks. They are:

     (a)    Bankruptcy policy favors rehabilitation of debtors and treating rejection as automatic termination will help rehabilitate Exide; and

     (b)    A negative inference in favor of termination should be drawn from the failure of Congress to include trademark licenses within the protections afforded by Section 365(n) of the Bankruptcy Code.

Exide's Brief also (i) attempts, unsuccessfully, to distinguish cases cited by EnerSys,

(ii) cites to a few cases, which are either poorly reasoned or lack any reasoning at all, which hold

that rejection equates to termination, and (iii) cites to a law review article which, when subjected

to scrutiny, lends no support to Exide's position. However, before addressing the points raised by

Exide in its Brief, it is important to note one glaring omission.

### 1. **Exide's Failure to Address _Teleglobe_**

In its Brief, Exide's fails to cite, let alone try to distinguish, this Court's very recent

opinion in _In re Teleglobe Communications Corp.,_ 304 B.R. 79 (D. Del. 2004). As this Court is

obviously aware, _Teleglobe_ specifically addressed the very same impact of rejection issue

currently in dispute. In _Teleglobe,_ this Court correctly concluded that rejection does not

automatically effect the termination of executory contracts.

Exide's failure to attempt to distinguish _Teleglobe_ is actually not surprising. For a

number of reasons, _Teleglobe_ is not distinguishable and is dispositive.

First, and most importantly, this Court did not indicate in *Teleglobe* that its conclusion concerning the impact of rejection varied, in any way, depending upon the subject matter of the underlying executory contract.

Second, in *Teleglobe,* this Court declined to view rejection as effecting automatic termination notwithstanding that the rejection as automatic termination argument was much stronger in that case than it is in this case. The reason the argument that rejection effects automatic termination was stronger in *Teleglobe* is because *Teleglobe* involved a non-residential real estate lease under which the debtor was the lessee. As a result, Section 365(d)(4) of the Bankruptcy Code applied. Section 365(d)(4) states that, upon rejection of a non-residential real estate lease under which the debtor is the lessee, the debtor/lessee is required to immediately surrender possession. 11 U.S.C. §365(d)(4). The mandatory surrender provision of Section 365(d)(4) has led several Courts to hold that, while rejection does not normally effect automatic termination of contracts, rejection of non-residential real estate leases under which the debtor is the lessee does automatically terminate the underlying contract. *See In re Carlton House Restaurant, Inc.*, 151 B.R. 353 (Bankr. E.D. Pa. 1993); *In re 6177 Realty Assocs., Inc.*, 142 B.R. 1017 (Bankr. S.D. Fla. 1992).

Third, to the extent Exide argues that the provisions of Section 365(n) of the Bankruptcy Code require a negative inference in favor of rejection as termination of trademark licenses, an identical negative inference would have been required in *Teleglobe*. That is because Section 365(h) of the Bankruptcy Code provides post-rejection protections to non-debtor lessees in possession of real estate which are very similar to the post-rejection protections provided to non-debtor licensees of intellectual property under Section 365(n). Just as non-debtor trademark licensees could have been, but were not, specifically protected under Section 365(n), non-debtor landlords could have been, but were not, afforded post-rejection protection under Section 365(h). If Exide's negative inference reasoning is consistently applied, it must follow that, while a lease under which the non-debtor is the lessee is not completely avoided and terminated if rejected

(because the non-debtor lessee is specifically protected by Section 365(h)), a lease under which the non-debtor is the lessor is completely avoided and terminated - - the direct opposite result from that which this Court correctly reached in *Teleglobe*.

### 2. Exide's Policy Argument Lacks Any Merit

Exide's debtor rehabilitation policy argument cannot withstand any level of scrutiny. First, Exide's underlying premise that treating rejection as automatic termination always improves a debtor's rehabilitation prospects is wrong. In fact, one need look no further than *Teleglobe* itself for a fact pattern in which treating rejection as termination would have impeded the debtor's rehabilitation efforts. Certainly, Exide cannot be arguing in favor of a purely results-driven approach which treats rejection as termination only when such treatment benefits the debtor.

Even if no circumstance existed in which treating rejection as automatic termination could ever hurt a debtor's rehabilitation prospects, Exide's argument is fatally flawed in other ways. While it is certainly correct that rehabilitation of debtors is a strong policy underlying the Bankruptcy Code, it is equally correct that the rehabilitation policy is not dispositive of every issue which could possibly arise in a bankruptcy proceeding. Otherwise, Bankruptcy Courts could simply dispense with any distributions to creditors or protections in favor of non-debtor counterparties to contracts since every benefit to a non-debtor, by definition, makes rehabilitation of the debtor more difficult. Clearly, rehabilitation of debtors is not the only policy the Bankruptcy Code seeks to advance. To the contrary, the Bankruptcy Code furthers other policies, including a policy designed to protect the reasonable expectations of non-debtors with interests in property, such as the interests of EnerSys under the Trademark Agreement. *In re Roberts*, 91 B.R. 57, 59 (E.D. Mo. 1998)("Thus, the aim of the Code is not only to afford the debtor a fresh start, but also to protect the interests of debtor's creditors.").

Finally, policy considerations are simply aids in statutory construction and do not provide independent bases to grant relief. *In re Enron Corporation Securities, Derivative & Erisa*

*Litigation*, 2004 WL 405886, *10 (S.D. Tex. 2004)("Policy considerations cannot change the interpretation of Congress's language, but they can contribute to an understanding of that language.").

### 3. Exide's Negative Inference Argument Lacks Any Merit

Exide's negative inference argument boils down to the following sentence in its Brief: "Congress certainly could have included trademark licenses when it moved to protect the rights of licensees, but it elected not to." Exide Brief, p. 17. Exide's argument repeats the mistake of the Bankruptcy Court by skimming the surface of the application of negative inferences to statutory construction and failing to delve any deeper.

As noted in EnerSys' Opening Brief, the fact that something could have been, but was not, included in a particular piece of legislation is the beginning, not the end, of the negative inference inquiry. And, for the reasons stated on pages 18 to 21 of the EnerSys' Opening Brief, once a deeper analysis of Section 365(n) is employed, it is impossible to escape the conclusion that no negative inference which would result in treating trademark licenses as terminated by rejection is justified.

Nor, contrary to Exide's arguments, does the decision of the Supreme Court in *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) support the application of a negative inference to the impact of rejection issue. Since no party to the dispute in *Bildisco* contested the fact that the collective bargaining agreement at issue in that case was an executory contract which was potentially subject to rejection, *id.* at 523, the passage quoted by Exide on page 17 of its Brief is pure *dicta*. Further, *Bildisco* addresses Section 365(a) of the Bankruptcy Code, not Section 365(n). Finally, *Bildisco* does not really involve the application of the doctrine of negative inference. By its express terms, Section 365(a) is of general application and includes within its scope all executory contracts unless they are specifically excluded. Collective bargaining agreements are not specifically excluded from the coverage of Section 365(a), so they

4

are covered. In order to reach that conclusion, all that is needed is a review of the plain language of the statute. In other words, no negative inferences need be drawn.

### 4. The Cases Cited by EnerSys as Supporting the Proposition that Rejection Does Not Automatically Terminate Contracts Are Relevant

On page 12 of its Brief, Exide argues that the cases cited by EnerSys in support of its position that rejection does not automatically terminate contracts are inapposite because they do not involve trademark licenses. The only argument advanced by Exide in support of any distinction between trademark licenses and other executory contracts is the supposed negative inference to be drawn from Section 365(n). Since, for reasons noted in EnerSys' Opening Brief and above, no such negative inference is justified, no distinction can properly be drawn between the cases cited by EnerSys and this case.

### 5. The Trademark License Cases Cited by Exide as Supporting the Proposition that Rejection Automatically Terminates Trademark Agreements Are Not Persuasive

On page 11 of its Brief, Exide represents that _every_ reported decision involving rejection of a trademark license has concluded that the license terminates. In support, Exide cites to a grand total of three cases, all from Bankruptcy Courts: _In re HQ Global Holding_, 290 B.R. 507 (Bankr. D. Del. 2003), _In re Centura Software_, 281 B.R. 660 (Bankr. N.D. Cal. 2002) and _In re Blackstone Potato Chip Co._ 109 B.R. 557 (Bankr. D.R.I. 1990).

For the reasons explained in EnerSys' Opening Brief, Exide's narrow focus on just trademark license cases is indefensible since, with the possible exception of non-residential real estate leases in which the debtor is the lessee, the impact of rejection should not vary based on the nature of the underlying contract. Finally, again for reasons explained in EnerSys' Opening Brief, neither _HQ Global_ nor _Centura_ provides any reasoned analysis which could support the results those courts reached concerning the impact of rejection on trademark agreements. And this Court should take note of the fact that Exide's Brief fails to address any of the points raised in EnerSys' Opening Brief in support of its proposition that neither _HQ Global_ nor _Centura_ was well-reasoned.

5

Exide's reliance on *Blackstone* to support the rejection as termination argument is new. Further, *Blackstone* was not cited by the Bankruptcy Court in support of its conclusion that rejection of the Trademark Agreement caused its termination. The reason Exide did not previously rely on and the Bankruptcy Court did not cite *Blackstone* is obvious from one quick reading. While it does appear that the Court in *Blackstone* treated rejection of a trademark agreement as equivalent to termination, it is clear that the non-debtor party never argued that such treatment was improper. In other words, the issue in dispute here was simply assumed away in *Blackstone*. As a result, *Blackstone* has no precedential value.[1]

### 6. The Cases Cited by Exide Outside the Trademark Area in which Courts Found that Contracts Terminated Upon Rejection Are Either Not Relevant or Support EnerSys

On page 14 of its Brief, Exide provides a string cite to seven cases which post-date the Andrew and Westbrook law review articles cited by EnerSys and which, Exide asserts, support the proposition that rejection terminates contracts. In fact, none of the cited cases provides any such support.

Six of the seven cited cases (all but *In re Harborview Dev. 1986 Ltd. P'ship,* 152 B.R. 897 (D.S.C. 1993)) involved situations in which the debtor was the lessee under a rejected non-residential real estate lease. As noted above, the impact of rejection of such contracts is potentially different from the impact in cases involving any other kind of contract because of the immediate surrender provisions of Section 365(d)(4) of the Bankruptcy Code. A review of the six debtor/lessee cases cited by Exide reveals that all were driven to their conclusions by reason of the unique treatment of nonresidential real estate leases provided under Section 365(d)(4). In fact, two of the debtor/lessee cases cited by Exide specifically held that rejection <u>does not</u> cause termination of executory contracts <u>except</u> in the case of nonresidential real estate leases under

---

[1]    At page 14 of its Brief, Exide asserts that the decision in *In re Columbia Gas Sys. Inc.,* 50 F. 3d 233 (3d Cir. 1995) somehow stands for the proposition that rejection terminates contracts. *Columbia Gas* stands for no such thing. In fact, the Bankruptcy Court in this case recognized that, if anything, *Columbia Gas* stands for the opposite proposition. (ENAR 341, p.38).

which the debtor is the lessee. *In re Carlton House Restaurant, Inc.*, 151 B.R. at 353; *In re 6177 Realty Assocs., Inc.*, 142 B.R. at 1017.

Nor is Exide's argument supported by the decision in *Harborview Dev.*, the one case cited by Exide which did not involve the debtor/lessee fact pattern. In *Harborview Dev.*, the Court found that, while rejection does <u>not</u> always cause termination, the contract in that case (a lease under which the debtor was the lessor) was terminated, but only because the tenant was an insider which, in the Court's view, was attempting to take unfair advantage of the debtor.

The Court should also note that one of the seven cases cited by Exide was *Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96 (D. Del. 1992), *aff'd*, 998 F.2d 1005 (3d Cir. 1993)(table). What makes this citation puzzling is that *Chatlos* was a decision of this Court which was subsequently clarified in *Teleglobe* to make clear that it was not intended to be interpreted as support for the proposition that rejection causes termination of contracts. In fact, *Teleglobe* makes clear that this Court holds the opposite view of that advanced by Exide.

A similar analysis can be applied to another debtor/lessee case cited by Exide, *In re Couture*, 202 B.R. 837 (Bankr. D. Vt. 1996). While the Bankruptcy Court in *Couture* makes passing reference to the Andrew article (apparently with approval), the same Bankruptcy Court engaged in a much more thorough examination of the impact of rejection issue in *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687 (Bankr. S.D.N.Y. 1992), in which it specifically adopted the proposition that rejection does not automatically cause termination.

Finally, this Court should keep in mind that EnerSys does not contend that rejection of an executory contract can never lead to its termination. Clearly, if the debtor rejects a contract, the non-debtor counterparty may very well have the option to terminate the contract under applicable non-bankruptcy law. That is because rejection by the debtor is a breach and, under non-bankruptcy law, non-breaching parties often have the option to terminate contracts. What Exide attempts to achieve in this case is to stand non-bankruptcy law on it head. Exide argues for a

7

result which would allow the breacher, by deciding to reject, to dictate whether or not a contract is terminated. Nothing in the Bankruptcy Code requires such a result.

### 7. The Law Review Article Cited by Exide Stands Alone and Is Not Persuasive

In its Opening Brief, EnerSys asserted that, since the publication of the Andrew and Westbrook law review articles, there had been no academic debate in connection with their central premise, that rejection does not automatically terminate contracts. EnerSys was mistaken. As noted by Exide in its Brief, a full sixteen years after publication of the Andrew and Westbrook articles, one law review article that takes issue with their conclusion has been published.[2] However, the reasoning employed in that article is unpersuasive.

The article cited by Exide is Laura B. Bartell, *Revisiting Rejection: Secured Party Interests in Leases and Executory Contracts*, 103 Dick. L. Rev. 497 (1999). Before addressing the reasoning employed by Professor Bartell, it is interesting to note that she characterizes the Andrew and Westbrook articles as "seminal" and concedes: "Their analysis has proven convincing to many courts." *Id.* at 500.

---

[2]    While the Bartell article stands alone in its criticism of Andrew and Westbrook, EnerSys' research has disclosed two law review articles, not cited in EnerSys' Opening Brief, which must be added to the list in footnote 4 to the EnerSys Opening Brief of academic studies which support Andrew and Westbrook. *See Rejection Versus Termination: A Sublessee's Rights in a Lease Rejected in a Bankruptcy Proceeding Under 11 U.S.C. §365(d)(4)*, 99 Mich. L .Rev. 853; *A Normative Theory of Bankruptcy Law: Bankruptcy As (Is) Civil Procedure*, 61 Wash & Lee L. Rev. 931 (2004). Also, Exide's statement at page 14 of its Brief that, "Even Andrew and Westbrook disagreed on many issues involved in their academic debate." could hardly be more misleading. While Andrew and Westbrook did, indeed, disagree on some issues, they had absolutely no disagreement when it came to the impact of rejection, the only issue in this case. Both believe that rejection does not automatically terminate contracts.

8

Professor Bartell begins her substantive analysis by acknowledging that, when a contract deals with an underlying piece of property owned by a debtor, the non-debtor obtains a property interest consisting of a subset of the debtor's rights in the property. *Id.* at 507. Her conclusion that rejection automatically terminates that property interest seems to be driven, primarily, by the following considerations:

(a)    Rejection should be analogized to non-bankruptcy doctrine of impossibility of performance and to rights granted to minors to disaffirm contracts upon achieving majority;

(b)    Negative inferences should be drawn from Sections 365(h), (i) and (n);

(c)    The fact that Sections 502(b)(6) and (b)(7) cap damages related to termination of employment contracts and leases and both apply to claims under rejected contracts;

(d)    The fresh start policy underlying the Bankruptcy Code; and

(e)    The equality of distribution policy underlying the Bankruptcy Code.

Conspicuously absent from Professor Bartell's analysis (but center stage in the Andrew and Westbrook articles) is any consideration of the historic underpinnings of rejection of contracts in bankruptcy proceedings. For the reasons discussed in EnerSys' Opening Brief, any review of those historical underpinnings leads easily to the conclusion that rejection was never intended as a vehicle to deprive non-debtors of interests in property. Professor Bartell's failure to reconcile such history with her view of the impact of rejection renders her entire analysis unreliable. Further, even if one were to assume that the historic treatment of executory contracts in bankruptcy is irrelevant, Professor Bartell's analysis is seriously lacking.

Professor Bartell's fresh start and negative inference justifications were previously advanced by Exide. For the reasons stated above and in EnerSys' Opening Brief, no negative inferences can be drawn from Section 365(n) or any of the other special purpose subsections (*i.e.*, Sections 365(h) and (i)) which would justify a finding that any contracts not specifically mentioned in those sections are terminated by rejection. Further, for the reasons stated above, the

9

fresh start policy underlying the Bankruptcy Code falls far short of providing support for the rejection as termination doctrine.

Professor Bartell's argument that rejection should be analogized to, and yield the same results as would obtain upon, non-bankruptcy disaffirmance of a contract by a minor or upon performance of a contract becoming impossible, is bewildering. The obvious question is: why are any such analogies required or appropriate? In the case of disaffirmance of contracts by minors, there is a policy, completely missing from the rejection scenario, that seeks to protect minors from the possibility of harm through over-reaching by others. *See* 5 Williston on Contracts §9:5; *Sheller by Sheller v. Frank's Nursery & Crafts, Inc.*, 957 F. Supp. 150 (N.D. Ill. 1997). Similarly, in the case of impossibility of performance, there is a policy that seeks to relieve contract parties from obligations which, through no fault of their own and due to unforeseeable circumstances, have become impossible to perform. *See* Restatement 2d, *Contracts* §266 (1981); *In re Flag Telecom Holdings Ltd.*, 320 B.R. 763, 771 (Bankr. S.D.N.Y. 2005). The insolvency of a party to a contract is hardly unforeseeable and, in any event, many, if not most, rejected contracts are not impossible for the debtor to perform. This case provides a perfect example: it would not only be possible for Exide to perform the Trademark Agreement, it would be virtually costless. Also, as noted by Professor Bartell, in the case of impossibility of performance, the courts attempt to restore the parties to the *status quo ante. Id.* at 520. However, to the extent rejection were construed to deprive non-debtor counterparties to rejected contracts of interests in property, the Bankruptcy Code makes no attempt to restore the *status quo ante.* Rather, if rejection causes automatic termination, the Bankruptcy Code would limit the non-debtor counterparty to an unsecured claim, invariably paid at a small percentage on the dollar.

Professor Bartell's reliance on the provisions of Sections 502(b)(6) & (7) is also misplaced. Professor Bartell appears to believe that because the claim limitations imposed under Sections 502(b)(6) & (7) have been applied to damages incurred by non-debtor landlords and employees upon rejection, and since both sections speak to "termination," rejection must result in

10

termination. What Professor Bartell fails to take into account is that rejection is a breach by the debtor. *See* 11 U.S.C. §365(g). As a result, as noted above, the non-debtor counterparty to the breached lease or employment contract obviously has the right to terminate after rejection and has a right to damages as a result of that termination even if rejection does not automatically cause termination.

Nor can Professor Bartell's equality of distribution policy argument withstand analysis. The primary thrust of this argument is that, unless the non-debtor counterparty's interests in property conveyed by the debtor under a rejected contract are eliminated, the non-debtor will receive full compensation for its claims, which result would violate the equality of distribution policy. *Id.* at 542-43.[3] Initially, it is important to note the circular nature of this argument. The "claim" about which Professor Bartell is apparently concerned is that which the non-debtor counterparty to the rejected contract would have IF the interest in property in question is deemed to terminate upon rejection. But that pre-supposes that such interest in property is terminated by rejection, the very issue which she is trying to resolve. Clearly, if the interest in property held by the non-debtor counterparty to a rejected contract is not terminated upon rejection, no "claim" ever comes into existence which could be preferred over other similarly situated claims.

Putting aside the pre-textual nature of the equality of distribution justification advanced by Professor Bartell, it is also important to note that the argument seems to be based, at least to some extent, on her inability to reconcile the possibility that: (a) a non-debtor counterparty to a rejected contract might retain rights; with (b) the fact that the debtor would receive a discharge. At least two points are worth making regarding this aspect of the equality of distribution argument.

First, not every debtor receives a discharge. For example, in a proceeding under Chapter 7 of the Bankruptcy Code, only an individual receives a discharge. *See* 11 U.S.C. §727(a)(1). Also, in Chapter 11, a liquidating debtor who is not an individual does not receive a discharge.

11

*See* 11 U.S.C. §1141(d)(3). In other words, many debtors pass through the bankruptcy system and reject contracts but do not receive discharges.

Second, equitable remedies, such as injunctions, are not discharged if monetary damages are not a viable alternative. *See In re Ben Franklin Hotel*, 186 F.2d. 301 (3d Cir. 1999)(holding that equitable remedy of reinstatement of partnership interest in debtor not discharged by confirmed plan because money damages not viable alternative). In this case, money damages would clearly not be an adequate alternative remedy if Exide sought to use the "Exide" mark in the industrial battery business. As a result, under New York law, EnerSys would be entitled to injunctive relief, which entitlement would not be discharged. 67A NY Jur. Injunctions § 24 (2003); *see also Mastercard Int'l Inc. v. Sprint Communications Co.*, 1994 U.S. Dist. LEXIS 3398 (S.D.N.Y. 1994) (holding exclusive licensee had right to enjoin third party from using mark under Lanham Act, 15 U.S.C. §1125 where use by third party likely to cause confusion in marketplace); *Shoney's, Inc. v. Schoenbaum*, 686 F. Supp. 554, 568 (D. Va. 1988) (granting licensee an injunction against licensor to enjoin licensor from issuing a license to a third party in violation of licensor's exclusive licensing agreement with licensee).

In the seven years since publication of Professor Bartell's article, it has been cited in only one reported decision, *In re Kmart Corp.* 2003 WL 23147948 (N.D. Ill. 2003). And, even there, the Court did not adopt Professor Bartell's approach. Rather, the Court cited Professor Bartell's article in the context of a general survey of the law and then held that, if the debtor is the lessee under a rejected lease of non-residential real property, the mandatory surrender provisions of Section 365(d)(4) require the conclusion that the lease terminates. As noted above, the mandatory surrender provisions of Section 365(d)(4) render unique the post-rejection rights of parties to non-residential real property leases under which the debtor is the lessee.

---

[3]    Exide makes this argument on page 19 of its Brief.

### 8. Treating Contracts as Not Automatically Terminated by Rejection Does Not Render Rejection an Illusory Right

At various points in its Brief, Exide complains that if rejection does not terminate contracts, the right to reject contracts will be illusory. To the contrary, treating rejection as the power to breach and to relegate monetary claims for damage to pre-petition unsecured status will often benefit the debtor. For example, in the classic example of an above-market rate lease, rejection will allow the debtor to breach, cap the landlord's damage claim, and relegate the capped claim to unsecured status. *See* 11 U.S.C. §§365(d)(4) and 502(b)(6).

What Exide is really complaining of is the fact that in this particular case, rejection will not benefit Exide. But, just as was the case with Professor Bartell, Exide engages in circular reasoning. The mere fact that a proper interpretation of the impact of rejection leaves Exide with less than it had hoped for is not evidence that such interpretation is wrong.

Nor does this case involve the kinds of "obligations" debtors are normally permitted to avoid by rejecting contracts. The only real "obligation" which Exide seeks to avoid going forward is the obligation to refrain from using the "Exide" mark on industrial batteries. That is quite different than the future affirmative duties to pay money normally sought to be avoided by a debtor by rejecting a contract.

Finally, this Court should not allow itself to be influenced by Exide's misleading attempts to cast itself as the wronged party. On page 7 of its Brief, Exide laments that it is "in the unenviable position of competing against a company that had the right to use Exide's own name" and that EnerSys has been receiving a windfall by virtue of the fact that Exide engages in advertising. Reading those passages from Exide's Brief, one would think that EnerSys had obtained its rights in the "Exide" mark through some subterfuge or nefarious act. Of course, nothing could be further from the truth. Exide was fully paid (over $130.0 million) in 1991 in return for, among other things, exactly what it now complains of.

13

Not only is Exide not the wronged party in this case, in the event it is permitted to prevail, it will have achieved an absolute windfall and EnerSys will have suffered an enormous forfeiture.

### 9. Treating Contracts as Not Automatically Terminated by Rejection Does Not Violate Trademark Laws

At page 18 of its Brief, Exide advances the argument that continued use of the "Exide" mark by EnerSys after rejection would constitute "an illegal act of trademark infringement" and would jeopardize Exide's rights in the mark since EnerSys would be operating without a "proper trademark license." In support of its assertions, Exide cites to *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3d Cir. 1981) and *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959).

Neither *United States Jaycees* nor *Dawn Donut* involved a bankruptcy case, let alone a bankruptcy case in which the interplay between rejection of a trademark agreement and trademark law was analyzed. Further, Exide's argument is, once again, circular. EnerSys does not dispute that use of a trademark without a license could constitute trademark infringement. However, as discussed at length above, it is EnerSys' position that rejection does not terminate contracts and, as a result, even after rejection, EnerSys would still have a viable license to use the "Exide" mark. The circular nature of Exide's trademark infringement argument renders it irrelevant.

### B. EXECUTORINESS OF THE AGREEMENTS

#### 1. The Doctrine of Substantial Performance Applies to the Agreements

In its Opening Brief, EnerSys argued that one of the ways the Bankruptcy Court erred in determining that the Agreements were executory was by failing to properly engage in the substantial performance analysis required under New York law. According to controlling New York law, the substantial performance doctrine requires a qualitative comparison of performance rendered versus performance due, and precludes a conclusion that any remaining obligation could

14

give rise to a material breach if the contract has already been substantially performed. *Hadden v. Consolidated Edison Co.*, 34 N.Y. 2d 88, 312 N.E. 2d 445 (1974). EnerSys concluded its argument on this issue by identifying the enormous amount of performance which has been rendered under the Agreements since 1991, comparing the performance rendered since 1991 with the remaining obligations, and urging a conclusion that the Agreements have long since been substantially performed and, so, cannot remain executory.

In its Brief, Exide does not dispute that the Bankruptcy Court failed to engage in a qualitative comparison of performance rendered versus performance due in order to determine whether the Agreements have been substantially performed. Exide Brief, p. 22. Rather, Exide argues that no such analysis is required because the substantial performance test is irrelevant. *Id.* According to Exide, the substantial performance analysis is only required in connection with construction and employment contracts. *Id.*

While the "substantial performance" analysis is often applied in construction and employment cases, Exide fails to cite a single case that holds, or even suggests, that such analysis is limited to those two types of contracts. In fact, no such authority exists. Further, contrary to Exide's claim, New York courts (and courts from other jurisdictions) have applied the substantial performance analysis to many types of contractual disputes outside of the construction and employment arena. *See American Steel & Iron Co., Inc. v. L.B. Foster Co., Inc.*, 148 Misc. 727 (N.Y. Sup. Ct. 1932)(applying substantial performance doctrine to contract for sale of rails); *Atlantic LB, Inc. v. Vrbicek*, 905 A.2d 552 (Pa. Super. Ct. 2006) (applying substantial performance analysis in landlord-tenant dispute); *Almena State Bank v. Enfield*, 954 P.2d 724 (Kan. Ct. App. 1998) (applying substantial performance analysis in loan/ mortgage action); *see also Oppenheimer & Co, Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685 (1995)(discussing but declining to apply substantial performance doctrine in landlord/tenant dispute because substantial performance not applicable to conditions precedent, not because substantial performance not applicable to leases).

15

Importantly, Exide does not even attempt to explain why limiting the doctrine of substantial performance to employment and construction contracts makes any sense. No such explanation is apparent. To the contrary, there does not appear to be anything so unique about construction or employment contracts that a special substantial performance doctrine, inapplicable to all other contracts, would be needed.[4]

## 2. Section 8 of the Trademark Agreement Does Not Support the Conclusion that the Agreements Remain Executory

Starting on page 23 of its Brief, Exide again presses its argument that Section 8 of the Trademark Agreement is a "self-identifying materiality provision" which requires that the entire integrated Agreement be deemed executory. As discussed in EnerSys' Opening Brief, Section 8 of the Trademark Agreement allows Exide to terminate only the Trademark Agreement in the event EnerSys were to fail to comply with the use restriction or quality control provisions of that agreement. (ENAR 210). In other words, Section 8 of the Trademark Agreement does not permit Exide to terminate any of the other agreements integrated with the Trademark Agreement even if EnerSys were to fail to comply with the use restriction or quality control provisions of the Trademark Agreement.

Exide's Section 8 argument might make sense if: (a) the Trademark Agreement were a stand-alone contract, or (b) Section 8 of the Trademark Agreement allowed Exide to terminate all of the integrated Agreements. But neither of those predicates is true. As a result, not only is Section 8 not a self-identifying materiality provision as relates to all of the integrated Agreements

---

[4]     The Court should not be confused by Exide's statements, at page 20 of its Brief, that "For the reason the obligations are ongoing, they cannot be substantially performed", and at page 21 of its Brief, that "Moreover, in this case, the Integrated Agreement contains numerous other mutual ongoing obligations each of which is incapable of being substantially performed during the life of the contract." Both passages attempt to blur the distinction between a micro analysis of one of many obligations under a single agreement, on the one hand, and a true substantial performance analysis, on the other hand. While, if focus is limited to a single obligation under an integrated agreement, one might conclude that the particular obligation in question has not yet been substantially performed, the substantial performance analysis required under New York law is a macro approach which focuses on the contract as a whole and compares total performance

16

but, rather, for the reasons stated at pages 31 to 33 of EnerSys' Opening Brief, the presence of Section 8 in the Trademark Agreement actually precludes any conclusion that the integrated Agreements are executory.

### 3. Section 13.6 of the Asset Purchase Agreement Requires a Determination that the Agreements Are Not Executory

In its Opening Brief, EnerSys pointed out that Section 13.6 of the Asset Purchase Agreement is an exclusive remedy provision which precludes any finding that breach by either Exide or EnerSys of any remaining obligation would entitle the non-breaching party to terminate all of its performance. In response, Exide notes that Section 13.6 allows either party to seek specific performance and other equitable relief in the event the other party fails to perform an obligation for which money damages would not be sufficient. However, Exide does not enlighten the Court or EnerSys as to why such entitlement is relevant to the question before the Court. The language cited by Exide does not alter the fact that Section 13.6 is an exclusive remedy section, and nothing in Section 13.6 provides either EnerSys or Exide with the right to a wholesale termination of the Agreements upon breach by the other of a post-closing obligation, the only real question when applying the *Countryman* materiality standard.

The only other substantive argument raised by Exide relating to Section 13.6 is that it is trumped by Section 8 of the Trademark Agreement. However, for the reasons stated above and in EnerSys' Opening Brief, Section 8 applies only to the Trademark Agreement, is not a "self-identifying materiality provision", and does not undercut the restrictions on remedies the parties agreed to incorporate in Section 13.6 of the Asset Purchase Agreement.

### 4. Exide Has Failed to Address the Sale/License Issues Raised by EnerSys

In its Opening Brief, EnerSys asserted that, when interpreting a contract, courts look to substance over form. EnerSys then went on to analyze the substantive rights granted to EnerSys under the Trademark Agreement before advancing its conclusion that, notwithstanding the labels

rendered with total performance remaining. *Hadden v. Consolidated Edison Co.*, 34 N.Y. 2d at

17

used by the parties, EnerSys purchased ownership of the "Exide" mark for use in the industrial battery business.

In its Brief, Exide does not contest the applicability of the substance over form rule of contract interpretation. Rather, at page 33 of its Brief, Exide contends that the Agreements satisfy the rule. However, the only bases advanced by Exide in support of its conclusion are that: (a) the Agreements say that the "Exide" mark is licensed to EnerSys, and (b) the Agreements say that other marks were assigned. In other words, Exide focuses solely on the form of the Agreements and fails to engage in any analysis of the substantive rights granted under Trademark Agreement.

## C. THE BUSINESS JUDGMENT TEST

### 1. Exide Has Failed to Address the Fundamental Evidentiary Defect in the Bankruptcy Court's Conclusion that Exide Satisfied the Business Judgment Test

Despite devoting 11 pages of its 46-page Brief to the business judgment test, Exide offers no true substantive response to the most glaring flaw in the Bankruptcy Court's conclusion that the test was satisfied. Specifically, Exide refuses to apply the applicable law to the relevant facts and, as a result, fails to justify the Bankruptcy Court's improper admission of inadmissible hearsay documents (DAAR 215-17) and related testimony. Despite Exide's loud protestations to the contrary, the ruling was necessarily based, in large part, on those documents and the related testimony. Exide knew, of course, that it needed an objective, quantified component to its benefit analysis, which is precisely why it created these eleventh hour documents just weeks before the hearing. Nonetheless, rather than addressing the dispositive and binding authorities cited by EnerSys which require the documents' exclusion, Exide engages in sleight of hand, citing non-binding Ninth Circuit authority (that is, in any event, distinguishable) and ultimately claiming the error was harmless. Exide Brief, pp. 40-44. Exide is mistaken.

Absent DAAR 215-17 and related testimony, the record is entirely devoid of evidence of any quantification of the claimed benefit from rejection and likewise lacking any real analysis –

---

88.

18

other than Exide's conclusory "say-so" – that rejection would result in a benefit to Exide. In ruling on rejection motions, a Bankruptcy Court must require a debtor to do something more than conclusorily claim a benefit. Unless it wants to be a "rubber stamp," a Bankruptcy Court must demand that a debtor objectively assess and quantify that claimed benefit, and as part of that analysis, consider the likely exposure from anticipated rejection damage claims. Such quantification is especially paramount in a case such as this one, where Exide has notice of a substantial damages claim by EnerSys of approximately $67 million (ENAR 202 pp. 58-108; ENAR 216). In short, even if this Court does not hold that quantification is required in all cases, it becomes essential when (as here) a substantial rejection damages claim (of more that $10 million) is likely or certain. At least in those cases, the business judgment test has not been satisfied without some admissible quantification of the claimed benefit.

As set forth in detail in EnerSys' Opening Brief at 48-51, the Bankruptcy Court's admission of DAAR 215-17 was error because those documents were not kept in the regular course of Exide's business but, rather, were created expressly for this litigation and are therefore not covered by the business records exception. Other than citing one distinguishable case[5] (that does not eliminate this rule of law or make it somehow inapplicable) and arguing the error was harmless, Exide never really addresses this argument. That silence speaks volumes: even Exide knows the admission of DAAR 215-17 was contrary to the binding authorities cited by EnerSys.

Moreover, DAAR 215-17, as redacted, are not relevant. Fed. R. Evid. 401 and 402. Exide' argument that the redactions go to weight, not admissibility, Exide Brief, p. 44, is misplaced. At some point, of course, redactions are so pervasive that they render the document

---

[5]    Having apparently scoured the nation, Exide cites one opinion admitting a document created in anticipation of litigation under the business records exception. *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999). *Sana*, however, is patently distinguishable. There, plaintiff sought to introduce a report created by defendant's insurance carrier, which had no incentive to gather evidence of plaintiff's illness. *Id.* Here, of course, Exide sought to introduce documents it itself created and Exide (unlike the carrier in *Sana*) obviously had every incentive to try to establish benefit. As the *Sana* Court itself noted: "Courts are rightfully wary when parties create self-serving documents and seek to offer them as business records." *Id.*

19

meaningless and unhelpful to the trier of fact. The redactions to DAAR 215-17 have crossed that line. Exide's argument misses the point, in any event. Even if the documents are weighted at zero, the record still does not contain any evidence of quantification, and reveals only a capricious, largely non-existent process in which Exide exercised no business judgment at all. *See* EnerSys' Opening Brief at 55-57.

## III. CONCLUSION

For all the foregoing reasons, Appellant EnerSys respectfully requests that this Court (a) find that rejection of the Agreements would not effect a termination of the Agreements and would not terminate EnerSys' exclusive right to use the Marks, including the "Exide" Mark, under the terms of the Trademark Agreement, and reverse the Bankruptcy Court Orders to the extent they hold to the contrary, (b) reverse the Bankruptcy Court Orders and render judgment in favor of EnerSys for all of the foregoing reasons, denying Exide's request to reject the Agreements, and (c) for such other and further relief, at law and equity, to which Appellant EnerSys may be justly entitled.

Dated: October 19, 2006

Respectfully submitted,

STEVENS & LEE, P. C.

/s/

Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3304
Telecopier: (610) 371-8512
E-mail: tgw@stevenslee.com

- and –

Robert Lapowsky, Esquire
Neil C. Schur, Esquire
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 575-0100
Telecopier: (215) 851-0214
Email: rl@stevenslee.com
ncsc@stevenslee.com

*Attorneys for EnerSys Delaware, Inc.*
*f/k/a EnerSys, Inc.*

20

## CERTIFICATE OF SERVICE

I, Thomas G. Whalen, Jr., hereby certify that on October 19, 2006, a true and correct copy of the foregoing Reply Brief of Appellant EnerSys Delaware, Inc. f/k/a EnerSys, Inc. was served on counsel for Appellee and other interested parties as follows:

*Via Hand Delivery*
James E. O'Neill, Esquire
Pachulski, Stang, Ziehl, Young,
      Jones & Weintraub, P.C.
919 North Market Street, Suite 1600
Wilmington, DE 19801

*Via Regular Mail*
Mark Kenney, Esquire
U.S. Trustee's Office
844 King Street, Room 2313
Lockbox 35
Wilmington, DE 19801

*Via Regular Mail*
Fred Hodara, Esquire
Mary R. Masella, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY 10022

*Via Hand Delivery*
David B. Stratton, Esquire
Pepper Hamilton LLP
1201 Market Street, Suite 1600
P.O. Box 1709
Wilmington, DE 19899-1709

*Via Federal Express*
Matthew N. Kleiman, Esquire
Matthew N. Kleiman, P.C.
2506 North Clark Street, Suite 307
Chicago, IL 60614

*Via Federal Express*
Roger P. Furey, Esquire
Intellectual Property Law Department
Katten Muchin Zavis Rosenman
1025 Thomas Jefferson Street, N.W.
Washington, D.C. 20007-5201

*Via Regular Mail*
Paul Garcia, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

/s/
_____
THOMAS G. WHALEN, JR.